## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES, | ) ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Case No. 23-9509 |
| U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, U.S. EPA, | ) ) ) ) | |
| Respondents. | ) ) | |

## THE STATE OF UTAH'S MOTION TO STAY THE FINAL RULE OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

Emily C. Schilling
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Ph. 801-799-5753
ecschilling@hollandhart.com

Kristina (Tina) R. Van Bockern
Aaron B. Tucker
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8107
trvanbockern@hollandhart.com
abtucker@hollandhart.com

Sean D. Reyes
ATTORNEY GENERAL OF UTAH
Melissa A. Holyoak
SOLICITOR GENERAL
*Counsel of Record*
Office of the Attorney General
Utah State Capitol Complex
350 North State Street Suite 230
Salt Lake City, UT 84114-2320
Ph. 801-538-9600
melissaholyoak@agutah.gov

William L. Wehrum
WEHRUM ENVIRONMENTAL LAW
LLC
1629 K Street, NW, Suite 300
Washington, D.C. 20006
Ph. 302-300-0388
William_Wehrum@comcast.net
*Attorneys for Petitioner State of Utah*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

GLOSSARY OF TERMS ................................................................. vii

LIST OF ATTACHMENTS .............................................................. viii

INTRODUCTION ............................................................................ 1

STATEMENT OF THE CASE .......................................................... 2

I.     Statutory Framework ................................................................. 2

     A.    Cooperative Federalism and the State's Role ......................... 2

     B.    The Interstate Transport Provision and the Ozone
            NAAQS .......................................................................... 4

II.    Procedural Background ............................................................. 6

     A.    Utah's Interstate Transport SIP Submissions ....................... 6

     B.    EPA's Proposed FIP ....................................................... 8

     C.    EPA's Proposed SIP Disapproval ..................................... 9

     D.    EPA's Final Disapproval of Utah's SIP ............................. 11

     E.    Pending Petition for Reconsideration and Stay ................... 11

ARGUMENT ................................................................................ 11

I.     Utah is Likely to Prevail on the Merits ..................................... 12

     A.    EPA Exceeded its Authority and Acted Arbitrarily in
            Disapproving Utah's SIP. ............................................... 12

     B.    EPA's Rejection of Utah's Weight-of-Evidence
            Approach was Arbitrary and Capricious. ........................... 18

II.    Utah Will Suffer Irreparable Injury Absent a Stay ...................... 21

A.    EPA's Final Rule Impermissibly Harms Utah's Sovereign Interests. ............................................... 21

B.    EPA's Final Rule Results in Immediate, Irreparable Harm to Utah and its Citizens. ............................. 23

    1.    Harms to Utah's Division of Air Quality. .................... 23

    2.    Harms to Regulated Sources. ...................................... 23

    3.    Harms to Utah Citizens as Power Consumers and Ratepayers. ................................................................. 24

III.    The Balance of Harms and the Public Interest Favor a Stay. ....... 26

CONCLUSION ......................................................... 28

CERTIFICATE OF COMPLIANCE ...................................... 30

CERTIFICATE OF SERVICE ........................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) ................................................................. 16

*Chamber of Commerce v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) .................................................. 24

*Crowe & Dunlevy, P.C. v. Stidham*,
640 F.3d 1140 (10th Cir. 2011) ................................................. 24

*Dominion Transmission, Inc. v. Summers*,
723 F.3d 238 (D.C. Cir. 2013) ................................................... 28

*EME Homer City Generation, L.P. v. EPA*,
696 F.3d 7 (2012) ....................................................................... 22

*EME Homer City Generation, L.P. v. EPA*,
795 F.3d 118 (D.C. Cir. 2015) ................................................... 14

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ................................................................... 21

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014) ..................................................................... 4

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ................................................................... 17

*Kansas v. SourceAmerica*,
874 F.3d 1226 (10th Cir. 2017) ................................................. 24

*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001) ................................................. 21

*Luminant Generation Co. LLC v. EPA*,
675 F.3d 917 (5th Cir. 2012) ............................................... 3, 17

*Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000) ........................................................... 5, 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................. 14

*North Dakota v. EPA*,
    730 F.3d 750 (8th Cir. 2013) ........................................................... 15, 16

*Oklahoma v. EPA*,
    723 F.3d 1201 (10th Cir. 2013) ................................................... 3, 12, 13

*Qwest Communs. Int'l, Inc. v. FCC*,
    398 F.3d 1222 (10th Cir. 2005) ........................................................... 14

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ........................................................... 3, 14

*Train v. NRDC*,
    421 U.S. 60 (1975) ................................................................... 3, 15, 17

*Tri-State Generation & Transmission Ass'n v. Shoshone River
    Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ............................................................. 28

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976) ........................................................................... 3, 14

*US Magnesium, LLC v. EPA*,
    690 F.3d 1157 (10th Cir. 2012) ............................................................. 2

*Virginia v. EPA*,
    108 F.3d 1397 (D.C. Cir. 1997) ........................................................... 15

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ......................................................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................. 11

