**Nos. 23-9509, 23-9512, 23-9520**

---

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

STATE OF UTAH, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

---

Petition for Review of Final Agency Action of the
United States Environmental Protection Agency
88 Fed Reg. 9336

---

**PRELIMINARY RESPONDENTS' BRIEF**
(Deferred Appendix Appeal)

---

TODD KIM
*Assistant Attorney General*

Of Counsel:

ROSEMARY HAMBRIGHT KABAN
DANIEL P. SCHRAMM
JEANHEE HONG
U.S. Environmental Protection Agency

ALEXANDRA L. ST. ROMAIN
ALEX J. HARDEE
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044
(202) 532-3284
alexandra.st.romain@usdoj.gov

**Oral argument is requested.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................v

PRIOR OR RELATED APPEALS.....................................................xiv

GLOSSARY.....................................................................................xvi

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION........................................................3

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE...............................................................5

I.    Legal Background..................................................................5

      A.    Clean Air Act..............................................................5

            1.    Ozone National Ambient Air Quality Standards
                  and Attainment Areas ................................................5

            2.    State Implementation Plans.......................................6

      B.    The Good Neighbor Provision ............................................8

            1.    EPA's Past Rulemakings Related to the Good
                  Neighbor Provision ...................................................9

            2.    EPA's 4-Step Framework for Evaluating Good
                  Neighbor SIP Obligations .........................................12

II.   Factual Background ..............................................................17

      A.    Modeling Issued for the 2015 Ozone NAAQS ...................17

      B.    2018 Memoranda....................................................................19

      C.    Utah's Initial SIP Submission and EPA's Finding of
            Failure to Submit ..................................................................20

D.      Utah's Second SIP Submission ............................................21

E.      EPA's Disapproval ...............................................................23

F.      EPA's FIP ..............................................................................26

III.    Procedural Background .................................................................26

SUMMARY OF ARGUMENT ..................................................................27

STANDARD OF REVIEW ........................................................................30

ARGUMENT .............................................................................................32

I.      Venue Lies Exclusively in the D.C. Circuit. ...................................32

A.      The Disapproval is Nationally Applicable. ..........................32

B.      EPA Properly Found and Published that the Disapproval
        is Based on Determinations of Nationwide Scope or
        Effect. ...................................................................................39

II.     EPA Acted Within its Statutory Authority. ...................................48

A.      The Act Directs EPA to Determine Whether Plans Meet
        Applicable Requirements. ....................................................49

B.      EPA's Evaluation of the Submission was Consistent with
        its SIP Approval Authority and the Good Neighbor
        Provision. ..............................................................................55

III.    EPA Reasonably and Lawfully Disapproved Utah's Submission
        on the Merits of the Submission. ...................................................59

A.      EPA Reasonably Concluded that Colorado Receptors
        Suffer from Collective Contribution. ...................................60

B.      EPA Reasonably Concluded that Utah is Not Absolved
        of its Good Neighbor Obligations Merely Because Other
        Sources Also Contribute to the Colorado Receptors. ..........66

C.    EPA Reasonably Concluded that Utah is Not Absolved of its Good Neighbor Obligations Because of Emissions Reductions Already Achieved Through 2017 and Unquantified, Vague Expectations of Future Emissions Reductions. ...................................................................68

IV.    EPA Did Not Violate Any Reliance Interest Utah Might Have in EPA's Pre-Proposal Memoranda or Pre-Submission Comments. .........................................................................70

A.    EPA Assessed Utah's Submission Consistent with the 1 ppb Memo and its Pre-Submission Feedback. ....................71

B.    EPA Did Not Disapprove Utah's Submission Because the State Relied on 2011-Based Modeling.................................72

C.    Utah Mischaracterizes Attachment A. .................................74

D.    EPA Abided by All Procedural Requirements and Provided Robust Explanations. ..........................................76

V.    It was Lawful and Reasonable for EPA to Consider the Most Up-to-Date Data, Which Accounted for Western-Specific Issues........................................................................78

VI.    Remedy ............................................................................80

A.    Any Remedy Should be Limited to the Disapproval that is Before the Court. ................................................80

B.    The Court Should Remand Without Vacatur. ......................83

CONCLUSION ..................................................................................86

STATEMENT REGARDING ORAL ARGUMENT ...........................87

CERTIFICATE OF COMPLIANCE ...................................................88

CERTIFICATE OF DIGITAL SUBMISSION ...................................89

CERTIFICATE OF SERVICE ...........................................................90

ATTACHMENTS ........................................................................................................91

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Env't Conservation v. EPA* (*Alaska DEC*),
    540 U.S. 461 (2004)................................................................ 30, 31, 59

*Alcoa, Inc. v. EPA*,
    No. 04-1189, 2004 WL 2713116 (D.C. Cir. Nov. 24, 2004)..............................43

*Allied-Signal, Inc. v. NRC*,
    988 F.2d 146 (D.C. Cir. 1993)................................................................83

*Am. Rd. & Transp. Builders Ass'n v. EPA*,
    705 F.3d 453 (D.C. Cir. 2013)................................................................38

*Appalachian Power Co. v. EPA*,
    249 F.2d 1032 (D.C. Cir. 2001)................................................................51

*Arizona ex rel. Darwin v. EPA*,
    815 F.3d 519 (9th Cir. 2016)................................................................50

*Arkansas v. Oklahoma*,
    503 U.S. 91 (1992)................................................................ 31, 80

*Ass'n of Irritated Residents v. EPA*,
    686 F.3d 668 (9th Cir. 2012)................................................................54

*ATK Launch Sys., Inc. v. EPA*,
    651 F.3d 1194 (10th Cir. 2011) ........................................................ 33, 34, 35, 37

*Balt. Gas v. NRDC*,
    462 U.S. 87 (1983)................................................................54

*BCCA Appeal Grp. v. EPA*,
    355 F.3d 817 (5th Cir. 2003) ........................................................ 54, 57

*Biden v. Texas*,
    142 S. Ct. 2528 (2022)................................................................77

*Bowen Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ..................................................................................30

*Calcutt v. FDIC*,
  598 U.S. 623 (2023) ..................................................................................81

*Chevron, U.S.A., Inc. v. EPA*,
  45 F.4th 380 (D.C. Cir. 2022) .................................................................38

*Dalton Trucking, Inc. v. EPA*,
  808 F.3d 875 (D.C. Cir. 2015) .................................................................38

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) .............................................................................70

*Diné Citizens Against Ruining Our Env't v. Haaland*,
  59 F.4th 1016 (10th Cir. 2023) ...............................................................83

*EME Homer City Generation, L.P. v. EPA*,
  696 F.3d 7 (D.C. Cir. 2012) .....................................................................11

*EME Homer City Generation, L.P. v. EPA*,
  795 F.3d 118 (D.C. Cir. 2015) ...................................................... 11, 12, 37

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ............... 1, 7, 8, 9, 11, 13, 14, 15, 16, 43, 55, 57, 58, 59, 84

*Fed. Power Comm'n v. Idaho Power Co.*,
  344 U.S. 17 (1952) ....................................................................................81

*Garcia ex rel. Garcia v. Miera*,
  817 F.2d 650 (10th Cir. 1987) .................................................................36

*Gen. Motors Corp. v. United States*,
  496 U.S. 530 (1990) ...................................................................................5

*GenOn REMA, LLC v. EPA*,
  722 F.3d 513 (3d Cir. 2013) .....................................................................51

*Heal Utah v. EPA*,
   No. 21-9509,   --- F.4th ----,
   2023 WL 5185608 (10th Cir. Aug. 14, 2023) ................. 7, 21, 30, 32, 48, 51, 53

*Jake's Fireworks Inc. v. Acosta*,
   893 F.3d 1248 (10th Cir. 2018) ........................................................................75

*Maryland v. EPA*,
   958 F.3d 1185 (D.C. Cir. 2020) .................................................... 8, 58, 67, 68, 84

*Mich. Dep't of Env't Quality v. Browner*,
   230 F.3d 181 (6th Cir. 2000) .............................................................................54

*Michigan v. EPA*,
   213 F.3d 663 (D.C. Cir. 2000) ..........................................................................10

*Midwest Ozone Grp. v. EPA*,
   61 F.4th 187 (D.C. Cir. 2023) ..................................................................... 12, 13

*Miss. Comm'n on Env't Quality v. EPA* (*MCEQ*),
   790 F.3d 138 (D.C. Cir. 2015) .......................................................................6, 8

*Mont. Sulfur & Chem. Co. v. EPA*,
   666 F.3d 1174 (9th Cir. 2012) ..........................................................................69

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................30

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
   891 F.3d 1041 (D.C Cir. 2018) .........................................................................43

*Nielsen v. Preap*,
   139 S. Ct. 954 (2019) ................................................................................ 48, 50

*North Carolina v. EPA*,
   531 F.3d 896 (D.C. Cir. 2008) ............................................................. 10, 13, 14

*North Carolina v. EPA*,
   550 F.3d 1176 (D.C. Cir. 2008) ........................................................................85

*North Dakota v. EPA*,
    730 F.3d 750 (8th Cir. 2013) ................................................. 51, 54, 55

*NRDC v. EPA*,
    512 F.2d 1351 (D.C. Cir. 1975) ..........................................................39

*NRDC v. Thomas*,
    838 F.2d 1224 (D.C. Cir. 1988) ..........................................................36

*Oklahoma v. EPA*,
    723 F.3d 1201 (10th Cir. 2013) ..................... 7, 30, 31, 32, 49, 53, 57, 77, 78, 82

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ....................................................................... 37, 76

*Quest Corp. v. FCC*,
    689 F.3d 1214 (10th Cir. 2012) ..........................................................76

*Rife v. Jefferson*,
    742 F. App'x 377 (10th Cir. 2018) ......................................................36

*RMS of Ga., LLC v. EPA*,
    64 F.4th 1368 (11th Cir. 2023) ...................................................... 33, 35

*S. Ill. Power Coop. v. EPA*,
    863 F.3d 666 (7th Cir. 2017) ..................................................... 33, 35, 37

*Sierra Club v. EPA*,
    926 F.3d 844 (D.C. Cir. 2019) ...........................................................37

*Sierra Club v. EPA*,
    939 F.3d 649 (5th Cir. 2019) .............................................................70

*Sierra Club v. EPA*,
    972 F.3d 290 (3d Cir. 2020) ..............................................................52

*Stifel, Nicolaus & Co., Inc. v. Woolsey & Co., Inc.*,
    81 F.3d 1540 (10th Cir. 1996) ...........................................................82

*Texas v. EPA (Texas 2011)*,
　No. 10-60961, 2011 WL 710598 (5th Cir. Feb. 24, 2011) ..................... 38, 39, 43

*Texas v. EPA (Texas 2016)*,
　829 F.3d 405 (5th Cir. 2016) ................................................................ 40, 41, 42

*Texas v. EPA*,
　706 F. App'x 159 (5th Cir. 2017) ...........................................................41

*Texas v. EPA*,
　983 F.3d 826 (5th Cir. 2020) ...............................................................40

*Train v. NRDC*,
　421 U.S. 60 (1975) ...................................................................... 5, 51, 52

*U.S. Magnesium, LLC v. EPA*,
　690 F.3d 1157 (10th Cir. 2012) ............................................................ 51, 54, 56

*Union Elec. Co. v. EPA*,
　427 U.S. 246 (1976) ...................................................................... 5, 6, 52

*Westar Energy, Inc. v. EPA*,
　608 F. App'x 1 (D.C. Cir. 2015) ................................................. 12, 13, 37, 54, 55

*WildEarth Guardians v. EPA*,
　770 F.3d 919 (10th Cir. 2014) ............................................................. 31, 54, 57

*Wisconsin v. EPA*,
　938 F.3d 303 (D.C. Cir. 2019) ............................... 8, 9, 12, 15, 52, 66, 77, 84, 85

*Woodford v. Garceau*,
　538 U.S. 202 (2003) ............................................................................75

*Wyoming v. EPA*,
　No. 14-9529, --- F.4th ----,
　2023 WL 5214083 (10th Cir. Aug. 15, 2023) ..................... 31, 48, 49, 52, 53, 56

## Statutes

5 U.S.C. § 551(13) ................................................................................81

5 U.S.C. § 706 ......................................................................................81

5 U.S.C. § 706(2)(A) ...........................................................................30

42 U.S.C. §§ 7401-7515 .......................................................................9

42 U.S.C. § 7401(b)(1) ..........................................................................5

42 U.S.C. § 7407(d) ...............................................................................5

42 U.S.C. § 7409(b)(1) ...........................................................................5

42 U.S.C. § 7410(a) .........................................................................6, 54

42 U.S.C. § 7410(a)(1) ......................................................................8, 49

42 U.S.C. § 7410(a)(2) ........................................................................69

42 U.S.C. § 7410(a)(2)(A) ...................................................................51

42 U.S.C. § 7410(a)(2)(D) ..............................................................13, 16

42 U.S.C. § 7410(a)(2)(D)(i) ......................... 1, 2, 4, 8, 13, 14, 15, 16, 48, 57

42 U.S.C. § 7410(c)(1) ............................................. 7, 21, 49, 81, 82

42 U.S.C. § 7410(i) ................................................................................7

42 U.S.C. § 7410(k) .........................................................................48, 51

42 U.S.C. § 7410(k)(1) ......................................................................7, 76

42 U.S.C. § 7410(k)(1)(B) ..................................................... 7, 20, 50, 77

42 U.S.C. § 7410(k)(2) .........................................................................49

42 U.S.C. § 7410(k)(3)................................................................ 7, 13, 49, 50

42 U.S.C. § 7410(*l*)....................................................................7

42 U.S.C. § 7413........................................................................7

42 U.S.C. § 7426(b)-(c)..............................................................9

42 U.S.C. §§ 7501-15.................................................................6

42 U.S.C. § 7511(a)....................................................................6

42 U.S.C. § 7604(a)(2)...............................................................79

42 U.S.C. § 7607(b)(1)..................... 2, 3, 4, 27, 32, 35, 36, 37, 38, 39, 40, 46, 47, 87

42 U.S.C. §§ 7401-7671q ...........................................................5

## Rules

10th Cir. R. 25.5.......................................................................89

10th Cir. R. 32(B) .....................................................................88

Fed. R. App. P. 32(a)(5).............................................................88

Fed. R. App. P. 32(a)(6).............................................................88

Fed. R. App. P. 32(a)(7)(B)(i).....................................................88

## Code of Federal Regulations

40 C.F.R. Pt. 50, App. U 1(c), 4 ...............................................14

## Federal Registers

41 Fed. Reg. 56767 (Dec. 30, 1976)..........................................43

63 Fed. Reg. 57356 (Oct. 27, 1998)...........................................9

70 Fed. Reg. 25162 (May 12, 2005) ............................................................9

76 Fed. Reg. 48208 (Aug. 8, 2011)...................................................... 9, 11

80 Fed. Reg. 65292 (Oct. 26, 2015)..........................................................6

81 Fed. Reg. 71991 (Oct. 19, 2016)......................................... 61, 62, 65

81 Fed. Reg. 74504 (Oct. 26, 2016) ("Update Rule") ......................... 10, 12, 64, 65

82 Fed. Reg. 1733 (Jan. 6, 2017) ...........................................................73

82 Fed. Reg. 9142 (Feb. 3, 2017) ...........................................................63

82 Fed. Reg. 9155 (Feb. 3, 2017) ....................................................... 62, 64

83 Fed. Reg. 65093 (Dec. 19, 2018)........................................................62

84 Fed. Reg. 7854 (Mar. 5, 2019)...........................................................64

84 Fed. Reg. 14270 (Apr. 10, 2019) .......................................................63

84 Fed. Reg. 66612 (Dec. 5, 2019) ("2019 Finding") .................................... 20, 82

86 Fed. Reg. 23054 (Apr. 30, 2021) ........................................... 10, 12, 18

87 Fed. Reg. 9463 (Feb. 22, 2022) ..........................................................23

87 Fed. Reg. 9484 (Feb. 22, 2022) ..........................................................23

87 Fed. Reg. 9498 (Feb. 22, 2022) ..................................................... 22, 23

87 Fed. Reg. 9516 (Feb. 22, 2022) ..........................................................23

87 Fed. Reg. 9533 (Feb. 22, 2022) ..................................................... 22, 23

87 Fed. Reg. 9545 (Feb. 22, 2022.............................................................23

87 Fed. Reg. 9798 (Feb. 22, 2022) ....................................... 22, 23, 25, 68

87 Fed. Reg. 9838 (Feb. 22, 2022) .............................................................23

87 Fed. Reg. 31443 (May 24, 2022)................................................ 23, 24, 25, 63

87 Fed. Reg. 31470 (May 24, 2022) ("Proposal")............ 18, 21, 24, 25, 61, 62, 63,
.................................................................... 64, 65, 67, 68, 70, 72, 73, 75

87 Fed. Reg. 31485 (May 24, 2022) ..........................................................24

87 Fed. Reg. 31495 (May 24, 2022) ..........................................................24

87 Fed. Reg. 60897 (Oct. 7, 2022).............................................................61

87 Fed. Reg. 61249 (Oct. 11, 2022).............................................................66

87 Fed. Reg. 66299 (Nov. 3, 2022).............................................................21

88 Fed Reg. 9336 (Feb. 13, 2023) ("Disapproval") ................. 1, 13, 14, 15, 16, 17,
........................................ 18, 19, 22, 23, 24, 25, 33, 34, 38, 39, 40, 41, 42, 43, 44,
........................................ 52, 56, 57, 59, 61, 62, 66, 67, 68, 70, 72, 73, 76, 78, 83

88 Fed Reg. 36654 (June 5, 2023) ("Good Neighbor Plan")............... 26, 65, 69, 86

## PRIOR OR RELATED APPEALS

The following related cases are pending before this Court:

- *Oklahoma v. EPA*, No. 23-9514 (10th Cir.)