## Statutes

5 U.S.C. § 705 ....................................................................................... 1

42 U.S.C. § 7408.................................................................................... 2

42 U.S.C. § 7409.................................................................................... 2

42 U.S.C. § 7410............................................................................. 3, 4, 14

42 U.S.C. § 7410(a)(1)......................................................................... 2, 3

42 U.S.C. § 7410(a)(2)............................................................................ 17

42 U.S.C. § 7410(a)(2)(D)(i) ................................................................ 1, 4

42 U.S.C. § 7410(a)(2)(D)(i)(I) ............................................................ 5, 6

42 U.S.C. § 7410(c)(1) ............................................................................. 4

42 U.S.C. § 7410(c)(1)(B) ...................................................................... 22

42 U.S.C. § 7410(k)(3)............................................................. 3, 10, 12, 14

## Federal Register

63 Fed. Reg. 57,356 (Oct. 27, 1998) ...................................................... 5

70 Fed. Reg. 25,162 (May 12, 2005) ....................................................... 5

76 Fed. Reg. 48,208 (Aug. 8, 2011) ........................................................ 5

80 Fed. Reg. 65,292 (Oct. 26, 2015) ....................................................... 5

81 Fed. Reg. 15,200 (March 22, 2016) ....................................... 18, 19, 20

81 Fed. Reg. 31,513 (May 19, 2016) ...................................................... 19

81 Fed. Reg. 74,504 (Oct. 26, 2016) ........................................................ 7

84 Fed. Reg. 66,612 (Dec. 5, 2019) ......................................................... 7

87 Fed. Reg. 20,036 (April 6, 2022)................................................. 8, 9, 26

87 Fed. Reg. 31,470 (May 24, 2022) ...................................................... 9, 20

88 Fed. Reg. 9,336 (Feb. 13, 2023) .................................................. *passim*

## Rules

10th Cir. R. 8.1 ........................................................................................ 11

10th Cir. R. 18 ........................................................................................... 1

10th Cir. R. 18.1 ..................................................................................... 11

10th Cir. R. 27.1 ....................................................................................... 2

Fed. R. App. P. 18(a)(2) ........................................................................... 1

Fed. R. App. P. 18(a)(2)(A) .................................................................... 11

Fed. R. App. P. 25(c) ............................................................................. 30

Fed. R. App. P. 27(d)(1)-(2) ................................................................... 30

Fed. R. App. P. 27(d)(1)(E) .................................................................... 30

Fed. R. App. P. 32(f) ............................................................................... 30

## Other Authorities

*Downwinders at Risk v. Regan*,
    No. 4:21-cv-3551-DMR, Dkt. 33, Joint Notice of Second
    Stipulated Extension of Consent Decree Deadlines (N.D. Cal.
    Jan. 30, 2023) .................................................................................... 27

Office of Management and Budget, Final Rule Pending EO 12866
    Regulatory Review,
    https://www.reginfo.gov/public/do/eoDetails?rrid=298164 .................. 9

# GLOSSARY OF TERMS

| | |
|---|---|
| Act or CAA | Clean Air Act |
| APA | Administrative Procedure Act |
| EGU | Electricity generating units |
| EPA | U.S. Environmental Protection Agency |
| Final Rule | *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336 (February 13, 2023) |
| FIP | Federal Implementation Plan |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | Nitrogen oxide |
| Ozone Transport Provision | Section 110(a)(1) of the CAA; 42 U.S.C. § 7410(a)(1) |
| Proposed Rule | *Air Plan Disapproval; Utah; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 31,470 (May 24, 2022) |
| Proposed Transport FIP | *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20,036 (April 6, 2022) |
| SIP | State Implementation Plan |
| UDAQ | Utah's Division of Air Quality |
| VOC | Volatile Organic Compounds |

## LIST OF ATTACHMENTS

| Number | Title |
|--------|-------|
| 1 | Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9,336 (February 13, 2023) ("Final Rule") |
| 2 | Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 Memorandum") |
| 3 | Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018 ("August 2018 Memorandum") |
| 4 | Declaration of Bryce Bird, Director of the Utah Division of Air Quality |
| 5 | Utah's 2015 State Implementation Plan Infrastructure Elements for Ozone (January 24, 2020) |
| 6 | Utah's Comments on the Proposed Rule, EPA-R08-OAR-2022-0315- 0011 |
| 7 | Utah's Petition for Reconsideration and Stay (January 24, 2023) |
| 8 | Declaration of Chris Parker, Director of the Utah Division of Public Utilities |
| 9 | Declaration of Thad LeVar, Chair of the Utah Public Service Commission |

## INTRODUCTION

The State of Utah moves under Federal Rule of Appellate Procedure 18(a)(2), Tenth Circuit Rule 18, and Administrative Procedure Act ("APA"), 5 U.S.C. § 705, for a stay of the Environmental Protection Agency's ("EPA") unlawful and arbitrary and capricious final rule that disapproves of Utah's State Implementation Plan ("SIP") developed to satisfy the Clean Air Act's ("CAA" or "Act") "Interstate Transport Provision," 42 U.S.C. § 7410(a)(2)(D)(i).  88 Fed. Reg. 9,336 (Feb. 13, 2023) ("Final Rule"), Att. 1.