- *Okla. Gas and Elec. Co. v. EPA*, No. 23-9521 (10th Cir.)

- *Tulsa Cement LLC, et al. v. EPA*, No. 23-9533 (10th Cir.)

- *W. Farmers Elec. Coop. v. EPA*, No. 23-9534 (10th Cir.)

- *Basin Elec. Power Coop. v. EPA*, No. 23-9537 (10th Cir.)

- *Wyoming v. EPA*, No. 23-9529 (10th Cir.)

- *PacifiCorp v. EPA*, No. 23-9531 (10th Cir.)

The following related cases are pending before other Circuit Courts:

- *Utah v. EPA*, No. 23-1102 (D.C. Cir.)

- *Oklahoma v. EPA*, No. 23-1103 (D.C. Cir.)

- *Okla. Gas & Elec. Co. v. EPA*, No.23-1105 (D.C. Cir.)

- *Tulsa Cement LLC v. EPA*, No. 23-1106 (D.C. Cir.)

- *W. Farmers Elec. Coop. v. EPA*, No. 23-1107 (D.C. Cir.)

- *PacifiCorp v. EPA*, No. 23-1112 (D.C. Cir.)

- *Nevada v. EPA*, No. 23-1113 (D.C. Cir.)

- *Nev. Cement Co. v. EPA*, No. 23-1115 (D.C. Cir.)

- *West Virginia v. EPA*, No. 23-1418 (4th Cir.)

- *Texas v. EPA*, No. 23-60069 (5th Cir.)

- *Kentucky v. EPA*, No. 23-3216 (6th Cir.)

- *Ky. Energy & Env't Cabinet v. EPA*, No. 23-3225 (6th Cir.)

- *Arkansas v. EPA,* No. 23-1320 (8th Cir.)

- *Missouri v. EPA*, No. 23-1719 (8th Cir.)

- *Union Elec. Co. v. EPA*, No. 23-1751 (8th Cir.)

- *Sw. Elec. Power Co. v. EPA*, No. 23-1765 (8th Cir.)

- *City Utils. of Springfield, Mo. v. EPA*, No. 23-1774 (8th Cir.)

- *ALLETE, Inc. v. EPA*, No. 23-1776 (8th Cir.)

- *Hybar, LLC v. EPA*, No. 23-1777 (8th Cir.)

- *Ark. League of Good Neighbors v. EPA*, No. 23-1778 (8th Cir.)

- *Nev. Cement Co. v. EPA*, No. 23-682 (9th Cir.)

- *Alabama v. EPA*, No. 23-11173 (11th Cir.)

- *Ala. Power Co. v. EPA*, No. 23-11196 (11th Cir.)

# GLOSSARY

| | |
|---|---|
| 1 ppb Memo | Memorandum, P. Tsirigotis, Director, Off. of Air Quality Plan. & Standards, EPA, Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Aug. 31, 2018), JA_-_ |
| 2016v2 Air Quality TSD | Air Quality Modeling Technical Support Document – 2015 Ozone NAAQS Transport SIP Proposed Actions, JA_-_ |
| 2016v3 Air Quality TSD | Air Quality Modeling Technical Support Document – 2015 Ozone NAAQS SIP Disapproval Final Action, JA_-_ |
| 2016v3 Emissions TSD | Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform, JA_-_ |
| 2019 Finding | Findings of Failure to Submit a Clean Air Act Section 110 State Implementation Plan for Interstate Transport for the 2015 Ozone National Ambient Air Quality Standards (NAAQS), 84 Fed. Reg. 66612 (Dec. 5, 2019) |
| APA | Administrative Procedure Act |
| Act | Clean Air Act |
| Colorado TSD | Air Quality Technical Support Document (AQTSD) for the Denver Metro/North Front Range 2023 Severe/Moderate Ozone State Implementation Plan, JA_-_ |
| Disapproval | Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National |

|   |   |
|---|---|
|   | Ambient Air Quality Standards, 88 Fed. Reg. 9336 (Feb. 13, 2023) |
| EPA | U.S. Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| Good Neighbor Plan | Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36654 (June 5, 2023) |
| Modeling Memo | Memorandum, P. Tsirigotis, Director, Off. of Air Quality Plan. & Standards, EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018), JA_-_ |
| NAAQS | National Ambient Air Quality Standards |
| $NO_X$ | Nitrous Oxides |
| Nov. 14, 2018 Email | Email from Adam Clark, Air Program, EPA Region 8 to Jay Baker, Environmental Scientist, Utah Department of Environmental Quality (Nov. 14, 2018), JA_ |
| October 2017 Memo | Memorandum, S. Page, Director, Off. of Air Quality Plan. & Standards, EPA, Supplemental Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Oct. 27, 2017), JA_-_ |
| ppb | parts per billion |
| Proposal | Air Plan Disapproval; Utah; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National |

|  | Ambient Air Quality Standards, 87 Fed. Reg. 31470 (May 24, 2022) |
|---|---|
| RTC | 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comments (RTC) Document, JA_-_ |
| SIP | State Implementation Plan |
| Submission | Utah's 2015 State Implementation Plan Infrastructure Elements for Ozone, EPA-R08-OAR-2022-0315-0007 (Jan. 24, 2020), JA_-_ |
| TCEQ Modeling TSD | EPA Region 6 – 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document, JA_ |
| TSD | Technical Support Document |
| Update Rule | Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 Fed. Reg. 74504 (Oct. 26, 2016) |
| VOC | Volatile Organic Compound |

## INTRODUCTION

Air pollution heeds no boundaries, creating a "thorny causation" problem whereby emissions from some states unduly affect other states' ability to attain the federal air quality standards, which are set to protect public health. *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 497-99, 514 (2014). The Good Neighbor Provision of the Clean Air Act ("Act"), 42 U.S.C. § 7410(a)(2)(D)(i)(I), ensures that upwind states do not impede the efforts of downwind states to attain federal air quality standards. Congress established a regime requiring states to propose to EPA plans to eliminate their significant contributions to nonattainment or interference with maintenance of healthy downwind air quality. EPA must ensure that those plans are adequate—and, if not, disapprove them.

The Good Neighbor Provision is particularly important for ozone, which presents a nationwide problem caused, in part, by emissions that can travel hundreds of miles. After EPA strengthened federal ozone standards in 2015, states had to submit plans to meet their Good Neighbor obligations. EPA carefully reviewed states' submissions to address this nationwide problem and reasonably disapproved submissions from 21 states, including Utah. *See* 88 Fed. Reg. 9336 (Feb. 13, 2023) ("Disapproval"). Despite record evidence demonstrating that these states were contributing to downwind pollution problems, each of these states provided unsound analyses in a bid to avoid doing their fair share to fulfill their

1

Good Neighbor obligations under the new, more protective ozone air quality standards.

Instead of reviewing EPA's Disapproval, this Court should dismiss the petitions or transfer them to the D.C. Circuit, which has exclusive venue under the Act. That is so because the Disapproval is either "nationally applicable" or "based on a determination of nationwide scope or effect" made and published by EPA. *See* 42 U.S.C. § 7607(b)(1). Interstate ozone pollution is a quintessential national problem, and Congress expressly directed states to adopt plans to prohibit emissions that "contribute significantly to nonattainment" or "interfere with maintenance" of the air quality standards in "any other state." *Id.* § 7410(a)(2)(D)(i)(I). On its face, the Disapproval is nationally applicable, as EPA used a nationally consistent analytical framework to evaluate states' compliance with these obligations and ultimately disapproved SIPs from 21 states throughout eight of ten EPA Regions and ten federal judicial circuits. The Disapproval was also based on several determinations that have nationwide scope or effect— precisely the types of determinations for which Congress directed centralized review in the D.C. Circuit.

If the Court nonetheless decides the merits itself, it should deny the petitions for review because EPA reasonably disapproved Utah's submission for failing to comply with the Good Neighbor Provision. To ensure that Utah meets its statutory

obligations, and to carry out its own statutory review obligations, EPA performed a highly technical review aligned with how the Supreme Court and the D.C. Circuit (which, again, has exclusive venue over this and similar EPA actions) have interpreted the Good Neighbor Provision for decades. *See EME Homer*, 572 at 497-99, 524. EPA carefully evaluated the substance of Utah's plan and reasonably determined that the State had failed to support its conclusion that it did not "contribute significantly" to nonattainment or "interfere with maintenance" of federal ozone standards in Colorado. EPA's updated air quality analysis in the Disapproval confirmed EPA's determination.

Petitioners engage very little with EPA's actual explanations for its Disapproval, instead denying EPA's statutory obligation to independently evaluate state plans' compliance with the Good Neighbor Provision and misrepresenting EPA's reasons for disapproval. Because EPA's grounds for its Disapproval were lawful and based on longstanding practice and case law, the Court should deny the petitions for review. Even if the Court finds some fault in EPA's reasoning, the Court should limit its remedy to the Disapproval before the Court and allow the Disapproval to remain in place on remand.

## STATEMENT OF JURISDICTION

The challenged EPA action (the Disapproval) constitutes final agency action subject to judicial review pursuant to 42 U.S.C. § 7607(b)(1), and Petitioners

timely filed their petitions for judicial review.  But the petitions should be transferred to the D.C. Circuit pursuant to 42 U.S.C. § 7607(b)(1).  *See infra* Arg. I.

## STATEMENT OF THE ISSUES

1.      Whether venue lies exclusively in the D.C. Circuit under 42 U.S.C. § 7607(b)(1), as the Disapproval is nationally applicable or, if regionally or locally applicable, is based on several determinations of nationwide scope or effect made and published by EPA.

2.      Whether EPA's technical evaluation and disapproval of Utah's state implementation plan submission—a submission that asserted without foundation that Utah's emissions do not contribute significantly to nonattainment or interfere with maintenance of downwind states' compliance with federal ozone standards—gave reasonable effect to the Act, case law, and EPA's longstanding practice implementing the Good Neighbor Provision.  *Id.* § 7410(a)(2)(D)(i)(I).

3.      Whether, if the Court determines that remand of the Disapproval is appropriate, the Court should limit its remedy to the Disapproval before the Court and otherwise remand without vacatur, as EPA likely could correct any defects in the Disapproval that the Court may find, and vacating the Disapproval (especially without recognizing EPA's independent authority to promulgate the Good

Neighbor Plan for Utah separate from the Disapproval) would have disruptive

consequences on states' and EPA's compliance with the Good Neighbor Provision.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    Clean Air Act

The Clean Air Act, 42 U.S.C. §§ 7401-7671q, seeks "to protect and enhance

the quality of the Nation's air resources so as to promote the public health and

welfare," *id.* § 7401(b)(1), and to control air pollution through a system of shared

federal and state responsibility, *see Gen. Motors Corp. v. United States*, 496 U.S.

530, 532 (1990). The Act, as amended, reflects "sharply increased federal authority

and responsibility" following "congressional dissatisfaction with the progress of

existing air pollution programs and a determination to . . . guarantee the prompt

attainment and maintenance of specified air quality standards." *Train v. NRDC*,

421 U.S. 60, 64 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246, 249 (1976).

#### 1.    Ozone National Ambient Air Quality Standards and Attainment Areas

The Act directs EPA to set National Ambient Air Quality Standards

("NAAQS") for specific pollutants, including ozone, at levels required to protect

public health and welfare.  42 U.S.C. § 7409(b)(1).  EPA then must designate areas

as being in "attainment" or "nonattainment," or "unclassifiable."  *Id*. § 7407(d).

Nonattainment areas are subject to statutorily based deadlines to attain the NAAQS

based on their classification.  *Id*. § 7511(a).  Failure to meet those deadlines leads to areas being reclassified to higher classifications and increasingly stringent emissions reduction requirements.  *Id*. §§ 7501-15.

Ozone at ground level (commonly known as smog) is harmful to public health and welfare—it "can cause lung dysfunction, coughing, wheezing, shortness of breath, nausea, respiratory infection" and widely affects "trees, vegetation, and crops."  *Miss. Comm'n on Env't Quality v. EPA* (*MCEQ*), 790 F.3d 138, 147 (D.C. Cir. 2015) (quotation omitted).  To sufficiently protect public health and welfare, EPA has strengthened the ozone NAAQS multiple times, most recently in 2015 by setting the ozone NAAQS to 70 parts per billion ("ppb").  80 Fed. Reg. 65292 (Oct. 26, 2015) ("2015 ozone NAAQS").

## 2.    State Implementation Plans

All states, regardless of whether they have nonattainment areas, bear the initial responsibility to adopt state implementation plans ("SIPs") that are adequate to implement, maintain, and enforce the NAAQS.  42 U.S.C. § 7410(a).  States must submit SIPs for EPA's review within three years of the promulgation or revision of a NAAQS.  *Id.*

While the Act places "primary responsibility for formulating pollution control strategies" on states, it subjects states "to strict minimum compliance requirements" to attain the NAAQS.  *Union Elec.*, 427 U.S. at 256-57.  Once a

state submits a SIP, EPA conducts a completeness review.  42 U.S.C.

§ 7410(k)(1)(B).  If EPA is satisfied that the submission contains all the requisite

parts, EPA considers the SIP complete and must review the substance of the SIP

for compliance with the Act.  *Id.* § 7410(k)(3).  If EPA determines that a SIP does

not meet all of the Act's applicable requirements, it must issue a partial or full

disapproval.  *See id*.

   If approved, the SIP becomes enforceable as a matter of federal law and

cannot be modified except by EPA's approval of a SIP revision.  *Id.* §§ 7410(i), (*l*),

7413.  If EPA finds that a state either failed to submit a complete SIP under

Section 7410(k)(1) or disapproves a SIP because it did not meet the Act's

applicable requirements under Section 7410(k)(3), EPA must promulgate a federal

implementation plan ("FIP").  *Id*. § 7410(c)(1); *Heal Utah v. EPA*, No. 21-9509,

--- F.4th ----, 2023 WL 5185608, at *2 (10th Cir. Aug. 14, 2023).

   Unless the Act otherwise specifies, there is no requirement for EPA to

provide guidance or specifically define the Act's applicable requirements for

states.  *EME Homer*, 572 U.S. at 510.  Nor is EPA required to provide states with

opportunities to correct a deficient state plan before issuing a FIP.  *Id*. at 509.  EPA

must promulgate a FIP at any time within two years and need not "postpone its

action even a single day."  *Id.*; *see also Oklahoma v. EPA*, 723 F.3d 1201, 1223

(10th Cir. 2013).

**B.    The Good Neighbor Provision**

Congress enacted the Good Neighbor Provision to hold upwind states accountable for their fair share of emissions reductions so that downwind states do not bear the regulatory compliance burden of attaining and maintaining the NAAQS alone.  42 U.S.C. § 7410(a)(2)(D)(i)(I); *EME Homer*, 572 U.S. at 496-99; *Wisconsin v. EPA*, 938 F.3d 303, 309-10 (D.C. Cir. 2019) (per curiam); *Maryland v. EPA*, 958 F.3d 1185, 1190 (D.C. Cir. 2020) (per curiam).

The provision is especially important for ozone, which travels great distances, its path subject to "the vagaries of the wind."  *EME Homer*, 572 U.S. at 497.  Additionally, ozone and its precursors, primarily nitrogen oxides ("$NO_X$") and volatile organic compounds ("VOCs"), "travel easily through the atmosphere, which can result in NAAQS violations hundreds of miles away from the source of the ozone precursors."  *MCEQ*, 790 F.3d at 147.

Once EPA promulgates or revises a NAAQS, states must submit SIPs that, in accordance with the Good Neighbor Provision, "prohibit[]" through "adequate provisions" in-state emissions from "any source or other type of emissions activity" that "will" "contribute significantly to nonattainment" or "interfere with maintenance" of the NAAQS in other states.  42 U.S.C. § 7410(a)(1), (2)(D).  The Act does not otherwise define the terms "contribute significantly" or "interfere with maintenance," though the Act requires that the Good Neighbor Provision be

8

implemented consistent with Title I of the Act (42 U.S.C. §§ 7401-7515). *See Wisconsin*, 938 F.3d at 315-16. Congress has also provided a mechanism in the Act for EPA to directly enforce the Provision's requirements against sources upon granting the petition of a downwind jurisdiction. 42 U.S.C. § 7426(b)-(c).

### 1. EPA's Past Rulemakings Related to the Good Neighbor Provision

"Over the past 50 years, Congress has addressed interstate air pollution several times and with increasing rigor." *EME Homer*, 572 U.S. at 497. More specifically, the Good Neighbor Provision evolved from earlier versions that first relied on states' "cooperation," which proved ineffective. *Id.* at 497-99. Even under the current more inclusive and prescriptive Good Neighbor Provision, many states still failed to submit or adopt plans containing adequate provisions addressing their Good Neighbor obligations, including for ozone, leading to successive rounds of rulemaking and judicial decisions.

Since 1998, for each ozone NAAQS revision, EPA has promulgated national rules specifically defining and/or implementing Good Neighbor requirements for states and has approved adequate Good Neighbor submissions and disapproved inadequate ones. *See, e.g.*, 63 Fed. Reg. 57356 (Oct. 27, 1998) ("$NO_X$ SIP Call," addressing the 1979 ozone NAAQS); 70 Fed. Reg. 25162 (May 12, 2005) ("Clean Air Interstate Rule," addressing the 1997 ozone NAAQS); 76 Fed. Reg. 48208 (Aug. 8, 2011) ("Cross-State Rule," addressing the 1997 ozone NAAQS); 81 Fed.

Reg. 74504 (Oct. 26, 2016) ("Update Rule," addressing the 2008 ozone NAAQS); 86 Fed. Reg. 23054 (Apr. 30, 2021) ("Revised Update Rule," addressing the 2008 ozone NAAQS).

These rules defining and implementing Good Neighbor obligations have been extensively litigated.  The resulting cases have clarified the meaning of key terms in the Good Neighbor Provision, at times setting bounds on the scope of EPA's authority and at other times holding that EPA must regulate more aggressively.  EPA's action on 2015 ozone NAAQS Good Neighbor SIPs was informed by these court decisions.