Utah, in close coordination with EPA, determined that Utah's in-state emissions do not significantly contribute to nonattainment or interfere with the maintenance of the 2015 ozone National Ambient Air Quality Standard ("NAAQS") in any downwind states.  Utah's determination met all requirements of the Act, and EPA was obligated by law to approve it.  Instead, EPA exceeded its statutory authority and committed substantial legal errors by rejecting the determination based on standards untethered to the CAA.

Meanwhile, if the Final Rule remains in effect, the state, as well as the regulated power plants within Utah, will be required to comply

1

with a subsequent federal emissions controls program that EPA has no authority to impose. These imminent costs of compliance will be borne by Utah's citizens through increased electric bills and will raise the prospect that power plants will be shuttered, severely compromising the reliability of Utah's power supply. A stay of EPA's disapproval of Utah's SIP pending judicial review and an extension of its effective date by the number of days between publication of the Final Rule and a final decision in this appeal is, therefore, justified. EPA opposes the relief requested. 10th Cir. R. 27.1.

## STATEMENT OF THE CASE

### I.   Statutory Framework

#### A.     Cooperative Federalism and the State's Role

"The CAA uses a cooperative-federalism approach to regulate air quality." *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012). Congress directs EPA to establish health-based nationally-applicable ambient air quality standards (i.e., "NAAQS") for criteria pollutants such as ozone, *see* 42 U.S.C. §§ 7408–7409, but then shifts responsibility to the states to develop emissions control programs needed to attain and maintain compliance with the NAAQS. 42 U.S.C. § 7410(a)(1).

Within three years after EPA issues a new or revised NAAQS, each state must develop and submit a "state implementation plan" to EPA that sets out programs and emission limitations adequate to demonstrate compliance with the NAAQS. *Id.* A state has "wide discretion in formulating its plan" to achieve the NAAQS, *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016), and it is the states, not EPA, that have "the power to determine which sources would be burdened by regulation and to what extent," *Union Elec. Co. v. EPA*, 427 U.S. 246, 269 (1976).

EPA does play an important role in reviewing "SIPs to ensure that the plans comply with the statute," *Oklahoma v. EPA*, 723 F.3d 1201, 1204 (10th Cir. 2013); however, EPA "shall approve" the SIP if it "meets all the applicable requirements of th[e] Act," 42 U.S.C. § 7410(k)(3). This Court has acknowledged that "EPA has less discretion when it takes actions to reject a SIP than it does when it promulgates a FIP." *Oklahoma*, 723 F.3d at 1213 n. 7. *See also Train v. NRDC*, 421 U.S. 60, 79 (1975) (EPA plays only "a secondary role" under § 110); *Luminant Generation Co. LLC v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (When

reviewing SIPs under this standard, EPA plays a "ministerial function.").

If EPA determines that a state failed to submit an adequate SIP, the CAA requires EPA to promulgate a "Federal Implementation Plan," or "FIP," within two years of EPA's determination, "unless the State corrects the deficiency" before a FIP is issued.  42 U.S.C. § 7410(c)(1); *see also EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014).  When EPA issues a FIP, EPA steps into the state's shoes for implementation and enforcement of an in-state emissions control program.

## B.     The Interstate Transport Provision and the Ozone NAAQS

CAA section 110 directs states to include in their SIPs provisions to mitigate in-state emissions that contribute significantly to air quality problems in other, downwind states.  Specifically, section 110(a)(2)(D)(i) requires "adequate provisions" prohibiting "any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will … contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any" NAAQS.  42 U.S.C. § 7410(a)(2)(D)(i).

The CAA does not, however, define when upwind states "contribute significantly" to downwind nonattainment or "interfere with maintenance." Nor has EPA promulgated regulations that define these terms for purposes of establishing approvable interstate transport SIPs. Instead, EPA has developed a policy-based four-step analytical "framework" that it has applied in making its own significant contribution determinations in previous interstate transport rulemakings.[1] In reviewing these rulemakings, courts have emphasized that when promulgating a FIP, EPA must "allow[] reasonable control alternatives and allow[] states to focus reduction efforts based on local needs or preferences." *Michigan v. EPA*, 213 F.3d 663, 688 (D.C. Cir. 2000).

In 2015, EPA lowered the ozone NAAQS to 70 parts per billion. 80 Fed. Reg. 65,292 (Oct. 26, 2015). Rather than promulgate a rule establishing parameters for ozone interstate transport SIPs, EPA issued a series of guidance memoranda[2] emphasizing state flexibility in

---

[1] *See* 63 Fed. Reg. 57,356 (Oct. 27, 1998); 70 Fed. Reg. 25,162 (May 12, 2005); 76 Fed. Reg. 48,208 (Aug. 8, 2011).

[2] Att. 2, "Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality

developing methodologies to assess significant contribution "so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." March 2018 Memorandum at 3; August 2018 Memorandum at 2. EPA acknowledged that "its analytical approaches have varied over time" and emphasized that "states have flexibility to follow the familiar four-step transport framework … or alternative frameworks." March 2018 Memorandum at 3. EPA also acknowledged that the guidance doesn't impose "binding, enforceable requirements" and "state air agencies retain the discretion to develop" SIPs that "differ from this guidance." August 2018 Memorandum at 1.