In 2000, the D.C. Circuit affirmed EPA's NO$_X$ SIP Call, including the use of cost as part of the determination of significant contribution, and upheld EPA's ability to set NO$_X$ budgets notwithstanding a state's authority to develop SIP submissions.  *Michigan v. EPA*, 213 F.3d 663, 674-79, 685-88 (D.C. Cir. 2000) (per curiam).  The D.C. Circuit, however, invalidated EPA's next Good Neighbor rule, the Clean Air Interstate Rule, holding, *inter alia*, that EPA (and states) must align Good Neighbor emission reductions with attainment dates faced by downwind areas and that each state must eliminate its own significant contribution to nonattainment or interference with maintenance regardless of other contributions to the same downwind areas.  *North Carolina v. EPA*, 531 F.3d 896, 911-12, 920-21 (D.C. Cir. 2008).

In 2011, EPA replaced the Clean Air Interstate Rule with the Cross-State Rule. 76 Fed. Reg. 48208. In that rule, EPA made error corrections because of *North Carolina,* converting its earlier approval of 22 states' submissions into disapprovals, and promulgated FIPs for those states. *Id.* at 48220-22.

The D.C. Circuit vacated the Cross-State Rule in part, holding that EPA must define Good Neighbor obligations and give states the opportunity to submit approvable SIPs before promulgating FIPs. *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 30-31 (D.C. Cir. 2012). The Supreme Court rejected this holding and reversed. *EME Homer*, 572 U.S. at 496. The Supreme Court also held that, through the Good Neighbor Provision, Congress delegated to EPA the authority to determine what constitutes significant contribution to nonattainment or interference with maintenance. *Id*. at 513-20. The Court upheld as reasonable the 4-step framework EPA relied on to evaluate Good Neighbor obligations. *Id*. In particular, the Court upheld EPA's cost-based analysis for defining significant contribution across all upwind states as an "efficient and equitable" interpretation of the Good Neighbor Provision. *Id.* at 519-20. On remand, the D.C. Circuit largely affirmed the Cross-State Rule but remanded to EPA on record-based grounds as to certain states. *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015).

During those proceedings, EPA revised the ozone NAAQS to 75 ppb in 2008, and, in 2016, following the decisions in *EME Homer*, promulgated the Update Rule, establishing Good Neighbor FIPs for 22 states.  81 Fed. Reg. 74504. The Update Rule was remanded on the narrow ground that EPA did not fully address states' Good Neighbor obligations by the next downwind attainment date. *Wisconsin*, 938 F.3d at 312-20.  In response to this remand, EPA promulgated the Revised Update Rule, which fully resolved the Good Neighbor obligations for 21 states.  86 Fed. Reg. 23054, *upheld by Midwest Ozone Grp. v. EPA*, 61 F.4th 187 (D.C. Cir. 2023).

While litigation over EPA's Good Neighbor rules has primarily focused on its FIPs and actions defining Good Neighbor obligations, the D.C. Circuit (and no other court to date) has also addressed EPA's SIP disapprovals.  In *EME Homer*, the court upheld EPA's error correction of 22 SIP approvals to disapprovals.  795 F.3d at 132-35.  And in *Westar Energy, Inc. v. EPA*, the court upheld EPA's disapproval of Kansas's Good Neighbor SIP for the 2006 fine particulate matter NAAQS.  608 F. App'x 1 (D.C. Cir. 2015) (per curiam).

> **2.  EPA's 4-Step Framework for Evaluating Good Neighbor SIP Obligations**

For decades, when evaluating SIPs and formulating FIPs, EPA has consistently utilized a 4-step framework to implement the Good Neighbor Provision, including for ozone.  Response to Comments ("RTC") at 431 [JA___].

This framework was developed to give content to the critical statutory terms in the provision, *see id.*; 42 U.S.C. § 7410(a)(2)(D)(i)(I), and has been upheld as "permissible, workable, and equitable," *EME Homer*, 572 U.S. at 524; *see also, e.g., Midwest Ozone Grp.*, 61 F.4th at 189 n.1 (listing other cases); *Westar*, 608 F. App'x at 2-3. The 4-step framework "provide[s] a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport." Disapproval at 9338. For this reason, many states generally follow this framework when formulating their SIPs, though EPA does not require states to do so. *Id.; see also* Submission at 15-16 [JA_-_] (applying EPA's Step 1 analysis). Regardless of the approach states take, however, the Act obligates EPA to independently evaluate whether a submission contains "adequate provisions" to comply with the Good Neighbor Provision. 42 U.S.C. § 7410(a)(2)(D), (k)(3). Given the multistate nature of ozone pollution, EPA does so "with an eye to ensuring national consistency and avoiding inconsistent or inequitable results." Disapproval at 9381.

Assessing Good Neighbor obligations requires first identifying an appropriate future analytic year. *See id.* at 9340-41; *North Carolina*, 531 F.3d at 911-12. Here, EPA identified 2023 as the appropriate analytic year, which reflects the last year that emissions reductions may be implemented in a full ozone season (May 1 through September 30) before the next attainment date, the Moderate attainment date of August 3, 2024. Disapproval at 9341.

Then, under the 4-step framework, states when preparing SIP submissions, or EPA when promulgating a FIP would:

**Step 1:** Identify downwind "nonattainment" and "maintenance" receptors, which are monitoring sites that "will" not attain or will struggle to maintain the NAAQS in a future year. 42 U.S.C. § 7410(a)(2)(D)(i); *EME Homer*, 572 U.S. at 495. "Nonattainment" receptors are those monitors that are currently measuring exceedances of the NAAQS and are projected to continue to exceed the NAAQS in the future analytic year, and "maintenance" receptors are those monitors at risk of exceeding the NAAQS in the future. Disapproval at 9348; *see also North Carolina*, 531 F.3d at 909-11.

Ozone concentration levels are represented as regulatory "design values," the average of three consecutive years' fourth-highest daily eight-hour average ozone concentration. 40 C.F.R. Pt. 50, App. U 1(c), 4. In the context of considering a state's Good Neighbor obligations for the 2015 ozone NAAQS, EPA (and Utah) uses modeling to evaluate whether any air quality monitor's projected design value for 2023 (the analytic year) is exceeding or at risk of exceeding 70 ppb (the level of the NAAQS).

**Step 2:** Determine whether upwind-state "emissions" "contribute" to those downwind "nonattainment" and "maintenance" receptors by applying a screening threshold. 42 U.S.C. § 7410(a)(2)(D)(i). If a state's impact to an identified

receptor meets or exceeds a contribution threshold, the state is considered linked to that receptor, warranting further evaluation in Step 3 to determine whether it will "contribute significantly to nonattainment" or will "interfere with maintenance" of the NAAQS in other states. *Id.*; Disapproval at 9342; *see also EME Homer*, 572 U.S. at 502-03; *Wisconsin*, 938 F.3d at 311. States with impacts below the threshold to all downwind receptors are screened out and are excluded from further consideration. Disapproval at 9342. Thus, Step 2 identified those states that "should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute." *Id.*

EPA has used a screening threshold equal to 1% of the relevant NAAQS since 2011 because ozone air quality problems are affected by "a great number of geographically dispersed emissions sources" and 1% is "a reasonably small enough value to identify only the greater-than-de minimis contributers yet is not so large that it unfairly focuses attention for further action only on the largest single or few upwind contributers." *Id.* at 9371; *see also EME Homer*, 572 U.S. at 500. For the 2015 ozone NAAQS (70 ppb), 1% is 0.70 ppb.

**Step 3:** Evaluate the "amounts" of air pollution that "contribute significantly" or "interfere with maintenance." 42 U.S.C. § 7410(a)(2)(D)(i). It is at this step in the analysis that the allocation of responsibility is determined among

contributing upwind states.  A state or EPA would determine the amount by which

a state is contributing significantly to nonattainment or interfering with

maintenance by evaluating how emissions control strategies broadly applied across

linked upwind states would benefit air quality downwind.  572 U.S at 514-

20.[1]  The factors EPA typically considers include the cost-effectiveness of potential

emissions controls, the total emissions reductions that may be achieved by

requiring such controls (if applied across all linked upwind states), and an

evaluation of the air quality impacts such emissions reductions would have on the

downwind receptors.  Disapproval at 9342-43.  In this way, each state is held

responsible for its fair share of a collective problem.  *See EME Homer*, 572 U.S. at

519 ("Eliminating those amounts that can cost-effectively be reduced is an efficient

and equitable solution to the allocation problem the Good Neighbor Provision

requires the Agency to address.").

   **Step 4:** Implement "adequate provisions" "prohibiting" those emissions.

*See* 42 U.S.C. § 7410(a)(2)(D).  At this step, a state or EPA would develop

permanent and federally enforceable strategies to achieve emissions reductions

found to be necessary at Step 3 to eliminate significant contribution to

---

[1] *EME Homer* upheld EPA's decision not to allocate responsibility among upwind
states proportionally to each state's contribution.  572 U.S. at 514-19.  The
Disapproval stated EPA's openness to this alternative method of allocating
responsibility, though no state adopted this approach.  Disapproval at 9376.

nonattainment or interference with maintenance.  Disapproval at 9343.  Thus,

emission control measures identified as necessary at Step 3 must be included in the

SIP (or FIP).  *Id*.

## II.    Factual Background

### A.    Modeling Issued for the 2015 Ozone NAAQS

EPA (and Utah) used the CAMx photochemical grid model to identify

downwind nonattainment and maintenance receptors in Step 1 and upwind-state

contributions to these receptors in Step 2.  *See id.* at 9343-44; Submission at 15

[JA_].  The modeling for Steps 1 and 2 is based on a nationwide "platform" that

incorporates a base year (i.e., historic year) of meteorological and emissions data

along with emissions projections for the analytic years (i.e., future year).  2016v3

Air Quality Technical Support Document ("TSD") at 3-7 [JA_-_].  The platform is

used in the photochemical grid model to predict ozone concentration levels and

ozone contributions in the future analytic years at individual monitoring sites to

identify receptors at Step 1 and linkages at Step 2.  *See supra* Background I.B.2.

Of relevance here, EPA released iterations of its Step 1 and 2 modeling

based on two different platforms.  The 2011-based modeling used 2011 as the base

year.  *See* Disapproval at 9338.  EPA made changes in response to comments it

received on this modeling and, in October 2017, released a memorandum with data

showing which monitoring sites were potential receptors for the 2008 ozone

NAAQS for the analytic year 2023.  October 2017 Memo [JA_-_].  In March 2018, EPA issued a memorandum ("Modeling Memo") containing final 2011-based modeling and showing which monitoring sites were potential receptors for the 2015 ozone NAAQS for the analytic year 2023, along with contribution modeling data to "assist[]" states in developing their Good Neighbor submissions for the 2015 ozone NAAQS.  Modeling Memo at 2-6, Atts. B, C [JA_-_; _, _]; Disapproval at 9338-39.  Many states, including Utah, employed the 2011-based modeling in their Good Neighbor SIP submissions for the 2015 ozone NAAQS. *See* 87 Fed. Reg. 31470, 31475 (May 24, 2023) ("Proposal").

After years of further collaboration with states, multi-jurisdictional organizations, and local agencies, EPA updated its modeling platform using emissions inventories and data for a 2016 base year and 2023 analytical year for use by states and EPA for regulatory air quality modeling purposes (the "2016v1 platform").  *See* Disapproval at 9339.  EPA released the "2016v1" modeling and accepted public comment on that modeling.  *see id.*; 86 Fed. Reg. 23054, 23078-82 (Apr. 30, 2021).

EPA subsequently updated the emissions inventories to incorporate improved data and stakeholder feedback.  The resulting "2016v2" modeling was considered in EPA's proposed evaluation of pending SIP submissions for the 2015 ozone NAAQS.  *See* Disapproval at 9339, 9343-44; 2016v2 Air Quality TSD at 1

[JA_].  Incorporating public comments on that modeling (including from Petitioners, *see, e.g.,* RTC 154-55 [JA_-_]), EPA considered the "2016v3" modeling in the final Disapproval.  Disapproval at 9339; *see generally* 2016v3 Air Quality TSD [JA_-_].  EPA found the 2016v3 modeling state-of-the-science and concluded that it performed within generally accepted model performance criteria.  *See* Disapproval at 9344-45, 9366.  And, recognizing that *measured* ozone levels continued to well-exceed the NAAQS at many monitoring stations through 2021 and 2022, EPA also identified "violating monitors" as an additional class of receptors to which the states covered in the Disapproval, including Utah, were also projected to be linked in 2023.  *Id.* at 9349.  Thus, in EPA's final analysis, Utah is linked to eight receptors in Colorado above 1% of the NAAQS, with contribution above 1 ppb at four of those receptors.  2016v3 Air Quality TSD at C-3, C-5 [JA_, _].

## B.    2018 Memoranda

Accompanying the Modeling Memo, EPA included Attachment A.  Attachment A listed potential stakeholder ideas for addressing Good Neighbor obligations, which EPA did not expressly endorse but on which EPA invited feedback.  Modeling Memo, Att. A [JA_] ("EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the [Act], nor are we specifically recommending that states use these

approaches.").  Attachment A also provided a set of "guiding principles" for how states and EPA should approach their obligations, which emphasized the importance of regional consistency, collaboration in addressing shared ozone problems, and compliance with judicial precedent.  *Id*.

EPA issued another memorandum in August 2018 ("1 ppb Memo"), providing additional information to states developing Good Neighbor SIPs for the 2015 ozone NAAQS.  The 1 ppb Memo suggested that, at Step 2, "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent [of the NAAQS] threshold."  1 ppb Memo at 4 [JA_].  The Memo noted that a 1 ppb contribution threshold may adequately account for the collective contribution nature of interstate ozone pollution, but EPA emphasized that regulators "should consider whether the recommendations . . . are appropriate for each situation," and that "[f]ollowing these recommendations does not ensure" approval.  1 ppb Memo at 1 [JA_].

### C.    Utah's Initial SIP Submission and EPA's Finding of Failure to Submit

On October 24, 2019, Utah submitted an initial SIP for the 2015 ozone NAAQS.  *See* Proposal at 31475.  In accordance with Section 7410(k)(1)(B), EPA concluded that the submission was incomplete because Utah had not certified that it provided an opportunity for public participation.  *See* 84 Fed. Reg. 66612, 66614 (Dec. 5, 2019) ("2019 Finding") (effective Jan. 6, 2020).  The 2019 Finding was

not challenged; it obligated EPA to promulgate a FIP within two years (by January 6, 2022) to address the Act's requirements, unless EPA first approved a SIP for Utah. *Id.* at 66613; 42 U.S.C. § 7410(c)(1).

After EPA missed that statutory deadline, parties brought a mandatory duty suit under Section 7604(a)(2). EPA entered into a consent decree requiring it to promulgate a FIP for Utah by March 15, 2023, unless EPA approved a SIP by that date. 87 Fed. Reg. 66299 (Nov. 3, 2022); Consent Decree, *Sierra Club v. Regan*, No. 3:22-cv-01992-JD (N.D. Cal. Jan. 24, 2023), ECF No. 37.

### D.    Utah's Second SIP Submission

On January 29, 2020, Utah submitted a new state plan ("Submission"). Utah stated that it was utilizing a "weight-of-evidence" approach, which partially followed EPA's 4-step framework while also invoking arguments concerning the alleged particularities of its emissions' transport into Colorado. Submission at 15-17 [JA_-_].[2] First, at Step 1, Utah identified nonattainment and maintenance receptors using EPA's 2011-based modeling. *Id.* at 15-16 [JA_-_]. Then, at Step 2, Utah attempted to follow the 1 ppb Memo, applying a 1 ppb threshold to identify

---

[2] Generally, a weight-of-evidence approach makes use of all available sources of information to inform a decision while accounting for the reliability of the data. *See Heal Utah*, 2023 WL 5185608, at *3 n.6. It has been used in the Good Neighbor context in circumstances where high-quality air quality modeling is lacking or considered unreliable—such as in the case of wintertime inversion conditions in the Uinta Basin. *See* RTC at 304 [JA_]; *infra* Arg. III.A.

its linkages;[3] Utah identified linkages to four projected nonattainment and maintenance receptors in the Denver Metro/North Front Range, Colorado nonattainment area ("Denver area") above 1 ppb.  *Id.* at 17-18 [JA_-_].

Despite being linked under its own preferred modeling and contribution threshold to four receptors, Utah claimed that it need not determine whether its contributions were significant or interfering with maintenance of the NAAQS in the Denver area.  First, Utah argued that the amount of collective contribution from upwind states at Colorado receptors is lower, and Colorado's in-state contributions are higher, relative to some eastern states.[4]  *Id.* at 18-19 [JA_-_].  Second, Utah claimed that its contributions to Colorado receptors are lower than non-anthropogenic (e.g., wildfires or biogenic emissions) and international (e.g., emissions emanating from Mexico and Canada) sources to Colorado.  *Id.* at 19-20 [JA_-_].  Third, Utah argued that emissions reductions already achieved since 2011

---

[3] Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nevada, Ohio, and Oklahoma also cited the 1 ppb Memo in applying a 1 ppb contribution threshold at Step 2.  Disapproval at 9373 n.311.

[4] Arkansas, California, Indiana, Kentucky, Louisiana, Michigan, Missouri, Ohio, Oklahoma, and Texas also referenced, in varying degrees of detail, their contributions relative to contributions from downwind states and other sources to support their argument that they have no Good Neighbor obligations.  87 Fed. Reg. 9798, 9805, 9812, 9818, 9833 (Feb. 22, 2022) (Arkansas, Louisiana, Oklahoma, Texas); 87 Fed. Reg. 31443, 31460 (May 24, 2022) (California); 87 Fed. Reg. 9838, 9847-48, 9851 (Feb. 22, 2022) (Indiana, Michigan and Ohio); 87 Fed. Reg. 9498, 9505-06 (Feb. 22, 2022) (Kentucky); 87 Fed. Reg. 9533, 9539 (Feb. 22, 2022) (Missouri).

and expected to occur through 2023 were sufficient to avoid the need for further emissions reductions.[5]  *Id.* at 20-22 [JA_-_].