## II.    Procedural Background

### A.    Utah's Interstate Transport SIP Submissions

Prior to the 2015 ozone NAAQS, EPA had excluded western states (including Utah) from interstate transport requirements for ozone-

---

Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)," March 27, 2018 ("March 2018 Memorandum"); Att. 3,"Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," August 31, 2018 ("August 2018 Memorandum").

causing emissions—ozone transport was seen as a uniquely eastern issue. Att. 4, Declaration of Bryce Bird, ¶11 ("Bird Decl."); 81 Fed. Reg. 74,504, 74,523 (Oct. 26, 2016). In 2016, EPA indicated that it would begin working with western states on a case-by-case basis to assess whether emissions from within the state significantly contributed to downwind air quality concerns. *See* 81 Fed. Reg. at 74,523.

Accordingly, following publication of the 2015 ozone NAAQS, the Utah Division of Air Quality ("UDAQ") worked hand-in-glove with EPA for over a year in developing Utah's Interstate Transport SIP. Bird Decl. ¶12. Utah and EPA relied on the methodologies set forth in the 2018 Memoranda and previously approved by EPA in other interstate transport SIPs, including a weight-of-evidence approach used in Arizona's approved SIP. Att. 5, Utah Proposed SIP, at 15 & n.6 (Jan. 24, 2020). Ultimately, Utah concluded that contributions to downwind state air quality were not significant when considering all relevant data. *Id.* at 22.

Utah submitted its SIP on October 24, 2019. Bird Decl. ¶16. Two months later, EPA made an incompleteness determination because Utah had not provided adequate public notice. *Id.* ¶17; 84 Fed. Reg.

66,612 (Dec. 5, 2019).  EPA did not object to the substance of the SIP or communicate that changes would be necessary to approve the SIP.  Bird Decl. ¶17.

In January 2020, Utah submitted a revised SIP after providing additional public participation opportunities.  *Id*. ¶19.  UDAQ expected the SIP would be approved because the only previously noted deficiency—involving public participation—was corrected.  *See id*.  EPA did not respond to, act on, or otherwise engage with Utah on its January 2020 SIP submission for over two years.  *Id*. ¶20.

**B.     EPA's Proposed FIP**

EPA eventually signaled its intentions by proposing to issue a FIP on April 6, 2022, which, for the first time, proposed that Utah and other western states significantly contribute to downwind nonattainment or interfere with maintenance and should, therefore, be subject to an onerous federal emissions control program.  *Id*. ¶21; 87 Fed. Reg. 20,036 (April 6, 2022) ("Proposed Transport FIP").

Under the Proposed Transport FIP, fossil-fuel-fired electricity generating units ("EGUs") in 25 states, including Utah, would become subject to a federal emissions control program.  It would consist of a

revised and expanded allowance-based trading program designed to reduce nitrogen oxide ("NO$_x$") emissions during the 2023 ozone season. *Id.* at 20,036. For the 2026 ozone season, EPA proposed state emissions budgets reflecting the installation of new pollution controls on EGUs. With expected constraints on the availability of allowances, the rule would require EGUs to either install expensive retrofits or shut down. *Id.* at 20,122. Finalization of Utah's SIP disapproval provides EPA with authority to impose on Utah EGUs the new Proposed Transport FIP obligations. *Id.* at 20,058.

The Proposed Transport FIP will be finalized shortly, with an anticipated effective date of May 1, 2023. 87 Fed. Reg. at 20,134. It is currently under the last stage of regulatory review by the Office of Management and Budget.[3]

### C.    EPA's Proposed SIP Disapproval

After years of silence regarding Utah's SIP status—and nearly six weeks after proposing the FIP—EPA proposed to disapprove Utah's SIP. 87 Fed. Reg. 31,470 (May 24, 2022) ("Proposed Rule"). EPA did

---

[3] *See* https://www.reginfo.gov/public/do/eoDetails?rrid=298164.

9

not identify any "applicable requirement" of the CAA that Utah failed to meet, as required by 42 U.S.C. § 7410(k)(3). Instead, EPA merely disagreed with Utah's determination that sources within Utah do not significantly contribute to downwind problems. EPA objected to Utah's use of the alternative threshold outlined in the August 2018 Memorandum, as well as its weight-of-evidence analysis. *Id.* at 31,478-79. Among other things, EPA disagreed with Utah's assessment that conditions in the western United States are different than in the East and that the total collective upwind state ozone contribution is insignificant especially when compared with in-state contributions in Colorado. *Id.* at 31,479.

Although Utah relied on the modeling (2011 base year inventory data) endorsed by the March 2018 Memorandum to develop its SIP, EPA used a different emissions platform (referred to as "2016v2") to review Utah's SIP. *Id.* at 31,472. The new 2016v2 modeling identified three nonattainment locations ("receptors") and no maintenance receptors in Colorado where Utah contributes more than 1 percent of the 2015 Ozone NAAQS in 2023. *Id.* at 31,480. Utah, through UDAQ,

filed comments objecting to EPA's disapproval of the SIP.  *See* Att. 6, Comments.