### E.    EPA's Disapproval

On February 22, 2022, EPA proposed to disapprove 19 states' SIP submissions.[6]  On May 24, 2022, EPA proposed to disapprove an additional four states' plans, including Utah's.  Proposal at 31470.[7]  In reviewing submissions, EPA considered each state's SIP on its own merits.  *See* Disapproval at 9354, 9360.  EPA evaluated modeling, methodologies, and analyses submitted by states and did not disapprove any state through rote application of the 4-step framework. *Id.* at 9338.  Nonetheless, EPA assessed all submissions with an eye toward ensuring national consistency in determining whether states adequately justified that they should have no Good Neighbor obligations, to ensure all states did their fair share to address a collective contribution problem.  *Id.* at 9354, 9381.

---

[5] Numerous states, including Alabama, Arkansas, California, Kentucky, Maryland, New Jersey, New York, and Oklahoma, also similarly made vague assertions, without adequate support, that existing or future controls would be sufficient to address any Good Neighbor obligations.  *See* Disapproval at 9354-59.

[6] *See* 87 Fed. Reg. 9463 (Maryland); 87 Fed. Reg. 9484 (New Jersey, New York); 87 Fed. Reg. 9498 (Kentucky); 87 Fed. Reg. 9516 (West Virginia); 87 Fed. Reg. 9533 (Missouri); 87 Fed. Reg. 9545 (Alabama, Mississippi, Tennessee); 87 Fed. Reg. 9798 (Arkansas, Louisiana, Oklahoma, Texas); 87 Fed. Reg. 9838 (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin).

[7] *See also* 87 Fed. Reg. 31443 (California); 87 Fed. Reg. 31485 (Nevada); 87 Fed. Reg. 31495 (Wyoming).

In assessing Utah's Submission, at Step 1, EPA agreed that Utah was linked to Colorado receptors. Proposal at 31479; Disapproval at 9351-52, 9360. At Step 2, EPA found that Utah had not adequately supported its use of a 1 ppb threshold but concluded that even under Utah's chosen 1 ppb contribution threshold, Utah was linked to downwind receptors. Proposal at 31478-79; Disapproval at 9360, 9373.

EPA then evaluated each of Utah's arguments for not proceeding to evaluate its emissions for significant contribution or interference with maintenance at downwind receptors. Proposal at 31479-83; Disapproval at 9360. First, consistent with EPA's prior findings that ozone problems in the Denver area partially result from collective upwind-state contribution, EPA disagreed that Utah did not impact Denver's air quality.[8] Proposal at 31481. Likewise, EPA explained that contributions from Colorado, non-anthropogenic sources, and international sources to the same receptors to which Utah is linked do not absolve Utah of its own Good Neighbor obligations.[9] *Id.* at 31482; Disapproval at 9378-79. Finally, EPA deemed inadequate Utah's conclusory assertions about current and future

---

[8] EPA reached the same conclusion regarding the nature of the ozone problem in the Denver area in assessing California's and Texas's submissions. 87 Fed Reg. at 31453 (California); 87 Fed. Reg. at 9833 (Texas).

[9] EPA reached the same conclusion regarding analogous arguments from Arkansas, California, Indiana, Kentucky, Louisiana, Michigan, Missouri, Ohio, Oklahoma, Texas, and West Virginia. *See* Disapproval at 9378-79.

emissions reductions resulting from preexisting requirements, as these emissions were already accounted for in EPA's updated modeling, which showed that Utah still contributes to air quality problems in the Denver area, despite those controls.[10] Proposal at 31483; RTC at 455-57, 459-62 [JA_-_, _-_].

EPA finalized its disapproval of Utah's Submission on January 31, 2023, along with 20 other SIP submissions that had similar inadequacies, each failing, despite at least one confirmed linkage to an out-of-state receptor, to include a technically and legally acceptable analysis to support its conclusion that its contributions to linked receptors was not significant.  *See* Disapproval at 9343. EPA's updated modeling and monitoring data confirmed its proposed bases for disapproving these 21 states.  *See id.* at 9343-54.  In finalizing the reasoning outlined in its proposals, EPA responded to numerous issues raised in comments common to multiple states.  *See, e.g., id.* at 9370-75 (Step 2 contribution threshold), 9378 (international contribution), 9378-79 (western state policy).  And EPA noted that its disapproval of Utah's Submission was consistent with its prior action partially disapproving Utah's Good Neighbor SIP for the less protective 2008 ozone NAAQS in 2016.  *Id.* at 9378 n.332.

---

[10] *See supra* n.5.

### F.    EPA's FIP

In compliance with its consent decree deadline to promulgate a FIP for Utah (and Pennsylvania and Virginia), EPA signed and issued the Good Neighbor Plan on March 15, 2023.  *See Sierra Club*, No. 3:22-cv-01992-JD, ECF No. 37.  The Good Neighbor Plan promulgated an integrated set of FIP requirements for 23 states, including Utah.  88 Fed. Reg. 36654 (June 5, 2023). The Good Neighbor Plan was published in the *Federal Register* on June 5, 2023, and became effective on August 4, 2023.  *Id*.

## III.    Procedural Background

Numerous states and interested parties have challenged the Disapproval.[11] Several petitioners in this and other courts moved to stay the Disapproval, and merits briefing is proceeding at different paces.

---

[11] *Utah v. EPA*, Nos. 23-1102, 23-1103, 23-1105, 23-1106, 23-1107, 23-1112, 23-1113, 23-1115 (D.C. Cir.) (consolidated cases); *West Virginia v. EPA*, No. 23-1418 (4th Cir.); *Texas v. EPA*, No. 23-60069 (5th Cir.); *Kentucky v. EPA*, Nos. 23-3216, 23-3225 (6th Cir.) (consolidated cases); *Arkansas v. EPA*, No. 23-1320 (8th Cir.); *Sw. Elec. Power Co. v. EPA*, No. 23-1765 (8th Cir.); *Ark. League of Good Neighbors v. EPA*, No. 23-1778 (8th Cir.); *Hybar LLC v. EPA*, No. 23-1777 (8th Cir.); *Missouri v. EPA*, No. 23-1719 (8th Cir.); *Union Elec. Co. v. EPA*, No. 23-1751 (8th Cir.); *City Utils. of Springfield v. EPA*, No. 23-1774 (8th Cir.); *Allete, Inc., v. EPA*, No. 23-1776 (8th Cir.); *Nevada Cement Co. v. EPA*, No. 23-682 (9th Cir.); *Oklahoma v. EPA*, Nos. 23-9514, 23-9521, 23-9533, 23-9534 (10th Cir.) (consolidated cases); *Wyoming v. EPA*, Nos. 23-9529, 23-9531, 23-9537 (10th Cir.) (consolidated cases); *Alabama v. EPA*, Nos. 23-11173, 23-11196 (11th Cir.) (consolidated cases).

Here, Petitioners moved to stay the Disapproval as to Utah pending judicial review, and EPA moved to transfer venue to the D.C. Circuit. *See, e.g., Utah*, No. 23-9509, ECF Nos. 10981771, 10983793. This Court abated the stay motion pending resolution of EPA's venue motion. *Id.* ECF No. 10984086. Thereafter, the Court referred the venue question to the merits panel and consolidated all Utah-related petitions. *Id.* ECF Nos. 10994985, 11002290. Most recently, the Court stayed the Disapproval as it relates to Utah pending judicial review, stating in its Order that EPA's FIP authority derives from the Disapproval. *Id.* ECF No. 11016742 ("Stay Order"). To comply with the Court's Stay Order, EPA is preparing a rulemaking to preserve the status quo pending judicial review. Memo, Notice of Forthcoming EPA Action to Address Judicial Stay Orders (Aug. 2, 2023), https://perma.cc/HYD6-U4PX.

## SUMMARY OF ARGUMENT

1.    The D.C. Circuit is the exclusive venue for petitions for review of the Disapproval under the Act's venue provision, 42 U.S.C. § 7607(b)(1). The Disapproval is either (a) "nationally applicable," because it applies to 21 states spanning eight EPA regions and ten federal judicial circuits and EPA utilized a nationally consistent framework to evaluate and ultimately disapprove Good Neighbor SIP submissions, or (b) if locally or regionally applicable, is based on multiple determinations of "nationwide scope or effect" made and published by

EPA.  This Court should therefore transfer the petitions for review to the D.C. Circuit or dismiss them.

2.    If this Court determines venue is proper here, the petitions for review of the Disapproval should be denied.  EPA lawfully disapproved Utah's Submission.  Under the Act's cooperative federalism framework, EPA exercises a critical oversight role in independently evaluating all SIPs to ensure they meet the Act's requirements.  Petitioners' interpretation of EPA's SIP review authority generally, and of the Good Neighbor Provision specifically, diverges from the history, text, and structure of the Act, binding case law in this Court, and EPA's longstanding approach to evaluating SIPs for compliance with the Act's requirements.

3.    EPA's grounds for disapproval were lawful and based on the whole record before the Agency.  Utah relied on modeling and methodology that showed emissions from the State contributes to receptors in downwind states.  However, Utah relied on technically and legally deficient arguments to avoid its statutory obligation to evaluate whether its contributions to Colorado are significant.  The Submission could not support Utah's claim that its sources have no responsibility to reduce their emissions to meet Good Neighbor obligations for the 2015 ozone NAAQS.  For this reason, and consistent with EPA's treatment in evaluating Good

Neighbor submissions from other western states and past submissions from Utah, EPA reasonably disapproved Utah's Submission.

    4.    In disapproving Utah's Submission, EPA did not move the goalposts on Utah or otherwise disrupt any reliance interest it had. Even under Utah's chosen 1 ppb contribution threshold and 2011-based modeling—which Utah contends it included in its Submission because of EPA's Memos and feedback— Utah contributed to downwind ozone problems in Colorado and was required to assess the significance of that contribution. And EPA provided Petitioners with ample opportunity to comment on EPA's proposed disapproval of Utah's SIP and met all procedural requirements.

    5.    EPA's 2016v3 modeling merely confirmed EPA's evaluation of Utah's Submission on its merits and was not itself necessary to the Disapproval. Regardless, the 2016v3 modeling met performance criteria, performing as well as, if not better than, Colorado's modeling, taking into account Colorado- and western-specific factors. EPA thoroughly considered and provided record responses to all issues Petitioners raise with respect to EPA's up-to-date modeling. It was therefore reasonable for EPA to use its 2016v3 to aid its evaluation of Utah's Submission.

    6.    If the Court concludes that remand is appropriate, it should limit its relief to the Disapproval action before the Court, as EPA has independent authority

to enforce the Good Neighbor Plan as to sources in Utah based on its 2019 Finding of Failure to Submit.  Additionally, the Court should remand without vacatur, as EPA's lawful bases for its Disapproval could easily be substantiated on remand. Failure to do so (especially if the Court disagrees that EPA has independent authority to continue to enforce the Good Neighbor Plan absent the Disapproval) further delays Utah's compliance with its Good Neighbor obligations and disrupts the implementation of EPA's Good Neighbor Plan.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") standard of review applies here. *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 496-97 (2004) ("*Alaska DEC*"); *Oklahoma*, 723 F.3d at 1211.  EPA's final action must be upheld so long as it is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Heal Utah*, 2023 WL 5185608, at *8 (quoting 5 U.S.C. § 706(2)(A)).

The familiar arbitrary-and-capricious standard is a narrow and deferential one that prohibits the Court from substituting its judgment for that of the Agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court must consider whether EPA's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Bowen Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285

(1974) (quotation omitted). "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Oklahoma*, 723 F.3d at 1211 (10th Cir. 2013) (quoting *Alaska DEC*, 540 U.S. at 497).[12]

Under this standard, the Court reviews EPA's actions on SIPs for adherence to the Act, respecting the discretion afforded to states within the Act's "cooperative-federalism approach," while also respecting EPA's obligation to substantively and carefully review each SIP for compliance with the Act. *Wyoming*, 2023 WL 5214083, at *4, *6. Furthermore, EPA's factual findings are entitled to substantial deference, *see Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992), and should be upheld so long as they are supported by the administrative record, even if the record could also support alternative findings, *WildEarth Guardians v. EPA*, 770 F.3d 919, 927 (10th Cir. 2014). Particular deference is given "[w]hen an agency acts under an unwieldy and science-driven statutory

---

[12] Although this Court stated in *Oklahoma* that EPA has less discretion when disapproving a SIP than when promulgating a FIP, *see* 723 F.3d at 1213 n.7, that statement merely reflects that EPA *must* disapprove a SIP if it is inconsistent with the CAA and regulations, while EPA has more flexibility in developing a FIP. *See Wyoming v. EPA*, No. 14-9529, --- F.4th ----, 2023 WL 5214083, at *4 (10th Cir. Aug. 15, 2023) ("The EPA 'has less discretion when it . . . reject[s] a SIP than it does when it promulgates a FIP,' because the EPA has a statutory duty to implement a sufficient plan if a state fails to do so." (internal citations omitted)). It is not an indication that the standard of judicial review is something other than the familiar arbitrary-and-capricious standard.

scheme like the Clean Air Act," in which case courts "afford the agency particular deference." *Id.* (cleaned up); *see also Heal Utah*, 2023 WL 5185608, at *8 ("[O]ur deference to the agency is especially strong when the challenged decisions involve technical or scientific matters within the agency's area of expertise.") (quotation omitted).  Accordingly, this Court affords EPA deference to its reasonable, technical determinations when evaluating SIPs.  *Id.* at *8-11; *Oklahoma*, 723 F.3d at 1204.

## ARGUMENT

## I.    Venue Lies Exclusively in the D.C. Circuit.

Any challenge to the Final Rule belongs in the D.C. Circuit and dismissal or transfer is appropriate.  The Act establishes exclusive venue in the D.C. Circuit to review two categories of EPA actions: those that are "nationally applicable," and those that are "locally or regionally applicable" but "based on a determination of nationwide scope or effect" made and published by EPA.  42 U.S.C. § 7607(b)(1).  The Disapproval clearly falls within either of these categories and therefore can be challenged only in the D.C. Circuit.  The petitions should be transferred there or dismissed.

### A.    The Disapproval is Nationally Applicable.

A petition for review that challenges a "nationally applicable" action under the Act may be filed "*only* in the United States Court of Appeals for the District of

Columbia." *Id.* (emphasis added).  Whether an action is "nationally applicable" is a narrow inquiry based on the "face of [the] rule, rather than [its] practical effect." *ATK Launch Sys.*, *Inc. v. EPA*, 651 F.3d 1194, 1197 (10th Cir. 2011).  The inquiry turns on the nature of the action, not the nature of a petitioner's challenge.  *Id.*; *see also S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 670 (7th Cir. 2017); *RMS of Ga., LLC v. EPA*, 64 F.4th 1368, 1372-73 (11th Cir. 2023).  On its face, the Disapproval is nationally applicable, applying to SIP submissions from 21 states across the country, spanning eight of the ten EPA regions and ten federal judicial circuits.  Disapproval at 9380.  EPA also used a nationally consistent analytical framework to evaluate all 21 submissions.  *Id.*

In *ATK Launch Systems*, this Court concluded that a similar action, where EPA addresses multiple states in a single rule, was nationally applicable.  651 F.3d at 1200.  *ATK Launch Systems* involved a statutory requirement that EPA evaluate each state's recommended nonattainment designations and promulgate final designations.  *Id.* at 1195.  EPA did so in one action, designating 31 areas in 18 states across the country as nonattainment areas.  *Id.* at 1197.  The petitioner brought suit in this Court, arguing that EPA's "case-by-case consideration of areas and boundaries transforms a national standard to a regional or local rule."  *Id.* at 1198.  This Court rejected these arguments, noting that "EPA's listing of the designations applied to each locality does not . . . constitute a mere amalgamation

of numerous local actions into a single rule," concluding instead that the action was nationally applicable and can only be challenged in the D.C. Circuit. *Id.* at 1200. Highlighting the "uniform process and standard" that EPA utilized to designate nonattainment areas across the country, this Court noted that "[a]ll of these standards and methodologies are part of EPA's nationwide approach to giving content to the Clean Air Act's mandate that nonattainment designations be assigned to areas that contribute to a nearby NAAQS violation." *Id.* at 1197, 1198.

Similarly, in the Disapproval, EPA evaluated each state's submission and technical rationales on their merits. Disapproval at 9354. EPA explained that ozone transport presents a "collective contribution" challenge in which many contributors across a broad region combine to generate a downwind air quality problem. *Id.* at 9342. So, given the "interdependent nature of interstate pollution transport," EPA utilized "a uniform legal interpretation and common, nationwide analytical methods" to avoid "inconsistent or inequitable results among upwind states . . . and between upwind and downwind states." *Id.* at 9380-81. While EPA acknowledged states could potentially substantiate alternative methodologies to its 4-step framework, EPA employed "a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations" to evaluate and ultimately disapprove all 21 states' submissions. *Id.* at 9339.

The figure below shows the 21 states whose plans EPA disapproved (colored green) for failing to comply with the Good Neighbor Provision:



That the Disapproval "reaches geographic areas from coast to coast" is "a strong indicator that the regulation is nationally applicable." *ATK Launch Sys.*, 651 F.3d at 1197.