### D.     EPA's Final Disapproval of Utah's SIP

On February 13, 2023, EPA finalized its disapproval of Utah's SIP.  88 Fed. Reg. 9,336.  In the Final Rule, EPA took action on 19 states' SIPs, including Utah's.  *Id.*  For its disapproval of Utah's SIP, EPA provided a *one paragraph* analysis, reiterating the points raised in the Proposed Rule as well as announcing the use of new modeling.  *See id.* at 9,360.

### E.     Pending Petition for Reconsideration and Stay

On February 24, 2023, Utah submitted to EPA a Petition for Reconsideration and Stay.  Att. 7.  Because Utah has received no response from EPA, and given the imminence of harm, Utah now moves for a judicial stay.  Fed. R. App. P. 18(a)(2)(A).

## ARGUMENT

This Court considers four factors in determining whether to grant a stay: (1) likelihood of success on the merits; (2) irreparable injury if relief is withheld; (3) possibility of harm to other parties if relief is granted; and (4) the public interest.  10th Cir. R. 8.1, 18.1; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## I.     Utah is Likely to Prevail on the Merits.

Utah is likely to prevail on the merits for at least two reasons.

*First*, the Final Rule constitutes an impermissible overreach under the CAA, which obligates EPA to approve a proposed SIP if it "meets all of the applicable requirements of this Act."  42 U.S.C. § 7410(k)(3).  EPA dismissed Utah's determination because it differed from EPA's nonbinding policy position rather than engaging in an objective assessment of whether the State's determination complied with CAA applicable requirements.

*Second*, EPA's rejection of Utah's use of a weight-of-evidence approach was arbitrary and capricious.  Utah's analysis, developed in collaboration with EPA, was reasoned, technically justified, and reflected EPA's same approach in guidance and previously approved interstate transport SIPs.

### A.     EPA Exceeded its Authority and Acted Arbitrarily in Disapproving Utah's SIP.

The law is clear—EPA "shall approve" a proposed SIP that "meets all of the applicable requirements of [the CAA.]"  42 U.S.C. § 7410(k)(3). This Court has acknowledged that EPA's SIP review is circumscribed given the discretion afforded states in preparing a SIP.  *See Oklahoma*,

723 F.3d at 1213 n. 7 ("EPA has less discretion when it takes actions to reject a SIP than it does when it promulgates a FIP.").

Here, EPA's review was based on whether Utah had "substantially justified" its departure from the Agency's four-step framework for ascertaining significant contribution. 88 Fed. Reg. at 9,340. In contrast to the *Oklahoma* case, EPA has not grounded its review in statutory or regulatory requirements. *See Oklahoma*, 723 F.3d at 1207-1209. Rather, EPA's standard for disapproval here is created out of whole cloth to further EPA's policy preferences.

EPA candidly admits that its four-step approach is a policy judgement, *see* 88 Fed. Reg. at 9,339, and that states have flexibility to use different analytical approaches within these four steps or even "alternative frameworks," *see* March 2018 Memorandum at 4. The four-step approach, therefore, is not an express requirement of the CAA or a duly promulgated regulation. Rather, it is a policy statement that reflects EPA's nonbinding preference as to how the Interstate Transport Provision could be implemented. Because the four-step approach is not a CAA applicable requirement, adherence to that approach is not an appropriate basis for judging SIP approvability under CAA section

13

110(k)(3). *See* 42 U.S.C. § 7410(k)(3). EPA exceeded its authority by using a policy preference as the standard for determining acceptability of Utah's SIP, rather than conducting an objective assessment of whether Utah's SIP meets CAA applicable requirements. *See Qwest Communs. Int'l, Inc. v. FCC*, 398 F.3d 1222, 1229 (10th Cir. 2005) ("An agency's action is arbitrary and capricious 'if the agency has relied on factors which Congress had not intended it to consider[.']") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Additionally, EPA's application of non-regulatory "policy" based principles in denying Utah's SIP unlawfully eliminates the discretion afforded to states to formulate air quality plans under CAA § 110 and upends the cooperative federalism approach set by Congress. *See EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 124 (D.C. Cir. 2015).

The CAA gives each state "wide discretion in formulating its plan" for achieving EPA's air quality standards. *Texas*, 829 F.3d at 411 (quoting *Union Elec. Co.*, 427 U.S. at 250). "[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever mix of emission

limitations it deems best suited to its particular situation." *Train*, 421 U.S. at 79.

The *Train* decision and subsequent precedent make clear that Congress in section 110 left to the States "the power to [initially] determine which sources would be burdened by regulation and to what extent." *Michigan*, 213 F.3d at 686 (citations omitted). Section 110 "did not confer upon EPA the authority to condition approval of [a SIP] … on the state's adoption of a specific control measure." *Virginia v. EPA*, 108 F.3d 1397, 1408 (D.C. Cir. 1997). Rather, in reviewing a SIP, EPA's role is "to ensure that [the proposed SIP] was one that was 'reasonably moored to the Act's provisions' and was based on 'reasoned analysis.'" *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013) (quotations omitted).