It makes no difference that Petitioners purport to challenge the alleged effects of the Disapproval only as to Utah. *See* Utah Br. 19. The question here is whether the "action" itself is "nationally applicable," 42 U.S.C. § 7607(b)(1), not whether the nature and scope of the arguments raised or relief sought are nationally applicable. *ATK Launch Sys.*, 651 F.3d at 1197; *RMS of Ga.*, 64 F.4th at 1372-73; *see also S. Ill. Power Coop.*, 863 F.3d at 668 (finding venue proper in the D.C. Circuit of an action affecting 61 geographic regions across 24 states and overruling prior circuit precedent that improperly focused on the localized nature of

petitioners' claims in doing so). A contrary approach to national applicability would needlessly complicate the venue analysis and create difficult line-drawing problems. *See NRDC v. Thomas*, 838 F.2d 1224, 1249 (D.C. Cir. 1988).

Recently, divided Fifth and Sixth Circuit motions panels concluded that "[t]he relevant unit of administrative action here is the EPA's individual SIP denials" for each of the states. Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023), ECF No. 269-1, at 9 ("*Texas* Order"); *see also* Order, *Kentucky v. EPA*, No. 23-3216 (6th Cir. July 25, 2023), ECF No. 39-2, at 5 ("*Kentucky* Order"). *But see Texas* Order at 25-28 (Douglas, J., dissenting) (finding the Disapproval nationally applicable and opining that the panel's ruling conflicts with in-circuit precedent as well as precedents of sister circuits, including precedent from this Court); *Kentucky* Order at 11 (Cole, J., dissenting) ("[L]imiting the 'action' to Kentucky's state-specific challenge is inappropriate." (citing *Thomas*, 838 F.2d at 1249)).

These orders are not binding on merits panels of those courts, let alone this Court. *See Texas* Order at 24; *Rife v. Jefferson*, 742 F. App'x 377, 386 (10th Cir. 2018) ("[T]he decisions of one circuit court of appeals are not binding upon another circuit." (quoting *Garcia ex rel. Garcia v. Miera*, 817 F.2d 650, 658 (10th Cir. 1987))). Additionally, the orders conflict with Section 7607(b)(1)'s text, which bases venue on the nature of EPA's final action. Nothing in the Act

constrains EPA to acting on SIP submissions individually. *Cf.* Utah Br. 22-24 (contrasting Disapproval with EPA's prior SIP actions). Applying such a requirement "would violate the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (cleaned up). Indeed, it was reasonable for EPA to take a single final action disapproving multiple SIPs under the Good Neighbor Provision, where the evidence shows that there are many complex, interwoven, and overlapping linkages between and among states.[13]

Furthermore, the orders also conflict with this Court's holding in *ATK Launch Systems*, the Seventh Circuit's holding in *Southern Illinois Power*, and other cases that have addressed the "nationally applicable" provision of Section 7607(b)(1). Like the actions at issue in those cases, EPA's Disapproval evaluated submissions from states located across the country, utilizing "uniform legal interpretation and common, nationwide analytical methods." Disapproval at 9380; *see also ATK Launch Sys.*, 651 F.3d at 1200; *S. Ill. Power,* 863 F.3d at 671; *cf. Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019) (finding locally or regionally applicable an EPA order addressing "a single permit for a single plant

---

[13] Notably, the D.C. Circuit is the only circuit court that has decided challenges to EPA's actions on Good Neighbor SIPs. *See Westar*, 608 F. App'x 1 (reviewing EPA's action on Kansas's Good Neighbor SIP); *EME Homer City Gen., L.P.*, 795 F.3d at 132-36 (reviewing EPA's error correction of 22 Good Neighbor SIP approvals).

located in a single state"); *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015) (finding locally or regionally applicable an EPA action "limited to fleets operating in California"). The Disapproval is therefore nationally applicable.

Petitioners claim their challenges belong in this Court because "approving or promulgating a [SIP]" is "the prototypical 'locally or regionally applicable' action." Utah Br. 18, 19-20. But the authorities Petitioners favorably cite are distinguishable, involving challenges to actions affecting a single state. *See Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013) (challenge to EPA action on a single SIP from one state); *Chevron, U.S.A., Inc. v. EPA*, 45 F.4th 380, 386 (D.C. Cir. 2022) (challenge to EPA letter addressing two oil and gas platforms located off the coast of California). Moreover, the legislative history of Section 7607(b)(1) "indicates that [the phrase 'action in approving or promulgating a SIP'] was intended to apply only to review of the approval or promulgation of implementation plans *which run only to one air quality control region*." *Texas v. EPA,* No. 10-60961, 2011 WL 710598, at *4 (5th Cir. Feb. 24, 2011) (unpublished) ("*Texas 2011*") (quotation omitted). The Disapproval, by contrast, directly applies to 21 states located across the country.

Petitioners are also incorrect to suggest that the Regional Administrator's signature on EPA's *proposal* to disapprove Utah's SIP is somehow relevant to venue. Utah Br. 22-23. The action being challenged here is not the Proposal but

the final Disapproval. That action was signed by the EPA Administrator.

Disapproval at 9381.

By petitioning for review in this Court, Petitioners invite multiple circuits to review concurrently the merits of the same legal interpretation, policy decisions, and analytical methodology that EPA utilized in a consistent manner, in a single action, to evaluate submissions from states across the country. In doing so, courts may well reach inconsistent outcomes on the lawfulness of that action. This is precisely the result that Congress sought to avoid in enacting Section 7607(b)(1). *See NRDC v. EPA*, 512 F.2d 1351, 1357 (D.C. Cir. 1975) (Bazelon, J., concurring in part) (explaining that by vesting the D.C. Circuit with exclusive review of nationally applicable actions, Congress sought "to ensure uniformity in decisions concerning issues of more than purely local or regional impact"); *Texas 2011,* 2011 WL 710598, at *4.

In sum, the Disapproval is nationally applicable and challenges to it may be filed only in the D.C. Circuit.

### B.    EPA Properly Found and Published that the Disapproval is Based on Determinations of Nationwide Scope or Effect.

Alternatively, venue lies in the D.C. Circuit because the Disapproval is based on several determinations of "nationwide scope or effect" made and published by EPA. Disapproval at 9380-81.

A locally or regionally applicable action must be challenged only in the D.C. Circuit if (1) the action is "based on a determination of nationwide scope or effect" and (2) "the Administrator finds and publishes that such action is based on such a determination." 42 U.S.C. § 7607(b)(1). No one disputes that EPA satisfied the second prong by making and publishing the requisite finding, Disapproval at 9380-81, which is committed to EPA's discretion by law and is unreviewable, *see Texas v. EPA*, 983 F.3d 826, 834-35 (5th Cir. 2020). So, the only question here is whether the "action" being challenged is "based on a determination of nationwide scope or effect." The answer is yes.

The Fifth Circuit has observed that "[t]he 'action' is the rule or other final action taken by the agency that the petitioner seeks to prevent or overturn." *Texas v. EPA,* 829 F.3d 405, 419 (5th Cir. 2016) ("*Texas 2016*"). Here, the "action" in question is the Disapproval.[14] Although not binding on this Court, the Fifth Circuit has also elaborated on the meaning of the "determinations" that the challenged action is "based on": "determinations" are (1) "the justifications the agency gives for the action," which "can be found in the agency's explanation of its action;" and (2) "those that lie at the core of the agency action," not determinations that are

---

[14] Although Utah is manifestly incorrect that the at-issue EPA "action" is EPA's disapproval of Utah's SIP, *see* Utah Br. 18, 19-20, accepting Utah's framing does not alter this Court's inquiry because both the Disapproval as a whole and EPA's disapproval of Utah's SIP were based on multiple determinations of nationwide scope or effect.

"peripheral or extraneous." *Id*. "Determinations are not of nationwide scope or effect if they are 'intensely factual determinations' such as those 'related to the particularities of the emissions sources in'" the subject states. *Texas v. EPA*, 706 F. App'x 159, 165 (5th Cir. 2017) (quoting *Texas 2016*, 829 F.3d at 421).

EPA was clear that the Disapproval is based on multiple determinations of nationwide scope or effect. *See* RTC 392 [JA_] (identifying determinations of nationwide scope or effect, discussed in the Disapproval at 9361-79). For example, EPA determined that: (1) use of any alternative contribution threshold at Step 2 must be adequately justified, and neither reliance on EPA's 1 ppb Memo nor reliance on EPA's guidance on "significant impact levels" (SIL) for the prevention of significant deterioration (PSD) permitting program provided adequate justification, Disapproval at 9372-74;[15] and (2) states are not excused from eliminating their significant contribution to downwind receptors merely because international, non-anthropogenic, or other states' emissions also contribute

---

[15] *See also* Disapproval at 9354-60, 9373 (identifying state failure to support use of alternative contribution threshold as basis for disapproving submissions from Alabama, Arkansas, Illinois, Indiana, Kentucky, Michigan, Mississippi, Missouri, Nevada, Ohio, Oklahoma, and Utah).

some amount of pollution to the same receptors, *id*. at 9378-79; RTC at 460-62

[JA_-_].[16]  These are just two examples of many.  *See* Disapproval at 9361-79.

None of these determinations is "related to the particularities of the

emissions sources" in specific states.  *Texas 2016*, 829 F.3d at 421.  To the

contrary, these determinations reflect EPA's nationwide policy judgments and

analyses on interstate ozone transport, which EPA appropriately applied uniformly

across the covered states to avoid inconsistent or inequitable results.  Disapproval

at 9380-81.  These determinations are justifications that "lie at the core of" the

Disapproval and "can be found in the agency's explanation of its action."  *Texas

2016*, 829 F.3d at 419.  EPA therefore reasonably found and published that the

Disapproval is "based on a determination of nationwide scope or effect."

Disapproval at 9380-81; *see also Kentucky* Order at 16-18 (Cole, J., dissenting)

(identifying multiple "core" determinations of nationwide scope or effect in the

Disapproval, while recognizing EPA's individualized assessment of each

submission).

The legislative history of the "nationwide scope or effect" provision evinces

clear congressional intent to centralize review of national SIP issues in the D.C.

---

[16] *See also* Disapproval at 9355-60 (disagreeing with claims about other
contributing sources as basis for disapproving submissions from Arkansas,
California, Illinois, Indiana, Kentucky, Michigan, Ohio, Oklahoma, Utah, and
West Virginia).

Circuit and a recognition that, although SIP actions "usually involve issues peculiar to the affected States, such actions sometimes involve generic determinations of nationwide scope or effect." 41 Fed. Reg. 56767, 56768-69 (Dec. 30, 1976); *see also Texas 2011*, 2011 WL 710598, at *4 (citing same legislative history and noting that "[c]entralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results"). Consistent with this congressional intent, the D.C. Circuit has recognized that EPA's decision to direct challenges on matters of national importance to the D.C. Circuit should be reviewed under a highly deferential standard. *See Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 891 F.3d 1041, 1053 (D.C Cir. 2018) (Silberman, J., concurring); *Alcoa, Inc. v. EPA*, No. 04-1189, 2004 WL 2713116, at *1 (D.C. Cir. Nov. 24, 2004) (unpublished).

Consistent and unified implementation of the Good Neighbor Provision is particularly important. To safeguard the health and welfare of millions of people nationwide living in areas of unacceptably high ozone, the Good Neighbor Provision requires states and EPA to ensure that states' emissions do not significantly contribute to or interfere with maintenance of air quality problems in other states. *EME Homer*, 572 U.S. at 495-96. Given the Good Neighbor Provision's interstate focus and the broad geographic scale associated with the transport of ozone pollution in particular—which can travel "hundreds or

43

thousands of miles away," Disapproval at 9372—EPA's evaluation in the

Disapproval of states' Good Neighbor submissions for the 2015 ozone NAAQS

considered complex, interwoven, and overlapping linkages between and among

multiple states across the country, as illustrated below.[17]



The concurrent petitions for review of the Disapproval in eight regional

courts of appeals underscore the potential for inconsistent results if litigation

proceeds in regional courts.  Take the examples above.  Petitioners here argue that

---

[17] EPA, Interstate Pollution Linkages Under the Good Neighbor Plan, *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs#maps.

the Disapproval should be set aside for Utah because: (1) EPA arbitrarily rejected

the alternative 1 ppb contribution threshold Utah applied at Step 2, Utah Br. 44;

Indus. Br. 34-35, and (2) EPA arbitrarily rejected claims regarding the relevance of

other contributing emissions sources, Utah Br. 44-45; Indus. Br. 24.  Other

petitioners challenging the Disapproval in multiple regional circuits also challenge

(1) EPA's contribution threshold determinations, *see, e.g., Oklahoma*, 23-9514

(10th Cir.), ECF No. 11013681 at 41-43, 50-53; *Texas*, 23-60069 (5th Cir.), ECF

Nos. 335 at 25-29 (Miss.), 332 at 35-36 (La.), 328 at 26-28 (Tex.); *Missouri*, 23-

1719 (8th Cir.), ECF No. 5304774 at 28-29; *Allete*, 23-1776 (8th Cir.) ECF No.

5305346 at 17; and (2) EPA's determination that other contributing emissions

sources do not excuse states from their Good Neighbor obligations, *see, e.g.*, *Ark.

League of Good Neighbors*, 23-1778 (8th Cir.), ECF No. 5305660 at 36-37.[18]

Likewise, Petitioners *concede* EPA's determinations regarding the relevance of

comparing an upwind state's emissions to other sources in determining

significance, which is at issue here, *see infra* Arg. III.B., are at play in other

circuits where the Disapproval has been challenged.  *See* Indus. Br. 24 n.8 (citing

---

[18] EPA highlights examples from the Fifth and Eighth Circuits because it has
reviewed petitioners' opening merits briefs in these courts.  Based on the stay
motions, it is likely the same or similar arguments will be presented to the Fourth,
Sixth, Ninth, and Eleventh Circuits as well.  *See, e.g., Nevada Cement,* 23-682 (9th
Cir.), ECF No. 9 at 15-16 (citing wildfire and international emissions).

*Arkansas v. EPA*, 23-1320 (8th Cir.)).  Clearly, litigation in the regional circuits may lead to conflicting rulings on matters of nationwide consequence.

It is easy to envision a scenario where some upwind states are required to reduce their emissions under the Good Neighbor Provision for the 2015 ozone NAAQS while others are not, based on the judicial circuit where they challenge the Disapproval.  This high risk of inconsistent results on determinations that pertain to the Good Neighbor obligations of 21 states with downwind impacts spanning coast to coast bolsters EPA's finding that the Disapproval is based on multiple determinations of nationwide scope or effect, a finding that is entitled to deference.

The reasoning of the Fifth and Sixth Circuit motions panels' unpublished orders—that the SIP disapprovals at issue "were plainly based on a number of intensely factual determinations unique to each State," *Texas* Order at 11 (quotation omitted); *see also Kentucky* Order at 5-6—appears to rest on the assumption that Section 7607(b)(1) allows EPA to direct challenges to locally or regionally applicable actions to the D.C. Circuit only when they are "based *solely* on" a determination (or determinations) of nationwide scope or effect.[19]  But that is not the language of the statute.  Where Congress intended such a limitation, it has

---

[19] Petitioners' argument that "the core determination" underlying the action "was that sources located within Utah contribute to nonattainment and interfere with maintenance of the 2015 ozone NAAQS in the Denver, Colorado area" likewise makes the same assumption.  *See* Utah Br. 24-26 (cleaned up).

stated it explicitly. *See, e.g.,* 42 U.S.C. § 7607(b)(1) ("Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is *based solely on* grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise." (emphasis added)).  Congress did not include such narrowing language in Section 7607(b)(1)'s venue provisions.

These orders (as well as Petitioners' argument) essentially read the venue exception in Section 7607(b)(1) entirely out of the statute.  All "locally or regionally applicable actions" invariably are based, to some extent, on factual determinations that are unique to the relevant locality.  If EPA can never invoke the venue exception when the action is based, even in part, on unique facts and circumstances, then EPA's finding that a "locally or regionally applicable action" is "based on a determination of nationwide scope or effect" will never suffice to direct challenges to the D.C. Circuit.  Thus, not only do these motions panel orders "gut" Congress's decision to centralize judicial review in the D.C. Circuit on issues of national import, *Texas* Order at 29 (Douglas, J., dissenting), they also render meaningless the discretion Section 7607(b)(1) grants EPA to "find[] and publish[]" that a locally or regionally applicable action is based on a determination of nationwide scope or effect, thus flouting the interpretive canon against surplusage,

*see Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) ("[E]very word and every provision is to be given effect and [none] should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.") (cleaned up); *see also Kentucky* Order at 17 (Cole, J., dissenting).

In sum, applying the only reasonable construction of the Act's text, purpose, and history, this Court should transfer the petitions for review of the Disapproval to the D.C. Circuit or dismiss the petitions for improper venue.

## II.    EPA Acted Within its Statutory Authority.

In Petitioners' view, because a state has the authority to develop a SIP, EPA cannot second guess a state's assertion that its SIP meets the Act's requirements. *See* Indus. Br. 19-24; Utah Br. 33-34.  Petitioners' argument misconstrues the respective roles of EPA and states in two ways.  First, Petitioners' reasoning contravenes the plain language of the Act, which expressly tasks EPA with approving a SIP submission *only if* it meets applicable requirements.  42 U.S.C. § 7410(k); *Heal Utah*, 2023 WL 5185608, at *2; *Wyoming*, 2023 WL 5214083, at *6.  Second, the Good Neighbor Provision unambiguously requires the prohibition of emissions that significantly contribute to nonattainment or interfere with downwind maintenance of the NAAQS.  42 U.S.C. § 7410(a)(2)(D)(i)(I).  Utah's Submission asserts that Utah does not have to adopt *any* additional emissions control measures to meet this requirement.  But whether an upwind state has

correctly determined that its emissions significantly contribute to nonattainment or interfere with maintenance of the NAAQS in a downwind state is squarely within EPA's wheelhouse to assess, as Congress provided.

### A.   The Act Directs EPA to Determine Whether Plans Meet Applicable Requirements.

The Act's plain terms direct EPA to ensure that a SIP "meets all of the applicable requirements" of the Act.  42 U.S.C. § 7410(k)(3).  Petitioners' argument that EPA must accept the determinations in Utah's Submission without engaging in a substantive review would render this requirement meaningless.