Utah prepared a SIP that met the express requirements of the Interstate Transport Provision. Utah applied a weight-of-evidence approach previously accepted by EPA in approving Arizona's interstate transport SIP for the 2008 ozone NAAQS. *See* Statement of Facts § II.A; Att. 5 at 16-17. Based on this approach, Utah concluded that emissions from Utah do not significantly contribute to nonattainment or

interfere with maintenance in Colorado (a downwind state) because
(i) the relative contribution of emissions from Utah and other upwind
states is small in comparison to local emissions in the Denver area,
(ii) emissions from Colorado as a whole, (iii) emissions from
nonanthropogenic sources (such as wildfires), and (iv) emissions
transported into the area from international sources.  Att. 5. at 17-22.

Utah further pointed to extensive emissions controls already
required, and soon to be required, in Utah that achieve significant
reductions in relevant pollutants.  *Id.* at 20-21.  Utah's proposed SIP
was based on a method accepted by EPA, was amply supported by the
available facts, and reflected reasoned decision making.  As such,
Utah's SIP was "'reasonably moored to the Act's provisions' and was
based on 'reasoned analysis.'"  *North Dakota*, 730 F.3d at 761 (quoting
*Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 485, 490
(2004)).

EPA still denied Utah's SIP.  EPA explained that it applied "a
consistent set of policy judgments" to evaluate all states' interstate
transport obligations. 88 Fed. Reg. at 9,339.  The Agency conceded "that
states may be able to establish alternative approaches to addressing

their interstate transport obligations" but that "deviation from a nationally consistent approach to ozone transport must be substantially justified." *Id.* at 9,340. Utah, however, demonstrated that its SIP satisfied all the CAA's requirements, and EPA was legally obligated to approve it—regardless of EPA's preference for a more "nationally consistent" approach. *Train*, 421 U.S. at 79 ("The [CAA] gives the [EPA] no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110(a)(2).").

Thus, Utah is likely to prevail on a claim that EPA overstepped its "ministerial function" of reviewing SIPs "for consistency with the Act's requirements[.]" *See Luminant Generation*, 675 F.3d at 921; *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (agency must identify "something more than a merely plausible textual basis for the agency action"); *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("an administrative agency ... may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" (citation omitted)).

**B.    EPA's Rejection of Utah's Weight-of-Evidence
Approach was Arbitrary and Capricious.**

The EPA's disapproval of Utah's SIP based on Utah's use of a
weight-of-evidence approach was arbitrary and capricious because it
was based on subjective determinations that are not rooted in the law
or applicable regulations and cannot be squared with EPA's approval of
this method in prior similar situations.

Relevant precedent for using a weight-of-evidence approach is
found in EPA's prior approval of Arizona's interstate transport SIP for
the 2008 ozone NAAQS.  In order "to determine whether Arizona should
be considered to significantly contribute to nonattainment or interfere
with maintenance of the NAAQS," EPA examined "several factors …
including the air quality and contribution modeling, receptor data, and
the statewide measures reducing emissions of [volatile organic
compounds] VOCs and NOx."  81 Fed. Reg. 15,200, 15,203 (March 22,
2016) (proposed rule).  As EPA noted "*no single piece of information is
by itself dispositive* … [i]nstead, EPA has considered the total weight of
all the evidence taken together."  *Id.* (emphasis added).  One
particularly relevant factor in Arizona's SIP was the "magnitude of

ozone attributable to transport from all upwind states collectively contributing to the air quality problem." *Id*.

EPA concluded that removing the receptors to which Arizona was linked was appropriate because "a 4.4% and 2.5% cumulative ozone contribution from all upwind states is negligible, particularly when compared to the relatively large contributions from upwind states in the East or in certain other areas of the West." *Id*. In the East, EPA "found the total upwind states' contribution to ozone concentration (from linked and unlinked states) based on modeling for 2017 ranges from 17% to 67% …, with between 4 and 12 states each contributing above 1% to the downwind air quality problem." *Id*. Based upon "the total weight of all the evidence taken together," EPA ultimately determined that "emissions reductions from Arizona [we]re not necessary to address interstate transport" and "f[ound] that Arizona did not significantly contribute to nonattainment or interfere with maintenance of the 2008 ozone NAAQS in other states." *Id*.; 81 Fed. Reg. 31,513 (May 19, 2016) (finalizing SIP without further analysis).

Like Arizona, Utah used a weight-of-evidence approach considering several relevant factors—including the predicted combined

contribution of all upwind states to relevant receptors, emissions trends, and the contributions of in-state and other relevant emissions sources. *See* Statement of Facts § II.A. Ultimately, Utah concluded that contributions from the state were not significant. *Id.*

In the Proposed Rule, EPA concluded that its prior use of the weight-of-evidence approach in approving Arizona's SIP was distinguishable from Utah's SIP disapproval—asserting that while combined upwind state emissions in the Arizona approval were "negligible" when they comprised 2 to 4 percent of ambient levels at relevant receptors, the combined upwind emissions in Utah's proposed SIP were "significant" because they comprise a "higher" 6 to 7 percent of ambient levels at relevant receptors. 87 Fed. Reg. at 31,481.