Under the cooperative federalism scheme, the respective roles of EPA and states are clearly defined.  Congress required states to "adopt and submit" SIPs that provide for the "implementation, maintenance, and enforcement" of the NAAQS. *Id.* § 7410(a)(1).

Importantly, Congress charged EPA with ensuring that SIPs, including Good Neighbor SIPs, meet "*all* of the applicable requirements" of the Act, allowing approval only if the submissions meet such requirements, and otherwise requiring disapproval, in whole or in part.  *Id*. § 7410(k)(2)-(3) (emphasis added).  If a SIP is deficient, EPA must exercise its oversight role by disapproving it and promulgating a FIP thereafter.  *Id.* § 7410(c)(1); *see also Oklahoma*, 723 F.3d at 1204 (explaining that states exercise SIP authority with "federal oversight"); *Wyoming*, 2023 WL 5214083, at *6 ("To be sure, the Act provides for substantive

49

and careful EPA review; the agency need not simply rubberstamp SIPs.").

"Congress intended that EPA, not the states alone, ultimately ensure that state

determinations . . . comply with the Act, and so authorized EPA to disapprove state

'analysis that is neither reasoned nor moored to the [Act's] provisions.'" *Arizona*

*ex rel. Darwin v. EPA*, 815 F.3d 519, 532 (9th Cir. 2016) (quoting *North Dakota v.*

*EPA*, 730 F.3d 750, 761 (8th Cir. 2013)) (rejecting argument that EPA bears the

burden of proving a state's determinations are unreasonable).

In this way, the Act distinguishes between EPA's substantive SIP review

obligations under Section 7410(k)(3) and EPA's more perfunctory responsibility of

assessing a SIP for administrative completeness under Section 7410(k)(1)(B), as

EPA did in finding Utah's initial submission incomplete, *see supra* Background

II.C.  Accepting Petitioners' view that EPA must defer to states' substantive Good

Neighbor analyses collapses these statutory obligations into one, rendering the

separate statutory provisions duplicative and leaving EPA in a box-checking role

without regard to EPA's own expert judgment regarding compliance with the Good

Neighbor Provision.  *See Nielsen*, 139 S. Ct. at 969 (courts should avoid

interpretations of a statutory provision "that causes it to duplicate another provision

or to have no consequence").

Petitioners' argument also conflicts with other provisions in the Act.  For

example, Section 7426(b)-(c) empowers EPA to impose federal requirements on

upwind sources or groups of sources (or force their shutdown within 3 months), based on petitions from downwind jurisdictions alleging Good Neighbor violations.  That statutory provision expressly incorporates the language of the Good Neighbor Provision, independent of EPA's SIP review processes under Section 7410(k).  *See GenOn REMA, LLC v. EPA*, 722 F.3d 513, 520-24 (3d Cir. 2013); *Appalachian Power Co. v. EPA*, 249 F.2d 1032, 1045-47 (D.C. Cir. 2001).  Congress would not have granted EPA such authority in response to downwind jurisdictions' petitions under Section 7426, while granting EPA no meaningful role in reviewing upwind states' SIP submissions under Section 7410.

Petitioners fundamentally misunderstand what it means for states to have the "primary responsibility" in SIP development under the Act.  *See* Utah Br. 29; Indus. Br. 19-20.  States surely enjoy wide discretion to formulate regulatory controls to include in their SIPs, 42 U.S.C. § 7410(a)(2)(A), meaning they can adopt whatever enforceable control measures they prefer that will attain and maintain the NAAQS, so long as they meet applicable requirements, *see Train*, 421 U.S. at 79.  *Compare Heal Utah*, 2023 WL 5185608, at *11 (upholding EPA's approval of a SIP that met applicable best available retrofit technology ("BART") requirements), *with U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1167-68 (10th Cir. 2012) (upholding EPA's determination that a SIP was inadequate because it did not conform with EPA's rules regarding unavoidable equipment malfunctions).

Here, Utah did not propose *any* regulatory controls, and the Disapproval rests on EPA's determination that states (including Utah) unreasonably concluded that no emissions controls were required at all.  Disapproval at 9343 n.43; *Wyoming*, 2023 WL 5214083, at *6 (agreeing that "EPA does not have to accept unreasonable analyses that lead to an unreasonable . . . determination").  The question of whether a plan will adequately prohibit emissions that significantly contribute to nonattainment or interfere with maintenance in downwind states is at the heart of EPA's role and responsibilities in overseeing implementation of the NAAQS.  *See Wisconsin*, 938 F.3d at 312, 316.

For this reason, the Supreme Court and this Court have recognized EPA's authority to substantively review SIPs.  As the Supreme Court observed when first interpreting the Act's SIP provisions, the Act obligates EPA to evaluate SIPs for compliance with the Act's requirements and to assess whether control measures that states adopt are adequate to actually attain the NAAQS or achieve other real-world results required by the Act.  *Union Elec.*, 427 U.S. at 249 (citing *Train*, 421 U.S. at 64).  EPA's failure to do so would be unlawful or arbitrary.  *See Sierra Club v. EPA*, 972 F.3d 290, 301-03 (3d Cir. 2020) (faulting EPA for approving SIP submission that lacked technical justification).

This Court has repeatedly affirmed that the Act unambiguously grants EPA the authority to substantively review states' determinations in their SIPs for

compliance with the Act. *Heal Utah*, 2023 WL 5185608, at *2 ("[T]he federal government develops baseline air quality standards and oversees states' progress toward attaining those standards."); *Oklahoma*, 723 F.3d at 1207-10; *Wyoming*, 2023 WL 5214083, at *6-7. For example, in *Oklahoma*, the Court was faced with a similar argument from petitioners: that because the statute gives states authority to make BART determinations in their SIPs, "the statute unambiguously prescribes a limited role for the EPA," and thus "EPA exceeded its statutory authority by rejecting [the State's] BART determinations and replacing them with its own." 723 F.3d at 1207. This Court rejected that argument, citing EPA's obligation to review SIPs for compliance with the Act and explaining that, "because the EPA monitors SIPs for compliance with the statute, it must monitor BART determinations for compliance with the guidelines." *Id.* at 1210. The Court therefore concluded, "[g]iven that the statute mandates that the EPA must ensure SIPs comply with the statute, we fail to see how the EPA would be without the authority to review BART determinations for compliance with the guidelines." *Id.* at 1208; *see also Heal Utah*, 2023 WL 5185608, at *8-11 (upholding EPA's review and approval of Utah's regional haze SIP). These holdings are aligned with

other decisions from this Court[20] and many other circuits,[21] deferring to EPA's technical determinations.

In sum, the plain text of the Act requires EPA to ensure that SIPs contain adequate provisions to provide for attainment and maintenance of the NAAQS, and to satisfy the Act's specific requirements, including the Good Neighbor Provision. 42 U.S.C. § 7410(a), (k). EPA therefore acts within Congress's clear delegation of authority when it disapproves a submission because it does not meet the Good Neighbor Provision's requirements.

---

[20] *See also WildEarth Guardians*, 770 F.3d at 927; *U.S. Magnesium*, 690 F.3d at 1167-68 (upholding EPA's determination that Utah's SIP was inadequate based on EPA's reasonable interpretation of how to treat emissions from equipment malfunctions).

[21] *See, e.g., BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 832-34 (5th Cir. 2003) (deferring to EPA's evaluation of Texas's photochemical modeling and approval of Texas's SIP because EPA provided a reasonable explanation for its reliance on the model); *North Dakota*, 730 F.3d at 760-61 (deferring to EPA's determination that North Dakota's SIP submission contained methodological flaws and upholding EPA's disapproval of that submission); *Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 677 (9th Cir. 2012) (highlighting EPA's "affirmative duty" to ensure SIPs demonstrate attainment); *Westar*, 608 F. App'x at 3 (agency action "regarding technical matters within its area of expertise warrants particular deference") (citing *Balt. Gas v. NRDC*, 462 U.S. 87, 103 (1983)); *Mich. Dep't of Env't Quality v. Browner*, 230 F.3d 181, 185-86 (6th Cir. 2000) (deferring to EPA's determination that a state's SIP submission failed to offer analysis showing that Michigan's SIP will not interfere with the attainment and maintenance of the NAAQS).

**B.      EPA's Evaluation of the Submission was Consistent with its
SIP Approval Authority and the Good Neighbor Provision.**

EPA's evaluation of Utah's SIP submission should be upheld as reasonable;

EPA's review was consistent with its longstanding practice of independently

reviewing SIP submissions generally and of utilizing its 4-step framework to

evaluate Good Neighbor SIPs' compliance with the Act specifically.

Although states are not bound to follow EPA's 4-step framework, the

framework provides essential clarity, predictability, and consistency among the

many affected states regarding how EPA would evaluate SIP submissions.  *See*

Disapproval at 9338-43.  The 4-step framework gives content to each critical term

in the Good Neighbor Provision, has been used in the context of both evaluating

SIPs and implementing FIPs, and has been upheld as reasonable.  *EME Homer*,

572 U.S. at 518-20; *Westar*, 608 F. App'x at 2-3; *see also* RTC at 431 [JA_]

(explaining how each step of the 4-step framework relates to the statutory terms).

Accordingly, EPA utilized the 4-step framework as a reasonable analytical

framework to organize its evaluation of Good Neighbor SIPs.  *See North Dakota*,

730 F.3d at 766.  This was neither improper nor unreasonable and did not mean

that EPA imposed the 4-step framework on states—EPA thoroughly evaluated

whether any alternative approaches states put forward could be approved.  *See*

*infra* Arg. III.

On this point, the Court's recent decision in *Wyoming* is not to the contrary. There, the Court faulted EPA for failing to sufficiently explain why the State's submission was unreasonable, absent EPA's reliance on BART guidelines the Act expressly directed were non-binding as to the source in question. 2023 WL 5214083, at *5. Here, by contrast, EPA did not rotely apply its non-binding guidance to disapprove Utah's (or any other states') Submission; rather, it recognized that states have latitude to present their own approaches to their Good Neighbor obligations, and EPA explained in detail why it found states' approaches compliant (or not) with the Act. *See* Disapproval at 9369; *infra* Arg. III. This is wholly consistent with *Wyoming*'s observation that "the Act provides for substantive and careful EPA review" of state submissions and its recognition that EPA may reference and utilize helpful guidelines in carrying out its statutory obligation. *Wyoming*, 2023 WL 5214083, at *5-6; *see also U.S. Magnesium*, 690 F.3d at 1168 (deeming reasonable EPA's reliance on "policy statements to explain its interpretation of the [Act]," while also "clearly explain[ing] its reasoning in determining" that the SIP did not comport with the Act).

Similarly, Utah's attempt to distinguish *Oklahoma* and *WildEarth Guardians* as involving application of EPA regulations misses the mark. Utah Br. 37-38. EPA routinely develops technical methodologies to evaluate SIPs that are tethered and give content to terms of the Act, and EPA regularly relies on these

frameworks to evaluate a SIP's compliance with the Act.  *See, e.g.*, *BCCA Appeal*, 355 F.3d at 823, 840 (upholding EPA's "exhaustive review" of Texas's SIP submission under three-part framework—not codified in regulation—that EPA developed to evaluate "enforceable commitments").  Notably, EPA was *required* to issue the BART Guidelines via rulemaking in accordance with Section 7491 of the Act.  *See Oklahoma*, 723 F.3d at 1205; *WildEarth Guardians*, 770 F.3d at 924. The Act imposes no similar requirement on EPA before it is empowered to act on Good Neighbor SIPs, so it is of no import that the 4-step framework has not been codified in regulation.  *See EME Homer*, 572 U.S. at 509 ("When Congress elected to make EPA's input a prerequisite to state action under the Act, it did so expressly.").

Contrary to Petitioners' assertions, *see, e.g.,* Indus. Br. 24-26; Utah Br. 35-36, EPA did not disapprove Utah's Submission merely to pursue its own policy preferences.  EPA issued the Disapproval pursuant to its statutory obligations after finding that none of the 21 states' submissions were consistent with the Good Neighbor Provision as no state submitted a satisfactory evaluation of their emissions for significance despite evident contribution to downwind air pollution. 42 U.S.C. § 7410(a)(2)(D)(i)(I).  Moreover, EPA's concerns with consistency and equity derive directly from the text of the Good Neighbor Provision itself.  As addressed above, ozone presents a regional-scale pollution problem, by which

multiple states across the country contribute to downwind nonattainment.  *See*

*supra* Arg. I.B (providing a map of this interstate ozone problem); Disapproval at

9342, 9380.  In reviewing EPA's approach to this problem in prior cases, courts

have repeatedly recognized the importance of equity and consistency; the more one

state declines to eliminate emissions, the more other states—whether downwind or

upwind—must implement their own controls to achieve compliance with the

NAAQS.  *See, e.g.*, *EME Homer*, 572 U.S. at 519 (holding that EPA's approach is

an "equitable solution to the allocation problem the Good Neighbor Provision

requires the Agency to address"); *Maryland*, 958 F.3d at 1201 (recognizing that

Good Neighbor actions "equalize the burdens between upwind and downwind

states").  What Petitioners present as EPA's policy preference is a nationally

consistent approach to reviewing all state submissions in the context of interstate

ozone transport—an approach that gives meaning to the plain language in the Act,

case law, and EPA's longstanding practice.

Finally, Petitioners take issue with EPA's review of Utah's Submission,

asserting federal overreach merely because EPA required that states technically

justify their alternative methodologies.  *See* Utah Br. 36.  EPA's expectation that

any alternative approach be technically and legally justified was eminently

reasonable.  Because EPA's 4-step framework had been approved as a reasonable

method to assess Good Neighbor obligations by the Supreme Court, *EME Homer*,

572 U.S. at 519, states proposing alternative frameworks should be reasonably expected to present technical justifications and rely upon scientifically acceptable methodologies to demonstrate that their frameworks would comply with the Act; this is nothing but a truism regarding the burden on any administrative agency. Otherwise, a state could simply assert without any rationale that it did not significantly contribute or interfere with maintenance. *Alaska DEC*, 540 U.S. at 490 ("We fail to see why Congress having expressly endorsed an expansive surveillance role for EPA . . . would then implicitly preclude the Agency from verifying substantive compliance . . . and, instead, limit EPA's superintendence to the insubstantial question whether the state permitting authority had uttered the key words[.]").  In sum, EPA acted within its statutory authority in evaluating the state SIP submissions for compliance with the Good Neighbor Provision.

### III.   EPA Reasonably and Lawfully Disapproved Utah's Submission on the Merits of the Submission.

Despite recognizing that it contributed emissions to Colorado receptors above its own chosen threshold of 1 ppb, Utah proposed taking no action to lower its emissions based on three legally and technically insufficient factors.  EPA, as the expert federal agency charged by Congress with addressing the nation's air pollution problems, reasonably found Utah's "weight-of-evidence analysis" inadequate to support Utah's conclusions.  First, EPA concluded that the Colorado receptors suffer from collective contribution from upwind states, including Utah.

Proposal at 31479-81.  Second, EPA rejected Utah's attempt to absolve itself of its statutory obligation simply because other emissions sources also contribute to those receptors.  *Id.* at 31482.  Third, EPA explained that any emissions reductions from existing regulations were already accounted for.  *Id.* at 31483.  For these legally and technically sound reasons, EPA found Utah's Submission deficient on its own terms, warranting disapproval.  Disapproval at 9360.  These findings are entitled to deference.

### A.    EPA Reasonably Concluded that Colorado Receptors Suffer from Collective Contribution.

The receptors in Colorado to which Utah is linked are all located in the Denver nonattainment area, which was recently reclassified to a worse level from Marginal to Moderate for failure to timely attain the NAAQS.  87 Fed. Reg. 60897, 60901 (Oct. 7, 2022).  EPA has consistently found that the air quality at these receptors is and continues to be impacted by "collective contribution."  "Collective contribution" refers to the total amount of upwind states' contributions to ozone concentrations at the same receptor.  Disapproval at 9371; RTC at 319-20 [JA_-_].  The fact that many smaller emissions sources combine to create ozone problems downwind necessitates emissions reductions from a broad region to address a problem that may be hundreds of miles away.  Disapproval at 9342.  Only in one narrow circumstance (for a less protective ozone NAAQS) has EPA found total upwind-state contribution to monitoring sites (in California) so low that upwind

state emissions reductions were not required.  RTC 236-37 [JA_-_].  For all other receptors, including the ones in Colorado, EPA has consistently declined to discount collective contribution and has disapproved SIPs that attempted to do the same.  *Id.*; 81 Fed. Reg. 71991, 71993 (Oct. 19, 2016) (disapproving Utah's SIP for 2008 ozone NAAQS).

Nonetheless, Utah contends that it need not determine whether its contributions to Colorado are significant because collective contribution at the Colorado receptors is lower than at some receptors in the eastern United States. Submission at 18 [JA_]; Utah Br. 42-43.  EPA fully considered the data presented in Utah's Submission and (once again) concluded that the Colorado receptors suffer from collective contribution impacting their nonattainment.  Proposal at 31481; Disapproval at 9378-79.

As EPA explained, notwithstanding any regionally specific issues western states may face, *see* Utah Br. 40-41; Indus. Br. 21,[22] Utah's own chosen modeling showed that upwind states contribute 8-10% of total ozone concentrations at Colorado receptors, sufficient to demonstrate a collective contribution problem. Proposal at 31481.  In the Disapproval, EPA again rejected the notion that the

---

[22] As explained *infra* Arg. V., EPA's updated modeling considered these regionally specific issues.

narrow circumstances presented by certain California monitoring sites were applicable elsewhere. *Id.*; RTC at 236-37 [JA_].