EPA's decision-making here is arbitrary. First, there is no statutory or regulatory basis for allowing a weight-of-evidence approach in Arizona's SIP and rejecting it in Utah's SIP. Second, there is no objective scientific or technical basis for distinguishing between total contributions of 2-4% percent for Arizona and 6-7% for Utah, particularly where eastern states' contributions were deemed significant between 17-67%. *See* 81 Fed. Reg. at 15,203. Finally, there

is no reasoned basis for where EPA drew the line, except EPA's insistence on imposing a one-size-fits-all approach across all potentially affected states. In short, EPA is making up the rules as it goes along— the epitome of arbitrary decision making. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.") (brackets and quotations omitted).

## II.     Utah Will Suffer Irreparable Injury Absent a Stay.

### A.     EPA's Final Rule Impermissibly Harms Utah's Sovereign Interests.

EPA's Final Rule irreparably harms Utah's sovereign interests. *See Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001) (finding irreparable harm where the challenged decision "places [a state's] sovereign interests and public policies at stake"). By disapproving the state's lawful and fact-justified determination that in-state sources do not significantly contribute to downwind nonattainment or interfere with maintenance, EPA deprives Utah of the authority to develop and implement its own CAA-based air quality program that (1) considers Utah's unique circumstances, (2) determines

the appropriate sources within the state that may need additional pollution controls, (3) assesses and determines the acceptability of costs of implementation, and (4) adequately considers the needs of Utah's citizens and economy.  Bird Decl. ¶¶24, 28.

EPA's Final Rule unlawfully shifts to EPA the authority to make air quality decisions through the imminent imposition of a FIP.  *See* 42 U.S.C. § 7410(c)(1)(B).  As such, the Final Rule is the proximate cause of the imminent, irreparable harms that will flow from EPA's forthcoming FIP.  *See EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 44 n.6 (D.C. Cir. 2012) (Rogers, J., dissenting), *rev'd on other grounds*, 572 U.S. 489 (2014).  A stay of the SIP disapproval would remedy the harms to Utah's sovereign interests, as well as the harms detailed below that flow from EPA's ability to finalize the Proposed Transport FIP.  *See id.* (If states "wish to avoid enforcement of the Transport Rule FIPs because they contend EPA's SIP disapprovals were in error, the proper course is to seek a stay of EPA's disapprovals ... [because] a stay would eliminate the basis upon which EPA may impose FIPs on those States.").

**B.     EPA's Final Rule Results in Immediate, Irreparable Harm to Utah and its Citizens.**

**1.     Harms to Utah's Division of Air Quality.**

As coal-fired power plants will need to add complex emission control technologies by 2026 under EPA's imminent FIP, UDAQ must immediately begin to permit the new controls because it may take several years for some sources to implement.  *Id.* ¶¶30-33.  The permitting process is long and resource intensive, involving staff review and development of draft permits, public notice, potential public hearings, and likely extensive public input.  *Id.* ¶32.  The ozone transport permitting burdens will put significant strain on UDAQ's staff and will coincide with UDAQ's other critical work involving two other SIP actions deigned to improve air quality in Utah's most populated areas.  *Id.* ¶33.  This undermines Utah's work that protects public health by shifting the state's limited resources to permitting facilities as required by the proposed FIP.  *Id.*

**2.     Harms to Regulated Sources.**

EPA's Final Rule will result in EPA's imminent imposition of its Proposed Transport FIP, which requires sources in Utah to install costly emission control technologies, despite UDAQ's findings that such

controls are unnecessary. Att. 8, Declaration of Chris Parker ("Parker Decl."), ¶10; Att. 9, Declaration of Thad LeVar ("LeVar Decl."), ¶¶10-11. These monetary damages to the regulated sources would not be recoverable because of the federal government's sovereign immunity, and thus are irreparable. *See, e.g., Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) ("While economic loss is usually insufficient to constitute irreparable harm, … imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.") (brackets omitted); *Kansas v. SourceAmerica*, 874 F.3d 1226, 1251–52 (10th Cir. 2017).

### 3. Harms to Utah Citizens as Power Consumers and Ratepayers.

Whether a power plant achieves compliance with the FIP by installing emissions controls or closing early, the cost of compliance will ultimately be borne by Utah's citizens (the energy consumers/ratepayers). Parker Decl. ¶13; LeVar Decl. ¶¶14-15. The costs to ratepayers can be acute if a plant shuts down because—even if

a plant stops generating electricity—its remaining cost must be recovered from ratepayers.  Parker Decl. ¶14.  At the same time, ratepayers will be forced to pay for replacement energy sources.  *Id*. Thus, ratepayers will be effectively paying double for the capacity used to serve them.  *Id*.