As the chart below demonstrates, EPA has consistently found Colorado receptors to be impacted by collective contribution for multiple ozone NAAQS and multiple states (including Utah multiple times). *See* Proposal at 31481.

| Contributing State | Ozone NAAQS | Determination | Cite |
|---|---|---|---|
| California | 2008 | "[T]he average interstate contribution to ozone concentrations from all states upwind of these receptors [in the Denver area] was both considerable (9.2 to 9.4 percent of the projected ozone design values) and comparable to collective contributions from upwind states to receptors in Texas as evaluated in the [Update Rule]." | 83 Fed. Reg. 65093, 65094 (Dec. 19, 2018) |
| California | 2015 | There are receptors in the Denver area. | 87 Fed. Reg. at 31457 |
| Texas | 2015 | The Denver area receptors analyzed by Texas are impacted by collective contribution. | TCEQ Modeling TSD, at 90 [JA_] |
| Utah | 2008 | Total collective contribution from upwind states represents a significant portion of the ozone concentrations at Denver receptors. | 81 Fed. Reg. at 71995 |
| | | Collective contribution of transported pollution to Colorado receptors is substantial. | 82 Fed. Reg. 9155, 9157 (Feb. 3, 2017) |

| Wyoming | 2008 | Air quality problems in Denver were "comparable to receptors the EPA has addressed in the East." | 82 Fed. Reg. 9142, 9149-50 (Feb. 3, 2017)[23] |
|---------|------|------|------|

So, EPA's assessment of Utah's contributions to the Denver area is consistent with its evaluation of collective contribution to the same receptors in the past, and, contrary to Petitioners' contention (Submission at 18 [JA_]; Utah Br. 46-49; Indus. Br. 21-22), is distinguishable from EPA's assessment of the California monitoring sites in its prior approval of Arizona's submission for the 2008 ozone NAAQS ("Arizona approval"). In that action, EPA concluded that two monitors in California should not be treated as receptors for purposes of determining Good Neighbor obligations for the 2008 ozone NAAQS, because the cumulative upwind-state impact to those two monitors was only 2.5% and 4.4% of ozone concentration, respectively. *See* Proposal at 31479-80. The total collective contribution to the Denver area is greater than that in all modeling iterations. *Id.* at 31481 (8-10% in the 2011-based modeling, Utah's preferred modeling); 2016v2 Air Quality TSD at C-7-C-8 [JA_-_] (6-7% in the 2016v2 modeling); 2016v3 Air Quality TSD at D-2-D-3 [JA_-_] (6-8% in the 2016v3 modeling).

---

[23] Although EPA later changed its disapproval of Wyoming at prong 2 to an approval using updated air quality information, EPA's determination of the nature of the air quality problem in Denver did not change. *See* 84 Fed. Reg. 14270 (Apr. 10, 2019).

EPA has previously explained why the facts from the Arizona approval are not analogous to Utah's situation. *See* 82 Fed. Reg. at 9157. In reexamining the issue in light of new data, EPA reasonably determined that *no* state included in the Disapproval presented circumstances analogous to that of the Arizona approval based on total collective contribution to downwind receptors. Proposal at 31481; RTC at 234-37 [JA_-_] (rejecting commenters' arguments that EPA should approve Alabama's and Missouri's SIPs by viewing Texas receptors analogously to monitoring sites in California).[24]

Utah also paints an inaccurate picture of EPA's past treatment of western states, arguing that EPA has recognized that air quality problems are different in eastern and western states. Utah Br. 41 (citing Update Rule at 75715). This mischaracterizes EPA's prior rulemakings. In proposing the Update Rule—a FIP for the less protective prior ozone NAAQS—EPA took comment on including

---

[24] Petitioners contend that EPA decided to exclude Oregon from the FIP, based on Oregon's weight-of-evidence approach. Indus. Br. 22. This is inaccurate. EPA previously approved Oregon's Good Neighbor SIP for the 2015 ozone NAAQS because the modeling at the time indicated Oregon was not contributing above 0.70 ppb to any receptor. *See* 84 Fed. Reg. 7854 (Mar. 5, 2019). When updated modeling indicated Oregon contributes above 0.70 ppb to monitoring sites in California, EPA explained it was not planning to issue an error correction of Oregon's approval because the circumstances were akin to (and not an expansion of) those in Arizona's approval. *See* RTC at 236-37 [JA_-_]. However, EPA did not finalize that decision and is further considering comments regarding the issue. 88 Fed. Reg. at 36718. EPA's treatment of Arizona for the 2008 ozone NAAQS remains the only time that EPA has deemed it appropriate in a final action to determine monitoring sites to which at least one state is linked are not receptors.

western states in that rulemaking, but did not do so, recognizing the *potential*

relevance of *unspecified* geographic factors.  *See* Update Rule at 74523.  EPA

expressly stated that even though western states were not covered by that

rulemaking, "western states are not relieved of their statutory obligation to address

interstate transport."  *Id*.  EPA thereafter disapproved Utah's Good Neighbor

submission for the 2008 ozone NAAQS.  81 Fed. Reg. 71991.

EPA has never concluded that *all* western states should be treated differently

than eastern states in evaluating ozone transport.  Instead, EPA has utilized its 4-

step framework in reviewing western state submissions for compliance with the

Act, Disapproval at 9378-79; RTC 459-62 [JA_-_], while accounting for any

particularities on a case-by-case basis, when appropriate using a "weight-of-

evidence" approach, *see, e.g.*, 87 Fed. Reg. 61249, 61254 (Oct. 11, 2022) (finding

the influence of the unique topography of the Uinta Basin in Utah on formation of

wintertime ozone supportive of approving Colorado's 2015 ozone NAAQS Good

Neighbor submission); *see also* RTC at 303-04 [JA_-_] (identifying circumstances

where EPA has considered weight-of-evidence approaches appropriate).

EPA has consistently concluded that Utah contributes to the Denver area's

ozone problems, those problems are due in part to the collective contribution of

upwind states, and Utah presented no persuasive reason to reach a different

conclusion.

**B.    EPA Reasonably Concluded that Utah is Not Absolved of its Good Neighbor Obligations Merely Because Other Sources Also Contribute to the Colorado Receptors.**

The Good Neighbor Provision requires states and EPA to address transport of air pollution that *contributes* to ozone levels at downwind receptors, regardless of whether other emissions contribute to the same problems; it does not establish a *causation* standard.  Disapproval at 9378-79; *Wisconsin*, 938 F.3d at 323-25.

Utah's Submission incorrectly concluded that because Colorado's in-state contributions to its own receptors are greater than Utah's, and because 52-56% of total contributions to Colorado receptors originate from international or non-anthropogenic sources, Utah need not consider whether it significantly contributes to Denver area's nonattainment.  Submission at 19-20 & Tables 3, 4 [JA_-_]; Utah Br. 34; Indus. Br. 21.  In disapproving Utah's submission, EPA explained why, as a legal and technical matter, contribution from other sources does not relieve Utah of its Good Neighbor obligations.  Proposal at 31482; Disapproval at 9378.

In *Wisconsin*, the D.C. Circuit expressly rejected petitioners' argument that monitors should not be identified as receptors under the Good Neighbor Provision if their air quality problems "were actually attributable not to upwind-state but to non-U.S. emissions," holding that the "logic incorrectly assumes that an upwind State 'contributes significantly' to downwind nonattainment only when its emissions are the *sole cause* of downwind nonattainment."  938 F.3d at 324

(quotation omitted).  As the court noted, "[m]any (or perhaps all) receptors would *also* attain the NAAQS if all in-state contributions were eliminated, *or* if all upwind contributions were eliminated, *or* if all non-anthropogenic contributions were eliminated."  *Id.* (quotation omitted).  EPA applied and explained the *Wisconsin* holding in the Disapproval, which accords with its own views of what significant contribution means.  *See* Disapproval at 9378; Proposal at 31482; RTC at 337-39 [JA_-_].

EPA also explained that even if non-anthropogenic/non-U.S. emissions total 52-59% of total ozone concentration at the Colorado receptors, 41-48% of ozone levels at these receptors is still the result of anthropogenic emissions originating in the United States.  Proposal at 31482.  Although not all U.S. anthropogenic emissions are attributable to Utah, the State's own modeling shows that Utah contributes to Colorado receptors at levels that justify evaluating emissions control opportunities.  *Id.*  Utah took no such action.

Petitioners cast blame on Colorado, arguing the Act imposes "the concomitant responsibility" for downwind states to also limit their emissions.  Indus. Br. 24 (quoting *Maryland*, 958 F.3d at 1201).  EPA explained that it does not disagree with that proposition, but in the absence of a definition of upwind states' significant contribution (Utah offered none), the analysis EPA would normally conduct to calculate the downwind areas' fair share is not possible (and

67

Utah did not offer an alternative calculation of that either).  RTC at 455 [JA_]; *see also* 88 Fed. Reg. at 36749 (assuming Colorado's implementation of commensurate emissions reductions at Step 3).  Further, Petitioners take *Maryland* out of context.  There the D.C. Circuit concluded that as part of a multi-state nonattainment area with a violating monitor *in Pennsylvania*, Delaware could hold Pennsylvania responsible under Section 7426 for its continuing nonattainment status.  *Id.* at 456 [JA_] (discussing 958 F.3d at 1197-1201).  If anything, *Maryland* reinforces that upwind states should not be excused from their statutory duty to reduce emissions hampering other states' ability to reach attainment.  *Id.*

**C.    EPA Reasonably Concluded that Utah is Not Absolved of its Good Neighbor Obligations Because of Emissions Reductions Already Achieved Through 2017 and Unquantified, Vague Expectations of Future Emissions Reductions.**

Utah's Submission argued that additional emission controls are not necessary because Utah and Colorado had and would continue to achieve emissions reductions due to state and federal regulations adopted since 2011 or anticipated to be adopted after Utah submitted its SIP.  *See* Submission at 20-22 [JA_-_]; Utah Br. 44; Indus. Br. 22, 24.  EPA reasonably rejected this argument.

Importantly, EPA's updated modeling captured the effects of existing, on-the-books control measures referenced in Utah's Submission (including reductions due to Colorado state measures) in its projections of air quality and contributions.

Proposal at 31483; RTC at 455 [JA_].  Even after accounting for the impacts of these emissions reductions, the Denver area's nonattainment persists, and Utah remains linked above 1 ppb to Colorado's receptors.  Proposal at 31483. Moreover, even if these emissions reductions were *not* already accounted for, Utah included none of its claimed emissions reductions as measures for EPA to approve in its Submission, rendering the Submission inadequate.  Disapproval at 9360, 9376-77; *see also Mont. Sulfur & Chem. Co. v. EPA*, 666 F.3d 1174, 1195-96 (9th Cir. 2012) ("The EPA correctly reads 42 U.S.C. § 7410(a)(2) as requiring states to include enforceable emissions limits and other control measures *in the plan itself*.").

EPA also deemed Utah's invocation of existing and expected regulations technically deficient.  Utah's conclusions about predicted $NO_X$ reduction were unsupported, as Utah failed to "explain the baseline from which that amount of emissions reductions was derived" or "how or why that amount of emissions reduction is sufficient to eliminate significant contribution or interference with maintenance."  Proposal at 31483.  And, by pointing only to planned emissions reductions inside the Salt Lake City nonattainment area, Utah failed to evaluate emissions reductions from the highest emitting $NO_X$ sources in the State, including multiple electric generating units located outside of that nonattainment area.  *Id*. Moreover, Utah's submission predominantly cited expected emissions reductions

in VOC emissions, but "EPA has long recognized that the more important ozone-precursors for purposes of addressing regional and long-range interstate ozone transport are [$NO_X$]." *Id.*

*    *    *    *    *

In sum, Utah's own modeling showed it was linked to Colorado receptors above even a 1 ppb threshold. Nonetheless, Utah presented a series of arguments for why it need not evaluate whether its contributions to Colorado are significant, in violation of the State's statutory obligations. EPA found each of those arguments legally and technically deficient. It was reasonable for EPA to disapprove the State's submission on these grounds, and the Court need not reach the lawfulness of EPA's consideration of updated modeling or any alleged change in EPA policy. *See Sierra Club v. EPA*, 939 F.3d 649, 687 (5th Cir. 2019) (upholding EPA's SIP approval based on state's chosen modeling without reaching merits of EPA's modeling).

## IV.    EPA Did Not Violate Any Reliance Interest Utah Might Have in EPA's Pre-Proposal Memoranda or Pre-Submission Comments.

Although Petitioners spill much ink accusing EPA of changing policy in violation of Petitioners' reliance interest, EPA has done no such thing. Utah Br. 29-32; Indus. Br. 26-31. A reliance-interest violation presumes a change in agency policy, and there was none here. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Petitioners' argument that EPA "changed the standards it

70

applied to reviewing Utah's SIP submission," Utah Br. 31, without giving Utah

"fair warning," Indus. Br. 26, mischaracterizes EPA's prior statements and its

bases for the Disapproval.  The Disapproval was entirely consistent with any

policies expressed in the 2018 Memos and pre-submission feedback.

## A.    EPA Assessed Utah's Submission Consistent with the 1 ppb Memo and its Pre-Submission Feedback.

Petitioners incorrectly assert that EPA disapproved Utah's Submission

because the State evaluated linkages at Step 2 using a 1 ppb threshold, citing the 1

ppb Memo and EPA's pre-submission feedback.  Indus. Br. 28-30; Utah Br. 30-31.

As a threshold matter, the contribution threshold made no difference to the

outcome of EPA's evaluation, because even Utah's Submission identified

contributions to receptors *above* its chosen 1 ppb threshold.  Submission at 17-18

& Table 1 [JA_-_].  For that reason, EPA stated that Utah's "use of this alternative

threshold at Step 2 . . . would not alter [EPA's] review and proposed disapproval."

Proposal at 31478; Disapproval at 9373.

Moreover, EPA's consideration of the 1% threshold was not "contrary" to

the 1 ppb Memo.  *Cf.* Indus. Br. 30, 34-35.  Instead, the 1 ppb Memo provides that

"it *may* be reasonable and appropriate for states to use a 1 ppb contribution

threshold," 1 ppb Memo at 4 [JA_] (emphasis added), but that states "should

consider whether the recommendations in this guidance are appropriate for each

situation," *id.* at 1 [JA_].  Similarly, EPA's pre-submission feedback merely

recommended that the State review the 1 ppb Memo, but never stated that if Utah did so, its Submission would be approved. Nov. 14, 2018 Email & Attach. 2 [JA_, _] (explaining that final decisions would be made only after submission and notice and comment rulemaking); *see also* RTC at 75-76 [JA_-_]. EPA assessed Utah's submission consistent with this pre-submission guidance. Because Utah offered no explanation for why a relatively large loss in upwind contribution would be appropriate to allow at Colorado receptors, EPA found that Utah had not justified the use of a 1 ppb threshold.[25] Proposal at 31478; Disapproval at 9360.

EPA did not change its prior position in concluding that Utah did not provide an adequate showing that the use of the 1 ppb threshold was justifiable. *See* Disapproval at 9373; RTC at 299 [JA_]. But, again, more fundamentally, this is irrelevant to any evaluation of Utah's reliance interests, since Utah's Submission was disapproved under Utah's chosen 1 ppb contribution threshold.

B.    **EPA Did Not Disapprove Utah's Submission Because the State Relied on 2011-Based Modeling.**

Petitioners also mistakenly contend that EPA moved the goalposts by evaluating Utah's Submission using its 2016-based modeling instead of 2011-

---

[25] Although the 1 ppb Memo suggests that a 1 ppb and 1% threshold generally result in a comparable amount of contribution captured, that generalization does not bear out at the Colorado receptors to which Utah contributes. *See* Submission at 18 [JA_]; Proposal at 31478 (identifying a loss of 13.5% and 33.2% in collective contribution in moving from a 1% to 1 ppb contribution threshold at two Colorado receptors).

based modeling.  Indus. Br. 27-28, 30.[26]  Once again, the argument is irrelevant because Utah was linked to Colorado in all iterations of the modeling.

As indicated in the chart below in bold, EPA's 2011-based modeling included in the Modeling Memo as well as every iteration of 2016-based modeling all identified that Utah contributes above 0.70 ppb to the same three receptors in Colorado (80350004, 80590006, and 80590011), with Utah's linkages to two of those monitors (80350004, 80590011) falling above 1 ppb, Utah chosen threshold, in every iteration of modeling:

| | 2011-based[27] | 2016v2[28] | 2016v3[29] |
|---|---|---|---|
| Linked receptors (monitor identification number) | 80050002[a] **80350004[a]** 80590006 **80590011[a]** 80690011[a] | **080350004[a]** **080590006[a]** **080590011[a]** | 080013001[b] 080050002[a, b] 080310002[b] 080310026[b] **080350004[a]** **080590006[a]** **080590011[a]** 080690011 |
| [a] Contribution above 1 ppb. [b] Violating monitor receptor. | | | |

[26] Industry Petitioners' reference to "Technical Support Document for the 2015 Ozone NAAQS Preliminary Interstate Transport Assessment" as the "December 2016 Memo," is apparently a reference to EPA's notice of data availability seeking feedback on *preliminary* modeling results.  *See* 82 Fed. Reg. 1733 (Jan. 6, 2017). However, Utah's submission relied on the subsequent round of 2011-based modeling results released with the Modeling Memo.  Submission at 17 [JA_].

[27] Modeling Memo at C-3 [JA_].

[28] Proposal at 31479 (Table 5).

[29] 2016v3 Air Quality TSD at C-3, C-5 [JA_, _].

Thus, Utah's choice of modeling does not affect whether EPA lawfully disapproved Utah's Submission, and Petitioners' claim that EPA violated its reliance interests in the 2011-based modeling is simply untrue. In any case, EPA's Modeling Memo merely presented the most up-to-date modeling data available at the time for states to consider. *See* Modeling Memo at 2 [JA_] (explaining that the memo was merely meant to "inform the development of the SIPs," and that "the information [wa]s not a final determination regarding states' obligations under the good neighbor provision"). EPA did not reject any SIP based on the state's choice of modeling, nor did it evaluate states' submissions based solely on the 2016-based modeling; rather, EPA considered the whole record to render an independent judgment whether states had met their Good Neighbor obligations. Disapproval at 9366; RTC at 60 [JA_].