PacifiCorp, which does business as Rocky Mountain Power, serves retail customers in Utah, five other Western states, and wholesale customers throughout the West.  LeVar Decl. ¶12.  For any compliance costs associated with PacifiCorp's Huntington and Hunter plants, Utahns would likely bear 42-46% of the additional costs of either compliance or replacement.  Parker Decl. ¶¶8-9, 16.

PacifiCorp has engaged in resource planning designed to retire most of its coal-fired plants by 2030, but its Huntington and Hunter plants are the last to retire, in 2036 and 2042, respectively.  LeVar Decl. ¶20.  Closing any of these plants early will result in a less reliable system, including power outages, and significant costs for PacifiCorp and Utah ratepayers.  *Id*. ¶¶22-32; Parker Decl. ¶21.  It will also decrease the fuel diversity of the system, which has helped Utah weather reliability and price shocks for decades.  Parker Decl. ¶¶21-27.

### III.    The Balance of Harms and the Public Interest Favor a Stay.

The last two stay factors favor Utah.  Because the Final Rule violates the CAA and is arbitrary and capricious, *see* Argument Sections I.A.–B., a stay is in the public interest, will preserve the status quo, and will provide the necessary time for EPA to collaborate with Utah on an approvable SIP.  Bird Decl. ¶35.

In addition, any corresponding delay in finalizing EPA's proposed FIP will not materially affect its implementation.  EPA designed its FIP to accomplish limited emissions reductions during the 2023 ozone season and to achieve the bulk of the mandated emissions reductions through new emissions controls that would not be required until 2026.  87 Fed. Reg. at 20,101 ("If finalized in early 2023, the final rule would provide more than three years for EGU and non-EGU sources to … comply with required emissions reductions by the 2026 ozone season.").  In the Final Rule, EPA acknowledges that for "the 2023, 2024, and 2025 ozone seasons … the large portion of full remedy reductions—mainly those reductions that are driven by post combustion control installation … *are not yet available*."  *Id.* at 20,100 (emphasis added).

Thus, for Utah sources, no significant emissions reductions would be achieved until 2026.  Assuming expeditious resolution of this litigation, a stay during litigation should not affect the implementation of the FIP for later ozone seasons.  To be sure, a stay would compress the time available to plan, permit, construct, and start up the new emissions controls by 2026.  But reasonable delay could be accommodated, especially if the result is lifting an unwarranted federal emissions control program.

Also, importantly, EPA itself has sanctioned delay in making a decision on Utah's SIP and implementing key elements of its FIP.  EPA waited over two years before taking any action on Utah's January 2020 SIP.  And EPA recently decided to extend the deadline to December 15, 2023 for issuing decisions on the SIPs submitted by Wyoming, Arizona, and Tennessee.  *See Downwinders at Risk v. Regan*, No. 4:21-cv-3551-DMR, Dkt. 33, Joint Notice of Second Stipulated Extension of Consent Decree Deadlines (N.D. Cal. Jan. 30, 2023).  Thus, EPA's actions demonstrate that a short delay is possible without harm to the public.

In any event, UDAQ has already implemented various other programs that have, and will continue, to reduce ozone emissions within

the state pending review, Bird Decl. ¶36, negating harm to the public or downwind states in the interim.

Moreover, there is a broad public interest in maintaining the CAA's system of cooperative federalism. *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013). State citizens have an interest in their legislators' and agencies' abilities to enact policies that meet their needs. Staying the Final Rule will prevent the harms that threaten Utah's ability to regulate power plants within the state to meet its citizens' needs, as well as Utahns' ability to receive reliable and affordable power. *See Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir. 1986) (court should consider if "customers may lose their source of electric power" and "be forced to pay higher electric bills" in weighing public interest factor and granting injunction).

## CONCLUSION

For all these reasons, the Court should stay the Final Rule disapproving Utah's SIP.

Dated: March 7, 2023.

Respectfully submitted,

*/s/ Melissa A Holyoak*
Sean D. Reyes
    ATTORNEY GENERAL OF UTAH
Melissa A. Holyoak
    SOLICITOR GENERAL
    *Counsel of Record*
Office of the Attorney General
Utah State Capitol Complex
350 North State Street Suite 230
Salt Lake City, UT 84114-2320
Ph. 801-538-9600
melissaholyoak@agutah.gov

William L. Wehrum
WEHRUM ENVIRONMENTAL LAW LLC
1629 K Street, NW, Suite 300
Washington, D.C. 20006
Ph. 302-300-0388
William_Wehrum@comcast.net

Emily C. Schilling
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Ph. 801-799-5753 / Fax 202-747-6574
ecschilling@hollandhart.com

Kristina (Tina) R. Van Bockern
Aaron B. Tucker
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8107 / Fax 720-545-9952
trvanbockern@hollandhart.com
abtucker@hollandhart.com
*Attorneys for Petitioner State of Utah*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the format and word limit of Fed. R. App. P. 27(d)(1)-(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,200 words.  This document also complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Dated: March 7, 2023

*/s/ Melissa A. Holyoak*

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(c), that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter, who are registered with the Court's CM/ECF system.

Dated: March 7, 2023

*/s/ Melissa A. Holyoak*

20801596_v11