### C.    Utah Mischaracterizes Attachment A.

Petitioners inaccurately describe Attachment A to the Modeling Memo as EPA-endorsed. Utah Br. 30; *see also* Indus. Br. 28 (describing Attachment A as "EPA-approved considerations"). All Attachment A amounted to was "a preliminary list of potential flexibilities that *may* warrant further discussion." Modeling Memo at 3 [JA_] (emphasis added). EPA made clear that these ideas were not guidance, but outside stakeholder ideas on which EPA merely invited "feedback." *Id.* at A-1 [JA_]; *see also* Disapproval at 9369. EPA expressly stated

that it "is not at this time making any determination that the ideas [in Attachment A] are consistent with the requirements of the [Act], nor . . . specifically recommending that states use these approaches."  Modeling Memo at A-1 [JA_]. In considering these ideas, EPA also listed "guiding principles to consider when evaluating the appropriateness of the concepts" in Attachment A, including the importance of consistency across states and "[c]ompliance with statutory requirements and legal precedent from court decisions interpreting the [Act's] requirements."  *Id.*  Petitioners ignore this clear language.

Nowhere did EPA suggest that states could apply alternative approaches that lacked technical justification or failed to comport with the Act or applicable case law, as Utah's Submission did.  *See supra* Arg. III.  In fact, EPA stated the opposite.  So, Petitioners could have no reasonable reliance interest in Attachment A, as EPA "specifically acknowledged" that the ideas in Attachment A had not yet been evaluated for consistency with the Act's requirements and that states seeking to apply those ideas would need to consider whether those ideas complied with the statute and relevant case law.  *See Woodford v. Garceau*, 538 U.S. 202, 213 (2003) (O'Connor, J., concurring).  Attachment A was *never* EPA policy.  *See Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1262 (10th Cir. 2018) (describing policy statements as "public pronouncements of the policy that the agency plans to follow") (quotation omitted).

D.    **EPA Abided by All Procedural Requirements and Provided Robust Explanations.**

Even if the Disapproval represents a change in policy from EPA's pre-submission memoranda and feedback (which it does not), EPA did not "mov[e] the goalposts" on Petitioners without giving them "fair warning."  Utah Br. 32; Indus. Br. 26.

Petitioners ignore the critical fact that EPA published its Proposal roughly a year before taking final action, thereby giving Utah the ability to comment on the Proposal and, if it deemed appropriate, submit a new SIP.  Although Utah did not submit a new SIP, it (and industries within the State) provided comments on the Proposal, which EPA thoroughly considered and addressed in the Disapproval and RTC.  *See, e.g.*, Disapproval at 9378-79.  Thus, EPA fulfilled every procedural obligation required of it under the APA.  *Perez*, 575 U.S. at 96; *see also Quest Corp. v. FCC*, 689 F.3d 1214, 1229-31 (10th Cir. 2012) (upholding FCC's decision despite change in policy, because the FCC requested comments on the new policy and offered a reasonable and robust explanation for its new approach).

Petitioners suggest that when EPA deemed Utah's initial submission incomplete, it should have given Utah notice that EPA disagreed with the substance of the State's Submission.  *See* Indus. Br. 29; Utah Br. 14.  But as already described, completeness determinations under Section 7410(k)(1) do not involve an evaluation of the submission's merits.  *Supra* Arg. II.A.  EPA makes its

completeness determination *prior to* reviewing the merits of a SIP and would not have been able to make any final determination on Utah's submission before reviewing public comments. *See* 42 U.S.C. § 7410(k)(1)(B).

Petitioners also claim that EPA "leveraged" delay in order to disapprove Utah's Submission. *See* Utah Br. 26, 31. EPA does not dispute that the Act requires it to take final action on SIPs and promulgate FIPs by certain deadlines under Section 7410(c) and (k). Disapproval at 9364. But those dates are "procedural" in nature and do not modify EPA's substantive review authority. *Wisconsin*, 938 F.3d at 322. Further, this Court has no basis to read bad faith or improper motive into the Disapproval, and Petitioners have supplied no evidence to support this contention. *See Biden v. Texas*, 142 S. Ct. 2528, 2546-47 (2022) (holding that a presumption of regularity attends agency action absent a "strong showing of bad faith or improper behavior" (quotation omitted)). In any case, EPA's timing in no way prejudiced Utah, since Utah was linked in every modeling iteration. *See supra* Arg. IV.B.

Moreover, EPA's timeliness to Act is not for this Court to review, but rather is appropriately adjudicated in the district courts. The Act provides only one judicial recourse when there is an alleged failure by EPA to perform a nondiscretionary duty—for EPA to be placed on a court-ordered deadline to address the relevant obligations. 42 U.S.C. § 7604(a)(2); *see also Oklahoma*, 723

77

F.3d at 1223-24 (rejecting argument that EPA loses its authority to promulgate a FIP when it fails to act within the statutory timeframe).

## V.    It was Lawful and Reasonable for EPA to Consider the Most Up-to-Date Data, Which Accounted for Western-Specific Issues.

As discussed *supra* Argument III, EPA thoroughly evaluated Utah's Submission and, based on Utah's chosen modeling and contribution threshold, determined that Utah contributed to Colorado's receptors.  EPA further deemed unsupported Utah's decision not to evaluate whether those contributions were in amounts that significantly contributed or interfered with maintenance, thus warranting emissions reductions.  *Id.*  Thus, EPA's consideration of the updated 2016-based modeling was not necessary to the Disapproval.  *See supra* Arg. IV.B. Petitioners nonetheless attack EPA's updated modeling in the Disapproval, claiming EPA's modeling was not as accurate as updated modeling conducted by Colorado.  Indus. Br. 31-34.  These arguments, too, lack merit.

Petitioners argue that EPA's modeling fails to account for terrain and meteorological conditions unique to the Rocky Mountain region and that Colorado's modeling was more location appropriate.  Indus. Br. 32-34.

But EPA thoroughly reviewed its modeling and found it suitable for assessing ozone transport in western states, including the Rocky Mountains, explaining that its 2016v3 modeling met performance criteria, performing as well as, if not better than, Colorado's modeling.  RTC at 176-78 [JA_-_].  EPA's

modeling considered impacts from international emissions by including emissions from Canada and Mexico, 2016v3 Emissions TSD at 85-87 [JA_-_]; long-range international emissions transport using a global chemistry model, 2016v3 Air Quality TSD at 8 [JA_]; and wildfire emissions, 2016v3 Emissions TSD at 70-78 [JA_-_].  In addition, days found to be "exceptional events" due to substantial impacts from wildfires or stratospheric intrusions were removed from the analysis. RTC at 460-61 [JA_-_].  EPA therefore concluded that the "modeling . . . captures the geographical differences between the west and the east."  *Id.* at 461 [JA_].

EPA explained that Colorado's modeling, prepared in 2022, does not indicate EPA's modeling is unreliable or that Colorado receptors are going to achieve the NAAQS in 2023 under a business-as-usual scenario.  RTC at 171-84 [JA_-_].  For example, contrary to what Petitioners assert, Indus. Br. 32, EPA explained that Colorado's *own modeling* projects that a receptor (monitoring site number 80590011) in the Denver area to which Utah contributes will continue to exceed the NAAQS in 2023.  *See* RTC at 178 (Table 4-13) [JA_]; Colorado TSD at 30 (Table 4-2) [JA_].[30]  And, although Colorado did not model upwind contributions, EPA's modeling concluded that Utah contributes 1.27 ppb at that

---

[30] EPA also found that, based on recent measured ozone levels, both EPA's and Colorado's modeling likely *underpredict* ozone levels in the Denver area, RTC at 178 n.51 [JA_], further undercutting Petitioners' argument that "the area will attain the ozone NAAQS even without any reductions from Utah sources," Indus. Br. 32.

same receptor in 2023.  2016v3 Air Quality TSD at C-3 [JA_].  Additionally, in response to comments, EPA compared its model performance to Colorado's model performance; although Colorado's modeling used a 4-kilometer grid resolution and EPA's uses a 12-kilometer resolution, *see* Indus. Br. 33, EPA found that both resolutions projected similar average design values.  RTC at 177-78 & Table 4-13 [JA_-_].

The fact that Petitioners may be dissatisfied with the outcome of EPA's review of Utah's SIP submission does not render the Disapproval arbitrary and capricious.  *Arkansas*, 503 U.S. at 110-13 (EPA's factual findings are entitled to substantial deference).  EPA thoroughly considered and provided record responses to all issues Petitioners raise in their briefs with respect to EPA's up-to-date modeling.  These conclusions are reasonable and entitled to deference.

## VI.  Remedy

### A.  Any Remedy Should be Limited to the Disapproval that is Before the Court.

These petitions for review challenge only the Disapproval.  Petitioners did not challenge EPA's 2019 Finding of Failure to Submit and are separately challenging the Good Neighbor Plan.  *See Utah v. EPA*, 23-1157 (D.C. Cir.).  Because these separate agency actions are not currently before the Court, any relief the Court orders must be narrowly tailored to the Disapproval action only and must not constrain EPA's authority to continue to enforce its 2019 Finding or its federal

Good Neighbor Plan. *See* 5 U.S.C. §§ 706 (limiting courts' review to "an agency action"), 551(13) (defining "agency action").[31]

Limiting any relief to the SIP Disapproval is also appropriate given EPA's independent authority to enforce the Good Neighbor Plan based on the 2019 Finding. See Consent Decree, *Sierra Club*, No. 3:22-cv-01992, ECF No. 37 (obligating EPA to promulgate a Good Neighbor FIP for Utah unless it approves a SIP). Under the Act, EPA has a duty to promulgate a FIP if it disapproves a SIP or if it makes a finding of failure to submit, and only EPA's approval of a SIP submission obviates the duty to develop a FIP following a finding of failure to submit. 42 U.S.C. § 7410(c)(1). As this Court correctly observed:

---

[31] It is undisputed that the Court lacks authority to order EPA to approve Utah's Submission or otherwise direct its actions on remand. Instead, relief is limited to upholding the Disapproval, or either (1) vacating and remanding or (2) remanding without vacatur. *See, e.g.*, *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952) ("[T]he function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration."); *Calcutt v. FDIC*, 598 U.S. 623, 629 (2023) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. A reviewing court, accordingly, is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." (cleaned up)).

> Under 42 U.S.C. § 7410(c)(1), the EPA must create a FIP after either the state has failed to make the required SIP submission or the EPA has disapproved part of the state's SIP. This duty continues to exist 'unless the State corrects the deficiency, *and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan*.' § 7410(c)(1) (emphasis added).  Once the EPA issued findings that Oklahoma failed to submit the required SIP under the Regional Haze Rule, the EPA had an obligation to promulgate a FIP. The statute itself makes clear that the mere *filing* of a SIP by Oklahoma does not relieve the EPA of its duty.

*Oklahoma*, 723 F.3d at 1223.  As in *Oklahoma*, EPA took both actions here.  *See* Disapproval at 9360; 2019 Finding at 66614.  Because the mere filing of Utah's Submission did not relieve EPA of its duty, and EPA has not approved a subsequent SIP submission, the 2019 Finding (which Petitioners did not challenge) is an independent basis for the Good Neighbor Plan.  Even if this Court vacates EPA's Disapproval, doing so would not obviate the need for either an approved SIP or a FIP; rather, vacating the Disapproval would merely put Utah's Submission before EPA again to consider in light of the Court's opinion.  Only an approved SIP would alleviate EPA's obligation to issue a FIP.

In its Stay Order, the motions panel erred by prohibiting EPA from enforcing the Good Neighbor Plan in Utah, and this Court can and should correct this mistake since the Stay Order is neither binding precedent nor the law of the case.  *See Stifel, Nicolaus & Co., Inc. v. Woolsey & Co., Inc.*, 81 F.3d 1540, 1544 (10th Cir. 1996).  This Court's final judgment should acknowledge, or at a

minimum not constrain, EPA's independent authority to implement the Good Neighbor Plan in Utah, which EPA could promptly execute through appropriate rulemaking action accounting for any needed adjustments in the schedule or requirements of that rule resulting from the stay.

### B.     The Court Should Remand Without Vacatur.

The Court should remand the Disapproval as to Utah without vacatur—especially if the Court disagrees that EPA has independent authority to continue to enforce the Good Neighbor Plan absent the Disapproval.  In considering whether to vacate an agency action, the Court must consider (1) the likelihood that the agency's action could be sustained on remand and (2) the disruptive consequences that might flow from a vacatur of the action.  *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023); *see also Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (explaining that "[a]n inadequately supported rule . . . need not necessarily be vacated").  Here, both prongs show that remand without vacatur is proper.

*First*, Petitioners primarily allege procedural defects and record-based deficiencies that EPA could address and correct on remand.  For example, if the Court concludes that EPA unlawfully considered state-of-science air quality data, EPA could substantiate the Disapproval on remand exclusively using information available to Utah.  *See supra* Arg. III.  Similarly, if the Court concludes EPA was

entitled to reject Utah's Submission but should have provided a more comprehensive explanation, EPA could provide one on remand.

*Second*, vacatur in a manner that prohibits EPA from otherwise enforcing the Good Neighbor Plan would result in substantial disruption to the parties and the public interest.[32]  Vacatur would further delay EPA's efforts to implement Congress's mandate to upwind states to prohibit emissions contributing significantly to nonattainment or interfering with maintenance as expeditiously as practicable.  *Maryland*, 958 F.3d at 1203-04; *Wisconsin*, 938 F.3d at 317.  Vacatur would thus leave downwind states to suffer continuing poor air quality and inequitable regulatory burdens and hinders downwind states' efforts to attain the 2015 ozone NAAQS while permitting upwind states to "reap[] the benefits of the economic activity causing the pollution without bearing all the costs."  *EME Homer*, 572 U.S. at 495.

The Good Neighbor Plan's goal of encouraging better emissions performance from power plants beginning in 2023 and bringing more substantial emissions reductions online by 2026 was designed to benefit downwind areas throughout the country, including in the Denver area to which Utah significantly contributes. *See supra* Arg. III.  The Good Neighbor Plan was also designed to

---

[32] Even if the Court agrees that EPA has independent authority, vacatur would still be disruptive—forcing EPA to begin rulemaking anew rather than narrowly addressing specific issues on remand.

comply with prior court rulings and deliver air quality benefits already delayed by several years under the statutory schedule.  *See, e.g.*, 88 Fed. Reg. at 36690.

Without the Good Neighbor Plan or approved SIPs that meet the Good Neighbor Provision, there is significant inequity, as sources in the states that are not affected by judicial stays remain subject to the Good Neighbor Plan, and downwind areas continue to obtain no relief from the significant contribution of these three states.  Vacating the Disapproval in a manner that prohibits EPA from otherwise enforcing the Good Neighbor Plan as applied to Utah would further disrupt the schedule of cost-effective emissions reductions, *see id.* at 36737-39, and delay "meaningful downwind air quality improvement," *id.* at 36748, that the Good Neighbor Plan is designed to deliver.

Out of concerns for public health and the environment, courts have a history of not vacating EPA actions implementing the Good Neighbor Provision, even when remand of some aspect of those actions may be appropriate.  *See, e.g.*, *Wisconsin*, 938 F.3d at 336 ("[W]e do not vacate regulations when doing so would risk significant harm to the public health or the environment."); *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (same).  Thus, if the Court determines that EPA erred, EPA asks the Court to remand the Disapproval without vacatur and let its stay order expire by its own terms.

# CONCLUSION

For the foregoing reasons, the petitions for review should be transferred to the D.C. Circuit, dismissed, or denied.

Date: September 11, 2023

                                        Respectfully submitted,

                                        TODD KIM
                                        *Assistant Attorney General*

                                        s/ *Alexandra L. St. Romain*
                                        ALEXANDRA L. ST. ROMAIN
                                        ALEX J. HARDEE

Of Counsel:
                                        U.S. Department of Justice
ROSEMARY HAMBRIGHT KABAN                 Environment and Natural Resources Division
DANIEL P. SCHRAMM                        Environmental Defense Section
JEANHEE HONG                             Post Office Box 7611
                                        Washington, D.C. 20044
U.S. Environmental Protection Agency     (202) 532-3284
                                        alexandra.st.romain@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

EPA requests oral argument.  EPA believes that the Court would benefit from argument addressing the application of 42 U.S.C. § 7607(b)(1)'s venue provision to the agency actions challenged here.

If the Court reaches the merits, the petitions raise complex legal and record issues.  The administrative record includes a significant amount of technical material regarding air pollutant modeling and analyses.  Adjudicating the merits of the petitions for review will therefore require the Court to consider many complex issues and a substantial amount of information.  EPA therefore believes the Court would benefit from oral argument.

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and the Court's May 30, 2023 Order, ECF No. 11002290, because, excluding the parts of the document exempted by Rule 32(f) and 10th Cir. R. 32(B), this document contains 19,472 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

s/ *Alexandra L. St. Romain*
ALEXANDRA L. ST. ROMAIN

Counsel for Respondents

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     no hardcopies of the preliminary briefs are required at this time, *see* ECF. No. 11002290; and

(3)     the digital submissions have been scanned for viruses with the native Microsoft Windows 10 Virus and Threat Protection service, last updated September 11, 2023, and, according to the program, they are free of viruses.

s/ *Alexandra L. St. Romain*
ALEXANDRA L. ST. ROMAIN

Counsel for Respondents

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2023, I electronically filed the

foregoing using the court's CM/ECF system, which will send notification of such

filing to all registered CM/ECF users.

s/ *Alexandra L. St. Romain*
ALEXANDRA L. ST. ROMAIN

Counsel for Respondents

## ATTACHMENTS

**Attachment A:** Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9336 (Feb. 13, 2023) ("Disapproval").

**Attachment B:** Air Plan Disapproval; Utah; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 31470 (May 24, 2022) ("Proposal").