**NOs. 23-9514, 23-9521, 23-9533, 23-9534**

THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STATE OF OKLAHOMA, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

**NOs. 23-9509, 23-9512, 23-9520**

THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STATE OF UTAH, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

Petitions for Review of Final Action of the U.S. Environmental
Protection Agency
88 Fed. Reg. 9,336

**BRIEF OF SIERRA CLUB, HEALTHY ENVIRONMENT
ALLIANCE OF UTAH, CENTER FOR BIOLOGICAL DIVERSITY,**

**DOWNWINDERS AT RISK, UTAH PHYSICIANS FOR HEALTHY ENVIRONMENT, SOUTHERN UTAH WILDERNESS ALLIANCE, AND CLEAN AIR TASK FORCE AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS AND AFFIRMANCE**

*/s/ Rose K. Monahan*
Rose K. Monahan
Sierra Club
2101 Webster St., Ste. 1300
Oakland, CA 94612
rose.monahan@sierraclub.org
415-977-5704

*Zachary M. Fabish*
Zachary M. Fabish
Sierra Club
50 F St. NW, 8th Floor
Washington, DC 20001
zachary.fabish@sierraclub.org
650-388-8446

*Counsel for Sierra Club, Healthy Environment Alliance of Utah, and Southern Utah Wilderness Alliance*

*/s/ Seth L. Johnson*
Seth L. Johnson
Kathleen Riley
Earthjustice
1001 G St. NW, Ste. 1000
Washington, DC 20001
sjohnson@earthjustice.org
kriley@earthjustice.org
202-667-4500
202-745-5227

*Counsel for Sierra Club, Center for Biological Diversity, Downwinders at Risk, and Utah Physicians for Healthy Environment*

*/s/ Shaun Goho*
Shaun Goho
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
sgoho@catf.us
617-624-0234

*Counsel for Clean Air Task Force*

Filed: September 18, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................i

TABLE OF AUTHORITIES.......................................................................ii

LIST OF FIGURES ...................................................................................iv

ATTACHMENT ........................................................................................iv

INTRODUCTION......................................................................................1

ARGUMENT .............................................................................................3

   I.   Ozone pollution significantly harms Amici's members and the public................................................................................................3

   II.  Utah and Oklahoma failed to control their pollution, harming people and the environment downwind and violating the Good Neighbor Provision. ................................................................8

   III.   Venue does not lie in this Court. ................................................13

     A.  The action at issue is nationally applicable ................................14

     B.  The action at issue is based on a determination of nationwide scope or effect, as EPA lawfully and rationally found and published. 19

       1.  The Disapproval Rule is based on multiple determinations of nationwide scope or effect.............................................................20

       2.  EPA found and published that the Disapproval Rule is based on a determination of nationwide scope or effect...........................23

   IV.   The Disapproval Rule is a proper exercise of EPA's statutory authority. ......................................................................................24

     A.  The Act requires EPA to disapprove plan submissions that fail to satisfy the Good Neighbor Provision.................................................24

     B.  EPA acted within its statutory authority in determining that plan submissions by Utah and Oklahoma failed to meet the requirements of the Good Neighbor Provision...................................29

   V.  If the Court finds fault with EPA's Disapproval Rule, it should remand without vacatur........................................................................32

CONCLUSION ........................................................................35

## TABLE OF AUTHORITIES

### CASES

*Am. Rd. & Transp. Builders Ass'n v. EPA*,
  705 F.3d 453 (D.C. Cir. 2013) .............................................17

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ............................................................33

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019) .......................................................16

*Cent. & S.W. Servs. v. EPA*,
  220 F.3d 683 (5th Cir. 2000) ..............................................32

*Chevron U.S.A., Inc. v. EPA*,
  45 F.4th 380 (D.C. Cir. 2022) ......................................16, 17

*City of Seabrook v. EPA*,
  659 F.2d 1349 (5th Cir. 1981) ............................................31

*Downwinders at Risk v. Regan*,
  No. 4:21-CV-03551-DMR (N.D. Cal. May 12, 2021) ............2

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) .....................................................25, 30

*Madison Gas v. EPA*,
  4 F.3d 529 (7th Cir. 1993) .................................................18

*McFadden v. United States*,
  576 U.S. 186 (2015) ...........................................................21

*Mich. v. EPA*,
  213 F.3d 663 (D.C. Cir. 2000) ...........................................28

*N.C. v. EPA*,
  550 F.3d 1176 (D.C. Cir. 2008) .........................................33

*Nat. Res. Def. Council v. EPA*,
  777 F.3d 456 (D.C. Cir. Dec. 23, 2014) ...............................8

*O'Reilly v. U.S. Army Corps of Eng'rs*,
  477 F.3d 225 (5th Cir. 2007) ..............................................32

*Okla. V. EPA,*
   723 F.3d 1201 (10th Cir. 2013)............................................................27

*Polselli v. Internal Revenue Serv.,*
   143 S. Ct. 1231 (2023).....................................................................22

*Pugin v. Garland,*
   143 S. Ct. 1833 (2023) .....................................................................26

*RMS of Ga. v. EPA,*
   64 F.4th 1368 (11th Cir. 2023) .........................................................14

*S. Ill. Power Coop. v. EPA,*
   863 F.3d 666 (7th Cir. 2017)...............................................14, 18, 20, 22

*Sec. Exch. Comm'n v. Chenery Co.,*
   332 U.S. 194 (1947).........................................................................30

*Sierra Club v. EPA,*
   294 F.3d 155 (D.C. Cir. 2002).........................................................34

*Sierra Club v. EPA,*
   926 F.3d 844 (D.C. Cir. 2019).....................................................14, 17

*Tex. v. EPA,*
   706 F. App. 159 (5th Cir. 2017) ..................................................15, 16

*Tex. v. EPA,*
   983 F.3d 826 (5th Cir. 2020);...........................................................16

*Tex. v. EPA,*
   829 F.3d 405  (5th Cir. 2016)......................................................15, 21

*Train v. Nat. Res. Def. Council,*
   421 U.S. 60 (1975) ...................................................................8, 26, 28

*TRW Inc. v. Andrews,*
   534 U.S. 19 (2001) .........................................................................23

*Union Elec. v. EPA,*
   427 U.S. 246 (1976)...................................................................24, 26

*United States v. Meyers,*
   200 F.3d 715 (10th Cir. 2000)...........................................................16

*Wis. v. EPA,*
   938 F.3 303 (D.C. Cir. Sept. 13, 2019)...............................................8

*Wyo. v. EPA,*

No. 14-9529, 2023 WL 5214083 (10th Cir. Aug. 15, 2023). ................27

**STATUTES**

42 U.S.C. § 7410 ............................................8, 11, 12, 24, 25, 26, 28, 29

42 U.S.C. § 7511 ...............................................................................8

42 U.S.C. § 7607 ......................................................... 13, 19, 21, 22, 23

**REGULATIONS**

40 C.F.R. § 51.1303...........................................................................8

41 Fed. Reg. 56,769 (Dec. 30, 1976). ...............................................19

72 Fed. Reg. 37,818 (July 11, 2007) ...................................................4

83 Fed. Reg. 25,776 (June 4, 2018) ....................................................8

83 Fed. Reg. 25,776 (June 4, 2018). ...................................................4

84 Fed. Reg. 66,612 (Jan. 6, 2020) ...................................................11

88 Fed. Reg. 36,654 (June 5, 2023) ...................................................12

88 Fed. Reg. 9,336 (Feb. 13, 2023). ...5, 6, 15, 19, 20, 21, 23, 25, 29, 31, 32

## LIST OF FIGURES

Figure 1: Cross State Ozone Pollution Linkages.....................................5

Figure 2: Total Ozone-Season Short Ton NOx Emissions from Utah and Oklahoma: 2019-2022 .............................................................10

## ATTACHMENT

Declarations of *Amici* Sierra Club, Healthy Environment Alliance of Utah, Center for Biological Diversity, Downwinders at Risk, Utah Physicians for Healthy Environment, Southern Utah Wilderness Alliance, and Clean Air Task Force as *Amici Curiae* in Support of Respondents and Affirmance

iv

Amici Sierra Club, Healthy Environment Alliance of Utah, Center for Biological Diversity, Downwinders at Risk, Utah Physicians for Healthy Environment, Southern Utah Wilderness Alliance, and Clean Air Task Force are local and national nonprofit organizations devoted to protecting the health of their members and the environment.[1] *See* Amici Decls. (attached). A motion for leave to file this brief has been simultaneously submitted.

No person, other than the amici, its members, and its counsel, authored or funded this brief.

## INTRODUCTION

Ozone air pollution causes severe health and environmental harms—including death—nationwide. States were required to develop regulations by 2018 to stop sending pollution across state lines where it would harm people and impose costs on downwind states. Since 2017, consistent modeling has shown significant pollution flows to ozone-polluted areas from Utah and Oklahoma, among other states.

_____

[1] Amicus Clean Air Task Force is not a membership organization. Therefore, references in this brief to Amici's members do not include Clean Air Task Force.

Despite having a legal duty to address this pollution, Utah and Oklahoma submitted do-nothing plans to EPA. Petitioners have thus foisted their pollution's costs on downwind states—and people. To address this harmful interstate pollution, certain Amici and allied environmental and public health organizations sued EPA to compel it to take overdue action on do-nothing state plan submissions.[2] Now that EPA has finally been compelled under the Clean Air Act to disapprove these do-nothing plans, Petitioners complain at the prospect of having to decrease their pollution.

Petitioners sue in the wrong court, raising meritless claims. The rule at issue is quintessentially national in applicability, and, in any event, is based on numerous determinations of nationwide scope and effect, as EPA reasonably determined. Accordingly, the rule must be reviewed only in the D.C. Circuit. Petitioners wrongly insist states are free to decide not only how but whether to reduce the pollution they dump on other states (they aren't) and that EPA's action is somehow a surprise (it isn't). Instead, EPA's action is entirely proper and long

---

[2] *See* Complaint*, Downwinders at Risk, et al. v. Regan*, No. 4:21-CV-03551-DMR (N.D. Cal. May 12, 2021) (challenging EPA's failure to act on Oklahoma's submission).

overdue. The stay should be lifted and this Court should transfer or

dismiss this action, or (if venue were proper here) uphold the

Disapproval Rule.

## ARGUMENT

### I. Ozone pollution significantly harms Amici's members and the public.

Ozone pollution is one of the most dangerous and persistent forms

of air pollution today. Breathing this pollution can cause or exacerbate

lung inflammation, lung and heart disease, and can even kill.[3] Ozone

pollution is linked to thousands of emergency room visits and tens of

thousands of asthma attacks each year and is particularly harmful to

the developing fetus, children and the elderly.[4] These harmful effects

---

[3] EPA, *Integrated Sci. Assessment for Ozone and Related Photochemical Oxidants* at ES-8, EPA/600/R-20-012 (Apr. 2020), *available at* www.epa.gov/isa; *Id.* at App. 3-2 (find associations between short-term increases in ambient ozone concentrations and increases in respiratory mortality.)

[4] *See, e.g.,* Jongeun Rhee et al., *Impact of Long-Term Exposures to Ambient PM$_{2.5}$ and Ozone on ARDS Risk for Older Adults in the U.S.* Chest 156, Issue 1 at 71–79 (July 2019), *available at* https://doi.org/10.1016/j.chest.2019.03.017 (analyzing air pollution exposure at the ZIP code level in the U.S. and hospital admissions with acute respiratory distress syndrome ("ARDS") and finding that an increase of 1 ppb in annual average ozone was associated with statistically significant increases in annual hospital admission rates for ARDS).

disproportionately burden communities of color and low-income communities.[5] Ozone pollution also contributes to plant and ecosystem damage. *See, e.g.*, 72 Fed. Reg. 37,818, 37,883-95 (July 11, 2007).

In fact, 70 ppb—the current level of the ozone NAAQS—is insufficient to protect public health. In the most recent Clean Air Scientific Advisory Committee letter to EPA, all but one of the 18 panel members found that "the scientific evidence unequivocally demonstrates that the current primary and secondary standards are not protective of public health and public welfare" and "recommend[ed] a revised NAAQS level in the range of 55 to 60 ppb to be protective of public health."[6] Indeed, in 2014, EPA estimated that a standard set at

---

[5] Michelle L. Bell et al., *Who Is More Affected by Ozone Pollution? A Systematic Review and Meta-Analysis*. Am. J. of Epidemiology 180, Issue 1 at 15-28 (July 1, 2014), *available at* https://doi.org/10.1093/aje/kwu115.

[6] Clean Air Sci. Advisory Comm., *CASAC Rev. of the EPA's Pol'y Assessment (PA) for the Recons. Of the Ozone Nat'l Ambient Air Quality Standards (External Rev. Draft Version 2)* (June 9, 2023), *available at* https://casac.epa.gov/ords/sab/f?p=113:0:14916760131896:APPLICATIO N_PROCESS=REPORT_DOC:::REPORT_ID:1114

65 ppb would have avoided almost 3,000 deaths and 640,000 asthma attacks in children, per year.[7]

Since 2017, consistent modeling has shown significant pollution flows to ozone-polluted areas from upwind states including Utah and Oklahoma. 88 Fed. Reg. 9,336, 9,359-60 (Feb. 13, 2023) ("Disapproval Rule").

**Figure 1: Cross State Ozone Pollution Linkages**



*Source:* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.

---

[7] EPA, *Regul. Impact Analysis of the Proposed Revisions to the Nat'l Ambient Air Quality Standards for Ground-Level Ozone* at Tbl. ES-7, EPA-452/P-14-006 (Nov. 2014).

Utah and Oklahoma are linked to areas whose real-world ozone data show actual violations of the 70 ppb standard: Utah contributes between 0.98 and 1.46 ppb to Douglas, Jefferson, Larimer, and Arapahoe counties in Colorado. Oklahoma contributes 1.57, 1.57, 0.79 and 1.01 ppb to Tarrant, Dallas, Galveston and Denton counties in Texas; 1.20 and 1.14 ppb to Muskegon and Allegan counties in Michigan; and 0.72 ppb to Cook County, Illinois.[8]

Clean air that meets the 2015 ozone standard is "already several years delayed[,]" 88 Fed. Reg. at 9,362, and residents in Colorado, Texas, Michigan, and Illinois experience "ozone alerts" on a regular basis, meaning that the day is forecasted to have ozone concentrations above 70 ppb. For example, in 2021, Colorado issued 65 ozone alerts, including an alert every single day between July 5 and August 14, and there were 38 alerts during the 2023 ozone season.[9] In 2022, Douglas,

---

[8] EPA, *2016v3 DVs State Contributions,* No. EPA-HQ-OAR-2021-0663-0070 (Feb. 12, 2023), *available at* https://www.regulations.gov/document/EPA-HQ-OAR-2021-0663-0070.

[9] Colo. Air Quality Dep't if Pub. Health & Env't, *Ozone Action Alert Days*, *available at* https://docs.google.com/spreadsheets/d/1BHUei0iDaE2EvSIrD4KAN9xy9mQQWhLDAgZtA1iFSl4/edit#gid=0 *from* Colo. Air Quality Dep't of Pub. Health & Env't, *Air Quality – Monitoring, Forecasts and Data*, *available at* https://www.colorado.gov/airquality/default.aspx.

Jefferson, Larimer, and Arapahoe counties recorded ozone levels as high as 93, 86, 78, and 79 ppb, respectively.[10] In Tarrant, Dallas, Galveston, and Denton counties, Texas, there have been 17, 17, 16 and 12 alerts, respectively, as of September 18, 2023.[11] Monitors to which Oklahoma is linked in Tarrant County have measured ozone levels as high as 92 ppb in 2023, 91 ppb in Dallas County, 89 ppb in Galveston County, 88 ppb in Denton County.[12]

Breathing unhealthy levels of ozone directly and significantly impacts Amici's members.[13] They face greater risk of lung damage, asthma attacks, and premature death, and they are forced to stay indoors, take medication, and miss work, school, or other activities. *See* Amici Decls. (attached). The elevated ozone levels also damage trees and crops, harming people's livelihoods.

---

[10] Colo. Air Pollution Control Div., Dep't Pub. Health & Env't, Ozone Summary Table, *available at* https://www.colorado.gov/airquality/html_resources/ozone_summary_table.pdf.

[11] Tex. Comm'n on Env't Quality, *Eight-Hour Ozone High Value Days for 2023 as of Sept. 18, available at* https://www.tceq.texas.gov/cgi-bin/compliance/monops/8hr_exceed.pl.

[12] *Id.*

[13] Although the SIPs at issue here addressed cross-state air pollution, Utah's emissions also cause smog within Utah and thus Amici's members in Utah would benefit if Utah's pollution was reduced.

## II.   Utah and Oklahoma failed to control their pollution, harming people and the environment downwind and violating the Good Neighbor Provision.

EPA and states are required to implement the Good Neighbor Provision "consistent with" statutory timeframes for attainment of the ozone standard downwind—namely, "as expeditiously as practicable" and no later than the 2021 attainment deadline. 42 U.S.C. §§ 7410(a)(2)(D)(i)(I), 7511(a)(1); *Wisconsin v. EPA*, 938 F.3d 303, 312-15 (D.C. Cir. 2019); 88 Fed. Reg. at 9,362; 40 C.F.R. § 51.1303; 83 Fed. Reg. 25,776 (June 4, 2018) (making most nonattainment designations). With that attainment deadline already missed, the next deadline is in 2024, and 2023 is the last year that factors into determining whether areas will meet it. 40 C.F.R. § 51.1303; *see NRDC v. EPA*, 777 F.3d 456, 467-68 (D.C. Cir. 2014). As the Supreme Court has explained, these deadlines for attainment of the NAAQS are "the heart of the Act." *Train v. NRDC*, 421 U.S. 60, 66 (1975); *accord Wisconsin*, 938 F.3d at 316.

Yet, across the board, neither EPA nor the states have acted to control pollution within the Congressionally mandated time frame. Many states (including Utah) failed to submit timely State Implementation Plans ("SIPs"), while EPA failed to timely disapprove

do-nothing submissions (like Oklahoma's). In fact, EPA's delay in acting on submitted, but deficient, plans forced certain Amici and allied environmental and public health organizations to sue the agency to compel action, including on Oklahoma's submission.[14] Amici did so because EPA's inaction on do-nothing submissions delayed necessary interstate pollution reductions and threatened their members' health and welfare.

Utah and Oklahoma state officials complain about EPA's delay, but, in truth, the states have avoided pollution mitigation costs because EPA inaction has allowed polluting sources in their states to continue operating without needed regulations. Notably, neither state brought suit to compel EPA to act, as Amici did.

Major sources of pollution in each state emit enormous amounts of nitrogen oxides ("NOx"), a primary ozone-precursor pollutant, and lack common control technologies that would reduce this pollution. In Utah, the Hunter and Intermountain coal-fired power plants, which produced the fifth and sixth highest NOx emissions from power plants in the

---

[14] *Supra* 2, n.2.

United States from 2021-2022,[15] do not have up-to-date pollution controls installed that would reduce NOx. Similarly, in Oklahoma, seven coal units do not have modern NOx pollution control technologies installed.

**Figure 2: Total Ozone-Season Short Ton NOx Emissions from Utah and Oklahoma: 2019-2022**



*Source:* https://campd.epa.gov/data/custom-data-download

Yet, Utah and Oklahoma's submissions failed to adopt any pollution controls. In fact, *none* of the states that submitted a Good Neighbor plan included "any emissions reductions beyond existing

---

[15] *Largest Nitrogen Oxide (NOx) Emissions from Power Plants in the U.S. from 2021 to 2022,* Statista (Feb. 2023), *available at* https://www.statista.com/statistics/1248124/nox-most-polluting-power-plants-united-states/.

controls[,]" despite the statutory mandate. EPA, Resp. to Comment Doc ("RTC") at 436, EPA-HQ-OAR-2021-0663-0083. On this record, EPA correctly disapproved the plans submitted by Utah, Oklahoma, and nineteen other states. Their do-nothing submissions failed to meet the requirements of the Good Neighbor Provision to "contain adequate provisions … prohibiting" emissions that "contribute significantly to nonattainment in, or interfere with maintenance by, any other State." 42 U.S.C. § 7410(a)(2)(D)(i)(I).

Because EPA correctly disapproved the do-nothing submissions, the Clean Air Act required EPA to do what the states refused to do and promulgate an implementation plan itself. 42 U.S.C. § 7410(c)(1). This was necessary on additional grounds for Utah, because EPA properly found that Utah failed to submit its plan by the deadline, 84 Fed. Reg. 66,612 (Jan. 6, 2020), which independently triggered EPA's duty to promulgate a federal plan, 42 U.S.C. § 7410(c)(1)(A). Although Utah eventually did submit a plan, EPA's obligation to issue a federal plan would only be negated by approval of an adequate state plan submission, which has not occurred. 42 U.S.C. § 7410(c)(1), (k)(3). In other words, even if EPA's disapproval of the Utah SIP should be

overturned (and it should not be), EPA would remain obligated, on independent statutory grounds, to issue a federal plan covering Utah.

EPA accordingly developed and issued the Good Neighbor Plan to address the unmet obligations of 23 states across the contiguous United States, including both Utah and Oklahoma. 88 Fed. Reg. 36,654 (June 5, 2023). That separate rule, not at issue in this case, promises major health benefits for people throughout the country. EPA projects that, starting in 2026, the Good Neighbor Plan will "prevent approximately 1,000 premature deaths, 2,400 hospital and emergency room visits, 1.3 million cases of asthma symptoms, and 470,000 school absence days," *every year*.[16] Amici's members would be the beneficiaries in that they would experience improved overall health—particularly those who endure breathing problems and are at risk of hospitalization. *See* Amici Decls. (attached).

Though the Good Neighbor Plan is not at issue here, the Disapproval Rule is a legal predicate for important parts of it (though

---

[16] EPA, *EPA's Proposed "Good Neighbor" Plan to Address Ozone Pollution – Overview* at 1, *available at* https://www.epa.gov/system/files/documents/2022-03/fact-sheet_2015-ozone-proposed-good-neighbor-rule.pdf.

not, as discussed above, for all of it). *See* 42 U.S.C. § 7410(c)(1); 88 Fed.
Reg. at 36,656. Thus, these cases—along with the dozens of other
challenges to the Disapproval Rule that have been filed in multiple
Circuit courts and the D.C. Circuit, Resp., No. 23-9509 at 26, n.11[17]—
will implicate whether millions of people throughout our nation will
finally have the healthful air the Clean Air Act promises us.

## III.    Venue does not lie in this Court.

In the Disapproval Rule, EPA took a coherent, single action that
has direct legal applicably to twenty-one states spanning the United
States, and is based that action on several determinations of nationwide
scope or effect—including, for example, that states must legally and
scientifically justify an alternative contribution threshold above 1
percent of the NAAQS. As EPA explains, venue is not proper in this
Circuit under 42 U.S.C. § 7607(b)(1)'s controlling test because the
Disapproval Rule is "nationally applicable" on its face; even if it weren't,
it is "based on a determination of nationwide scope or effect," as EPA so
found and published in the Disapproval Rule. Resp., No. 23-9509 at 32;
Resp., No. 23-9514 at 25-26; 42 U.S.C. § 7607(b)(1).

---

[17] References to EPA's Responsive Briefs are denoted by case number.

## A. The action at issue is nationally applicable

The Act expressly directs that challenges to "any" nationally applicable final action "may be filed only in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 7607(b)(1). As this Court has explained, § 7607(b)(1) divides challenges into three general categories: (1) petitions for review of nationally applicable actions may only be filed in the D.C. Circuit; and (2) petitions for review of locally or regionally applicable actions may be filed in the United States Court of Appeals for the appropriate circuit; except (3) petitions for review of locally or regionally applicable actions may only be filed in the D.C. Circuit where EPA finds and publishes that the action is based on a determination of nationwide scope or effect. *ATK Launch Sys. v. EPA*, 651 F.3d 1194, 1196-97 (10th Cir. 2011).

"The inquiry ... begins by determining if the challenged regulation is 'nationally applicable' or 'locally or regionally applicable.'" *Id.* at 1197. In making this evaluation, this Court has noted that regulations including portions of states with no local or regional connection to one another "is, at a minimum, a strong indicator that the regulation is nationally applicable." *Id.* at 1197. Additionally, this Court has

14

considered whether EPA "appli[ed] a uniform process and standard across the country." *Id.* And finally it is well-established in this Circuit and others that applicability depends solely on the face of the action at issue, with the petitioner's challenge playing no role. *Id.* at 1199.[18]

At base, the Disapproval Rule addresses a single issue—state compliance with the Good Neighbor provision—and has direct legal effect on states throughout the country, from California to Virginia, and Texas to Minnesota. 88 Fed. Reg. 9,336. Applying "from coast to coast," the Disapproval Rule cannot be locally or regionally applicable; thus, it is nationally applicable on its face. *ATK Launch*, 651 F.3d at 1197.

Indeed, the Disapproval Rule is functionally indistinguishable from the rule at issue in *ATK Launch*. There, this Court found initial air quality designations to be nationally applicable, and rejected petitioners' attempts to carve out pieces of a unified, nationally applicable action and call the pieces locally or regionally applicable. EPA's rule did not "constitute a mere amalgamation of numerous local

---

[18] *See also, e.g.*, *RMS of Ga. v. EPA*, 64 F.4th 1368, 1372-73 (11th Cir. 2023); *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019); *S. Illinois Power Coop. v. EPA*, 863 F.3d 666, 671 (7th Cir. 2017); *Texas v. EPA*, 706 F. App'x 159, 163-64 (5th Cir. 2017) ("*Texas 2017*"); *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) (hereinafter "*Texas 2016*").

actions into a single rule[,]" but rather "constitute[d EPA's] national interpretation of Clean Air Act mandates," and must therefore be challenged in the D.C. Circuit. *ATK Launch,* 651 F.3d at 1200; *see also S. Illinois Power Coop.*, 863 F.3d at 666 (similar).

*ATK Launch* and other cases firmly establish that EPA can and does determine venue by the scope of the final action it takes. For instance, the 5th Circuit has held that EPA's decision to act separately on initial air quality designations for a subset of areas made the action locally or regionally applicable. *Texas v. EPA,* 983 F.3d 826, 833 (5th Cir. 2020); *see also Texas v. EPA*, 706 F. App'x 159, 163-64 (5th Cir. 2017) (preliminarily finding venue in the 5th Circuit proper because "EPA … publish[ed] four Texas designations in a separate final rule, and that rule is the only one Petitioners challenge.").

Under *ATK Launch*'s reasoning, which controls the venue analysis here, the Disapproval Rule is nationally applicable. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1126 (2019) ("just as binding as this holding is the reasoning underlying it."); *United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000) (similar).

Petitioners' arguments to the contrary miss the mark. First, Utah argues that approval or promulgation of a SIP is "prototypical[ly]" locally or regionally applicable. Utah Br. 19-20 (citing dicta in *Chevron U.S.A., Inc. v. EPA*, 45 F.4th 380, 387 (D.C. Cir. 2022)). Yet the cases Utah proffers do not support regional or local applicability here. All those cases address EPA actions concerning only single geographical areas. *See Chevron*, 45 F.4th at 386 (EPA action affects only "two specific platforms off the coast of…California"); *Sierra Club v. EPA*, 926 F.3d 844, 849-50 (D.C. Cir. 2019) (EPA action has "immediate effect only" for a single power plant); *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455-56 (D.C. Cir. 2013) (EPA action approved only one SIP). Utah also relies (at 19, 24) on language in *ATK Launch* wherein this Court characterized a Seventh Circuit decision's discussion of venue for a single SIP. *ATK Launch,* 651 F.3d at 1199. Conversely here, EPA acted not on a single SIP submittal but on multiple submissions from across the country, in an integrated and consistent manner, with immediate effect in all covered states. *See id.* at 1199-200 (challenges to multi-state "SIP Calls" belong in D.C. Circuit). The cases Utah cites thus are inapposite.

17

Second, Utah complains that under the regional haze program, EPA did not claim that its SIP submission disapprovals were nationally applicable, even though EPA examined consistency with national requirements. Utah Br. 23. When determining national applicability for venue purposes, courts determine whether the action itself is nationally applicable, not what sort of determination it is based on. As Utah acknowledged, Utah Br. at 23 n.9, EPA's actions on regional haze SIPs were not nationally applicable on their face, as EPA separately issued state-specific rules, unlike the Disapproval Rule here.

For the same reasons, Utah's claim that EPA's Disapproval Rule must be locally or regionally applicable because EPA instructed parties to bring challenges to its approvals of good neighbor SIPs in the appropriate circuit court also fails. In those instances, EPA published separate state-specific rules or a single rule for a limited number of regionally connected states.

Finally, despite the overwhelming consensus in this Circuit and others that applicability turns on the face of the rule "as a whole," not the petitioner's challenge, *see supra* 14 n.18 (citing cases), Petitioners' arguments against venue lying in the D.C. Circuit depend on

18

Petitioners' limiting their challenges just to EPA's disapproval of specific states' submissions. Such an argument flies in the face of all governing, published precedent.[19] Simply examining the face of the rule serves judicial efficiency, and eases matters for litigants, who know where to go to timely protect their rights.

### B. The action at issue is based on a determination of nationwide scope or effect, as EPA lawfully and rationally found and published.

Even if EPA's disapproval of Utah and Oklahoma's submissions alone (and not an integrated rule covering twenty-one states) were the relevant EPA actions for venue purposes, venue would still lie in the D.C. Circuit because those actions are based on multiple determinations of nationwide scope or effect, and EPA so found and published. 88 Fed. Reg. at 9,380; 42 U.S.C. § 7607(b)(1).

When Congress enacted the § 7607(b)(1) exception in 1977, the committee that drafted the exception agreed with a recommendation from a member of the Administrative Conference of the United States that "it makes sense to centralize review of 'national' SIP issues in the

---

[19] The Seventh Circuit overruled the sole exception *sua sponte*. *S. Ill. Power Coop.*, 863 F.3d 666 (overruling *Madison Gas v. EPA*, 4 F.3d 529 (7th Cir. 1993)).

D.C. Circuit,…facilitating an orderly development of the basic law under the Act." H.R. Rep. No. 95-294, at 324 (1977); 41 Fed. Reg. 56,767, 56,768-69 (Dec. 30, 1976).

The overlapping, multi-circuit litigation over the Disapproval Rule that is currently taking place exemplifies why Congress sought to centralize judicial review of such rules. Challenges to the *very same* determinations of nationwide scope and effect are pending before multiple circuits. To give just one example of several, the one percent contribution threshold—which Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Missouri, Oklahoma, and Utah argued against—is now at issue in the Fifth, Sixth, Eighth, Tenth, and Eleventh Circuits. 88 Fed. Reg. 9,373; RTC at 295-300. The inconsistent resolution of those determinations would deprive people in one judicial circuit of protections they would receive if they lived within another circuit, "utterly defeating" the Act's obvious goal of ensuring centralized, consistent review of national issues, and harming public health and welfare, including for Amici's members. *S. Illinois Power Coop.*, 863 F.3d 666.

      1. The Disapproval Rule is based on multiple
         determinations of nationwide scope or effect.

In its briefs, EPA identifies numerous determinations of nationwide scope and effect that are core to the Disapproval Rule generally and to the disapproval of the Utah and Oklahoma submissions. Resp., No. 23-9509 at 41-42; Resp., No. 23-9514 at 29-30. Other such determinations include that nationwide photochemical grid modeling should be the primary basis for assessing future air quality and that maximum design values above the standard indicate maintenance problems. 88 Fed. Reg. at 9,341-43, 9,380-81; RTC at 392.

The Act authorizes EPA to direct review of a locally or regionally applicable action to the D.C. Circuit if even just one determination upon which the final action is based is of nationwide scope or effect. 42 U.S.C. § 7607(b)(1) (providing for review in the D.C. Circuit "if such action is based on *a* determination of nationwide scope or effect") (emphasis added); *see also Texas 2016*, 829 F.3d at 421 (finding rule under review was "not based on *any* determinations that have nationwide scope or effect" (emphasis added)). "When used as an indefinite article, 'a' means 'some undetermined or unspecified particular.'" *McFadden v. United States*, 576 U.S. 186, 191 (2015). Section 7607(b)(1)'s text thus does not require that whatever determination is of nationwide scope or effect be

the only determination in the action, so long as it is "a determination" that the action "is based on." *See Texas 2016*, 829 F.3d at 419 (determinations an action is based on may not be "peripheral or extraneous" to it).

Nor does the text require that the action be based solely on determinations of nationwide scope or effect. To the contrary, when Congress, in section 7607, wanted to hone in on a single basis, or all the main bases, it did so expressly. Congress required EPA to summarize "*the major* legal interpretations and policy considerations underlying the proposed rule" when it issues certain proposed rules under the Act. 42 U.S.C. § 7607(d)(3) (emphasis added); *see also* Resp., No. 23-9509 at 47. Congress's choice not to include such language in the nationwide scope or effect exception must be given effect. *E.g.*, *Polselli v. IRS*, 143 S. Ct. 1231, 1237 (2023).

Thus, it is sufficient if EPA based the Disapproval Rule–even if taken state by state–on just one determination of nationwide scope or effect. *See Texas* 2017, 706 F. App'x at 165 (EPA's designation of areas as nonattainment under another NAAQS could be based on determinations of nationwide scope or effect, even though EPA's

22

designations must also rely on highly site-specific determinations, like location-specific air quality); *S. Illinois Power Coop.*, 863 F.3d at 669 (describing factual determinations underlying designations under the same standard); *ATK Launch*, 651 F.3d at 1196 (similar). Indeed, limiting D.C. Circuit review of a locally or regionally applicable action to cases where the action did not involve *any* determinations of local or regional scope of effect would virtually if not entirely read the nationwide scope or effect exception out of the Act. *See* Resp., No. 23-9509 at 47. Congress carefully crafted the exception, and it would be improper to effectively erase it from the Act. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (cleaned up)).

> 2. EPA found and published that the Disapproval Rule is based on a determination of nationwide scope or effect.

There is no dispute that EPA took the necessary procedural step of making and finding that the Disapproval Rule is based on a determination of nationwide scope or effect. Resp., No. 23-9509 at 40; 88 Fed. Reg. at 9,380-81; 42 U.S.C. § 7607(b)(1).

**IV.   The Disapproval Rule is a proper exercise of EPA's statutory authority.**

Despite abundant record evidence that Utah and Oklahoma contribute significant quantities of pollution to downwind areas that do not attain, or struggle to maintain, the ozone standard, their state plans, like the other plans that EPA disapproved, failed to require any emissions reductions. These do-nothing plans did not satisfy Petitioners' obligations under the Good Neighbor Provision, and EPA acted well within its statutory authority in disapproving them.

**A. The Act requires EPA to disapprove plan submissions that fail to satisfy the Good Neighbor Provision.**

The Act charges EPA with reviewing state plans and provides that EPA shall approve a plan only if it "meets all of the applicable requirements of" the Act, including the Good Neighbor Provision. 42 U.S.C. § 7410(k)(2)-(3). Thus it is proper for EPA to evaluate whether state plans satisfy the Good Neighbor Provision and disapprove them when they do not, as EPA did here.

Petitioners' argument that EPA was obligated to defer to states' claims that they satisfied the Good Neighbor Provision, when the record before EPA showed the opposite, lacks any support in the Act or the

24

cases on which Petitioners rely. While the Act gives states discretion in formulating state plans, it also places limits on that discretion. Indeed, the Act "reflect[s] congressional dissatisfaction with the progress of existing air pollution programs and a determination to take a stick to the States." *Union Elec. v. EPA*, 427 U.S. 246, 249 (1976) (cleaned up).

Consistent with that dissatisfaction, after *Union Electric*, Congress amended the Act in 1977 and again in 1990 to increase the Good Neighbor Provision's effectiveness at compelling states to control the pollution they export downwind. *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498-99 (2014). Accordingly, the Act provides explicitly that state plans purporting to implement the Good Neighbor Provision must "contain adequate provisions … prohibiting" emissions that will "contribute significantly to nonattainment in, or interfere with maintenance by, any other State." 42 U.S.C. § 7410(a)(2)(D)(i)(I). Thus, when states that contribute significantly to downwind air quality violations submit plans that do nothing to prohibit that pollution, EPA can—and must—disapprove the submissions. *Id*. § 7410(k)(2)-(3).

25

If EPA were required to defer to each state that claims it has no Good Neighbor obligations—which is all of them, *supra* 10—the Good Neighbor Provision would be "rendered ineffective." 88 Fed. Reg. at 9,375. That would negate Congressional intent and allow polluting states to "reap[] the benefits of the economic activity causing the pollution without bearing all the costs." *Homer City*, 572 U.S. at 496. Rather than "conclude that Congress enacted a self-defeating statute," *Pugin v. Garland*, 143 S. Ct. 1833, 1841 (2023), the court should reject Petitioners' argument.

Whatever discretion the Act affords to states, it does not extend to adopting plans incompatible with the Good Neighbor Provision. *Train v. NRDC* held that EPA has a secondary role as to "specific, source-by-source emission limitations" under certain provisions of the Act, but also that state plans must meet the Act's requirements and "provide[] for the timely attainment and subsequent maintenance of [NAAQS]." 421 U.S. at 79. *Union Electric* held that the Act "place[s] the primary responsibility for formulating pollution control strategies on the States, but nonetheless subject[s] the States to strict minimum compliance requirements," including a requirement to "provide for the attainment

26

of the NAAQS." 427 U.S. 246, 249, 256–57 (1976). And because these SIPs purport to implement the Good Neighbor Provision, states must provide for the attainment of the NAAQS in-state *and* prohibit significant contributions to nonattainment and interference with maintenance downwind. 42 U.S.C. § 7410(a)(2)(D)(i)(I).

This Court's decisions confirm EPA's authority and obligation to ensure SIPs comply substantively with the Act. In *Oklahoma v. EPA,* this Court stressed that while states have a responsibility to adopt SIPs, states "exercise this authority with federal oversight," and "EPA *may not* approve any plan that 'would interfere with any applicable requirement'" of the Act. *Okla. v. EPA,* 723 F.3d 1201, 1204 (10th Cir. 2013) (emphasis added). Instead of deferring to state discretion, as Petitioners urge, *Oklahoma* evaluated EPA's determinations of non-compliance with the Act under the deferential arbitrary and capricious standard. *Id.* at 1210. *Wyoming v. EPA* reinforced this point, explaining that "the Act provides for substantive and careful EPA review [of SIP submissions]," not a "rubber-stamp." No. 14-9529, 2023 WL 5214083, at *6 (10th Cir. Aug. 15, 2023).

Accordingly, this Court should, like the D.C. Circuit, reject
Petitioners' argument that whatever discretion states may have in
crafting SIPs detailing *how* they will satisfy their Good Neighbor
obligations also somehow confers complete discretion as to *whether* they
satisfy those obligations. *Michigan v. EPA* considered claims that an
EPA SIP call "impermissibly intruded on the statutory rights of states
to fashion their [plans]" by determining the amount of pollution each
state could emit in compliance with the Good Neighbor Provision, while
allowing states to develop the emission reduction measures. *Mich. v.
EPA,* 213 F.3d 663, 670, 687 (D.C. Cir. 2000). Applying *Train*, the D.C.
Circuit held the Act grants EPA authority to determine "whether states
have reduced emissions sufficiently" to satisfy the Good Neighbor
Provision. *Michigan v EPA*, 213 F.3d at 687. EPA's authority when
reviewing a SIP submission must be at least as great as its authority
when issuing a SIP call under section 7410(k)(5): for Congress to
authorize EPA to demand states revise their SIPs on a given basis, but
bar them from disapproving submissions on that same basis, would
render the Clean Air Act incoherent and self-defeating.

**B. EPA acted within its statutory authority in determining that plan submissions by Utah and Oklahoma failed to meet the requirements of the Good Neighbor Provision.**

EPA properly disapproved these state plan submissions because they do not satisfy the requirements of the Good Neighbor Provision. EPA determined compliance in four steps, each of which is rooted in the text of the provision. First, EPA identified locations that will not attain, or will struggle to maintain, the 2015 ozone NAAQS. *See* 88 Fed. Reg. at 9,341-2; 42 U.S.C. § 7410(a)(2)(D)(i)(I) (referring to "nonattainment" and "maintenance" of the NAAQS). Second, EPA identified upwind states that contribute at least one percent of the NAAQS, or 0.70 ppb, to at least one such downwind location. *See* 88 Fed. Reg. at 9,342; 42 U.S.C. § 7410(a)(2)(D)(i)(I) (referring to emissions that significantly "contribute" to nonattainment or "interfere" with maintenance). Third, EPA determined whether the identified contributions are "significant," in part by considering the availability of cost-effective controls that the upwind state has not yet implemented. *See* 88 Fed. Reg. at 9,342-3; 42 U.S.C. § 7410(a)(2)(D)(i)(I) (referring to emissions that contribute "significantly"). Fourth, EPA evaluated whether the state plan prohibits all identified significant contributions. *See* 88 Fed. Reg. at 9,343; 42

U.S.C. § 7410(a)(2)(D)(i)(I) (requiring provisions "prohibiting" such emissions). EPA determined that twenty-one states' submissions failed to satisfy the Good Neighbor Provision because the states were linked to downwind attainment problems, yet they failed to evaluate or adopt pollution controls. 88 Fed. Reg. at 9,369, 9,375; RTC at 435. Petitioners' arguments that EPA's action was based on non-statutory considerations (Utah Br. 35; Okla. Br. 22-24; Utah Indus. Br. 24-26) are therefore refuted by the record. *See also* EPA RTC at 434.

Nevertheless, Utah and Oklahoma complain that EPA's four-step process has not been codified in regulation. Utah Br. 6-9; Oklahoma Br. 6-7; Utah Industry Br. 5. It is black letter administrative law that an agency has broad flexibility to proceed by general regulation or case-by-case: "the choice . . . lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery*, 332 U.S. 194, 201-03 (1947). EPA's authority and responsibility to implement the statute remains fully intact regardless. *Id.* at 201-02 (rejecting notion that an agency's "failure . . . to promulgate a general rule withdrew all power from that agency to perform its statutory duty"); *cf. Homer City*, 572 U.S. at 510 ("nothing in the statute places EPA under an obligation to provide

specific metrics to States before they undertake to fulfill their good

neighbor obligations"). And, of course, here EPA proceeded via

rulemaking anyhow.

Finally, that EPA gave due consideration to various state

attempts to justify do-nothing plans does not change the conclusion that

EPA's action determines compliance with the Good Neighbor Provision.

Both administrative law principles and cooperative federalism call for

EPA to engage with state submissions. Accordingly, EPA allowed states

to use alternative approaches, provided that they were legally and

technically justified under the Good Neighbor Provision. 88 Fed. Reg. at

9,370. EPA "evaluated the merits of each state's arguments as to why

no additional emissions reduction requirements are needed to satisfy

their obligations under [the Good Neighbor Provision]," 88 Fed. Reg. at

9,369, "considering the core statutory objective of ensuring elimination

of all significant contribution to nonattainment or interference with

maintenance of the NAAQS in other states." *Id.* at 9,374. Doing so

required EPA to evaluate state arguments about wildfires, contribution

thresholds, linear extrapolation, and more. *See City of Seabrook v. EPA*,

659 F.2d 1349, 1359 (5th Cir. 1981) ("In deciding whether a particular

state's plan satisfies the statutory requirements … the EPA must at many points make factual determinations."). Ultimately, however, EPA found that "[t]he contributions from no state covered by this action . . . are so small that the states have proven they do not significantly contribute to nonattainment or interfere with maintenance." RTC at 319. Therefore, EPA determined "in each case that what these states submitted was not approvable." 88 Fed. Reg. at 9,375. This review of state submissions for consistency with the Good Neighbor Provision was a proper exercise of EPA's statutory authority.

## V.   If the Court finds fault with EPA's Disapproval Rule, it should remand without vacatur.

Even if the Court finds some error in EPA's Disapproval Rule, vacatur is unwarranted because (1) there is "a serious possibility that the [agency] will be able to substantiate" the Disapproval Rule if given an opportunity to do so; and (2) vacating would be "disruptive" and would thwart Congress's objectives in protecting public health and the environment. *Cent. & S.W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (cleaned up); *see also O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 239 (5th Cir. 2007) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[o]nly in 'rare circumstances' is remand for

agency reconsideration not the appropriate solution."). As EPA explains (Resp., No. 23-9509 at 83-84; Resp., No. 23-9514 at 58), the agency can correct each procedural and factual error Petitioners allege, if the Court finds fault with the Disapproval Rule. More fundamentally, vacatur is inappropriate because it would seriously disrupt implementation of the Good Neighbor Provision, causing serious, irreparable health harms,[20] and would prevent EPA from implementing the Good Neighbor Plan in Oklahoma, allowing health harms to persist.[21]

These serious adverse health effects are irreparable: a person who is killed or sickened by air pollution is not compensated by the fact that the air is cleaned up later. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."); *see also N. Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (remanding EPA's 2005 good neighbor regulation because vacatur "would at least temporarily defeat ... the enhanced protection of the environmental values covered by [the

---

[20] *See supra* 13.
[21] As discussed above, *supra* 11, EPA would remain obligated, on independent statutory grounds, to issue a federal plan covering Utah.

rule]"). Because it would mean irreparable losses to public health, vacatur is unwarranted, even if the Disapproval Rule were flawed.

Vacatur would also disrupt achievement of the Act's attainment deadlines and impede its core purpose of ensuring expeditious attainment of the NAAQS. As discussed, *supra* 8, an area designated nonattainment for ozone must attain standards as expeditiously as practicable and no later than fixed deadlines, and the next relevant deadline is in 2024. *See Sierra Club v. EPA*, 294 F.3d 155, 161-62 (D.C. Cir. 2002) (refusing to extend statutory ozone attainment deadlines because doing so would "subvert the purposes of the Act").

Despite Amici's legal efforts, there have already been extreme—and unlawful—delays in implementing basic statutory requirements. EPA issued the health-based ozone standard at issue here eight years ago, yet over 100 million people across the country live in communities that have yet to attain the standard, due in part to pollution from beyond their borders. EPA's Good Neighbor Plan establishes the emissions reductions EPA has determined are required to enable downwind states to attain and maintain the standard as expeditiously

as practicable. Any order vacating the Disapproval Rule would further delay those necessary reductions, contrary to the Act's text and purpose.

## CONCLUSION

The stay should be lifted and this Court should transfer or dismiss the petitions. If the Court reaches the merits, it should deny the petitions. If the Court finds the Rule unlawful or arbitrary, it should remand without vacatur.

Respectfully submitted,

*/s/ Rose Monahan*
Rose Monahan
Sierra Club
2101 Webster St., Ste. 1300
Oakland, CA 94612
rose.monahan@sierraclub.org
415-977-5704

*/s/ Zachary M. Fabish*
Zachary M. Fabish
Sierra Club
50 F St. NW, 8th Floor
Washington, DC 20001
zachary.fabish@sierraclub.org
650-388-8446

*Counsel for Sierra Club, Healthy Environment Alliance of Utah, and Southern Utah Wilderness Alliance*

*/s/ Seth L. Johnson*
Seth L. Johnson
Kathleen Riley
Earthjustice
1001 G St. NW, Ste. 1000
Washington, DC 20001
sjohnson@earthjustice.org
kriley@earthjustice.org
202-667-4500
202-745-5227

*Counsel for Sierra Club, Center for Biological Diversity, Downwinders at Risk, and Utah Physicians for Healthy Environment*

*/s/ Shaun Goho*
Shaun Goho
Clean Air Task Force

114 State St., 6th Floor
Boston, MA 02109
sgoho@catf.us
617-624-0234

*Counsel for Clean Air Task Force*

Filed: September 18, 2023

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

I hereby certify that this foregoing brief complies with Fed. R. App. P. 29(a)(5) because it contains 6,485 words, excluding the caption, signature block, tables of contents and citations, and required certifications, as counted by a word processing system and, therefore, is within the word limit. The brief also complies with typeface requirements of Fed. R. App. 32(a)(5) because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font.

Dated: September 18, 2023          */s/ Rose K. Monahan*
                                   Rose Monahan

**CERTIFICATE OF DIGITAL SUBMISSION AND HARD-COPIES**

I hereby certify that with respect to the foregoing:

All required privacy redactions have been made per 10th Cir. R. 25.5.

The digital submissions have been scanned for viruses with the native

Microsoft Windows 10 Virus and Threat Protection service, last updated

September 18, 2023, and, according to the program, they are free of

viruses. Finally, I hereby certify that seven (7) copies of this pleading

required to be submitted to the clerk's office will be exact copies of this

CM/ECF filing.

Dated: September 18, 2023              */s/ Rose K. Monahan*
                                       Rose Monahan

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September 2023, a true and correct copy of the foregoing was filed using the Case Management/Electronic Case Files ("CM/ECF") system, which will notify all counsel of record.

Dated: September 18, 2023                  */s/ Rose K. Monahan*
                                           Rose Monahan

**NOs. 23-9514, 23-9521, 23-9533, 23-9534**

THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STATE OF OKLAHOMA, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

**NOs. 23-9509, 23-9512, 23-9520**

THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STATE OF UTAH, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

Petitions for Review of Final Action of the U.S. Environmental
Protection Agency
88 Fed. Reg. 9,336

**DECLARATIONS OF *AMICI* SIERRA CLUB, HEALTHY
ENVIRONMENT ALLIANCE OF UTAH, CENTER FOR**

**BIOLOGICAL DIVERSITY, DOWNWINDERS AT RISK, UTAH PHYSICIANS FOR HEALTHY ENVIRONMENT, AND CLEAN AIR TASK FORCE AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS AND AFFIRMANCE**

Carly Ferro ..................................................................DECL. 001

Ruth Hund ...................................................................DECL. 004

Brian Moench ...............................................................DECL. 007

Misti O'Quinn ..............................................................DECL. 011

Richard Reading............................................................DECL. 016

Deeda Seed ...................................................................DECL. 019

Scott Silber ...................................................................DECL. 022

**DECLARATION OF CARLY FERRO**

I, Carly Ferro, declare as follows:

1. My name is Carly Ferro. I am over 18 years old. The information in this declaration is based on my personal experience and my review of publicly available information.

2. My primary residence is in Salt Lake City, Utah. I moved to Utah in 2012 and I have lived in Salt Lake City at my current address for the past 6 years.

3. I have been a member of the Sierra Club since June 2017.

4. The Sierra Club is a nationwide non-profit environmental membership organization, which has its purpose to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

5. In Salt Lake, ozone pollution is a large contributor to poor air quality. We are consistently exposed to high levels of ozone pollution with highest concentrations during midday and the summer months. These high concentrations are a byproduct of fossil fuel production in the State.

6. Breathing is generally something you don't think about, but living in Utah, breathing is something I think about every day. As part of my morning routine, I check air quality and plan my daily activities accordingly. Regrettably, the presence of poor air quality will shorten or eliminate a daily dog walk, walk with our toddler daughter, or outdoor exercise in the valley.

DECL. 001

8.      In July 2021, I was pregnant with my daughter; when spikes in ozone pollution were reported, I would spend very little time outside. Even now, I closely monitor air quality when I spend time outdoors with my daughter and dog, and will avoid spending time outside with her if the air quality is poor.

9.      As my daughter grows up, my partner and I consider our future in the valley. I love Salt Lake and believe it's uniquely positioned: it has the advantages of a city with access to the beautiful mountains. We want our daughter to live in this incredible place, but we are knowingly subjecting her to asthma-inducing pollutants, and it's been difficult for us to complacently accept this reality.

10.      The COVID-19 pandemic especially forced us to grapple with the consequences of air pollution, seeing as continued exposure could increase risk and severity of illnesses like COVID-19. To me, it seems foolish to live in a toxic plume that is shortening my family's lifespan and worsening our quality of life.

11.      Apart from the health impacts, ozone pollution prevents me from enjoying nature, which also decreases my quality of life. It's obvious when ozone pollution is high because I can no longer see the mountains from my house – a picturesque landscape becomes nothing but a blur of color. It's disheartening that ozone pollution prevents me from enjoying the valley's beautiful landscape.

12.      I also find myself seeking out a clean air refuge, somewhere where my family can enjoy the outdoors via hiking, biking, running, or being at the park without worrying about breathing. This often means driving to higher elevations, outside of the poor air quality bubble, to go to the park or just somewhere else other than our home because we don't want to sit in our backyard of polluted air. Continuously seeking out clean air decreases

my enjoyment of living in Salt Lake, and is frustrating. I love our home and our
neighborhood, but poor air quality makes it so we have to remain indoors instead of
enjoying time in and around our community or enjoying our backyard.

13.    If ozone pollution were reduced in Salt Lake, my quality of life would improve – clean air
is an invaluable asset to me and my family. A reduction in ozone pollution would increase
the likelihood that I stay in Salt Lake, and that I encourage my daughter to live her life
and raise her family here.

14.    I feel like the State of Utah has consistently failed its citizens by refusing to adequately
address air pollution. I want to encourage the State to implement available and financially
feasible measures to reduce ozone pollution. I am participating for the future of my family
and our quality of life.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed Sept.   13  , 2023.

Carly Ferro

## DECLARATION OF RUTH HUND

I, Ruth Hund, declare as follows:

1.     My name is Ruth Hund. I am over 18 years old. The information in this declaration is based on my personal experience and my review of publicly available information.

2.     My primary residence is in Golden, Colorado. I have lived in Golden for over 25 years, and at my current address for the past 22 years.

3.     I am a retired teacher.

4.     I have been a member of the Sierra Club since October 2022.

5.     The Sierra Club is a nationwide non-profit environmental membership organization, which has its purpose to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

6.     I joined Sierra Club after retiring from my teaching career. I decided to retire, in part, because I wanted to be able to dedicate more time to environmental activism.

7.     Golden, Colorado is out of compliance for ozone. I graduated from the Colorado School of Mines in 1993 with a master's degree in environmental science and engineering. I remember at that time that we were talking about how Golden had recently come into ozone compliance with federal standards. But we slipped back out of compliance, and we've been out of compliance for years.

8.     Poor air quality, including ozone pollution, negatively impacts my life. About 20 years ago, I developed asthma, which can be triggered from ozone pollution exposure. I have an undergraduate degree in biochemistry with a minor in chemistry, so I understand how

DECL. 004

reactive ozone pollution is and how tender the lung tissues are. I did not have asthma before moving to Golden.

9.    Because ozone exacerbates my asthma, it impacts my ability to train for triathlons. I have been a triathlete for about the past 20 years. I primarily compete in sprint triathlons, and I've qualified for age-group nationals three times.

10.   Training for triathlons just makes me happy, and I am a pretty serious competitor. I typically train six days-a-week, and once the triathlon season has begun and I am training for my A-race (the race I've picked where I want to do really well), I will often be training twice-a-day. Being a triathlete takes serious commitment, and it typically takes about 10 years before you really hit your stride.

11.   Ozone pollution impacts my training plans. If the ozone pollution is high, I can immediately tell because my chest will get tight and it will be difficult to breathe. Running is the hardest to do when the air quality is poor.

12.   High ozone days will mean that I have to adjust my training from outdoor workouts to being inside. I may have to swim indoors or go to the YMCA to use the elliptical instead of running. I have to pay attention to how my chest is feeling and may not be able to do a training as planned if ozone pollution is an issue.

13.   I worry about the ozone pollution in Golden not only because of how it impacts my triathlon training and contributes to my asthma but also because of how it impacts people who also suffer from asthma but are not as fortunate as I am. I am able to manage my asthma with an inhaler, and I have access to health care. But other people are not as lucky: they can't afford an inhaler or don't have health insurance to be able to see a doctor. When you don't have options, you tend to accept that it's difficult to breathe, that

the air quality is just bad where we live. But that makes me want to scream because there are easy fixes to our ozone pollution problems. Lawn equipment, like leaf blowers, could be electric, the oil and gas industry—which spews volatile organic compounds (VOCs) and nitrogen oxides (NOx)—could clean up their operations, and our regulatory bodies could enforce ozone pollution limits.

14.     I want something to be done about ozone pollution. I believe that we have a duty to be good stewards of the Earth, and ozone pollution is harmful to wildlife and plants. Moreover, by not taking care of the Earth, we are destroying our own health.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed September 13, 2023.

_____
Ruth Hund

**DECLARATION OF DR. BRIAN MOENCH**

I, Dr. Brian Moench, hereby declare as follows:

1. I am 72 years old, and I am a member, Board member, the President of the Board of Directors, and co-founder of Utah Physicians for a Healthy Environment (UPHE). I founded UPHE in 2007.

2. I live on the east side of Salt Lake County, just south of Salt Lake City, with my wife. I grew up in Salt Lake County, went away to college, then returned in 1981. I have lived at my home since 1982, and I intend to continue to live here for the foreseeable future. My children and grandchildren visit me at my home frequently.

3. I am a semi-retired doctor. I have worked as an anesthesiologist in Salt Lake City since 1981. Now, I primarily do research consulting and hands on clinical work as part of that research.

4. I engage in outdoor activities regularly. I commute to work by bike whenever I can— lately, about 2-5 times a month. It's about 5 miles round-trip. I also spend many hours a week gardening and doing landscaping maintenance at my home. I plan on continuing these activities for as long as I am able.

5. I also hike, camp, backpack, and bicycle, including in Utah's parks and natural areas. I visit Big and Little Cottonwood Canyon, and Parley's Canyon a couple of times a year. In the past five years, I have also visited Zion National Park, and parks in Wyoming and Oregon. I also plan on continuing these activities for as long as I am able.

6. Both as a physician and through my work with UPHE, I am familiar with the harmful effects associated with air pollution, including ozone pollution, on human health. As President and co-founder of UPHE, I give lectures, publish articles, and submit comments to the U.S. Environmental Protection Agency (EPA) and the Utah Division of

1

DECL. 007

Air Quality (UDAQ) compiling scientific information concerning the health effects of air pollution. Additionally, I coordinated and did the majority of the research for the document *The Health Consequences of Air Pollution* that is featured on UPHE's website. I have been the principal author of extensive and heavily referenced comments submitted to federal and state agencies on various types of environmental rule making, and I've consulted on court briefs written for environmental lawsuits on behalf of UPHE. I am the author of the health chapter in the book published by the University Press, *Utah's Air Quality Issues: Problems and Solutions* (2020). I have also self-published two books with prominent chapters on environmental toxins, titled: *Death by Corporation: The Killing of Humankind in the Age of Monster Corporations* (2019); and *The Great Brain Robbery: Why Women have Become Smarter Than Men—Science with an Attitude* (2021).

7. Air pollution, including ozone pollution, affects me personally. I have had a type of cancer that some studies have found to be correlated with air pollution. In August of 2019, I also had a blood clot in the large artery to my right leg, causing near 100% occlusion of the blood flow to the leg and a life threatening emergency. This type of blood clot is extremely rarefor someone without other health issues, and I have had to be on blood thinners ever since. Blood clots are known to be highly associated with air pollution. In February of this year—on the day that we had the worst air quality all year—my wife had a heart attack, also from a blood clot.

8. I also have immediate family members in the Salt Lake Valley that suffer from diseases that can be attributed in whole or in part to the higher rates of air pollution we have in our area. For example, my daughter has breast cancer, which is known to occur more frequently where there are higher rates of air pollution. Numerous studies also show that

DECL. 008

cancer survival is also correlated with less air pollution. In total, seven of my twelve immediate family members have had cancer, including two of my children.

9.   Other serious medical conditions related to air pollution have afflicted my family members. My mother died of pneumonia during one of the severe wintertime pollution episodes that are common in Salt Lake County. Poor air quality increases the likelihood that common illnesses, like pneumonia, will be fatal. My mother-in-law died of a pulmonary embolus. The incidence of this disease is dramatically increased by higher levels of air pollution. For the last twelve years of his life, my father was debilitated by a stroke. Medical studies have shown that air pollution can trigger strokes, along with heart attacks and irregular heart rhythms, especially for people already at risk for these conditions.

10.   I also know, based on medical studies that I have read and that mainstream medical societies have embraced, that poor air quality compromises my grandchildren's health in multiple ways, even if the effects are currently subclinical and may not become clinical for decades. Some of the well-documented subclinical consequences of air pollution exposure are an accelerated aging process, shortened life span, higher blood pressure, and a more rapid decline in cognition. Numerous studies show that some of the health consequences of air pollution can be transgenerational—i.e., can persist in subsequent generations through alterations of chromosome function.

11.   For all of these reasons, I have serious concerns about the way air pollution is affecting and could affect my health and my family's health. Thus, I track publicly available air quality alerts. I avoid biking to work on days with high levels of ozone pollution, and I avoid gardening as well when the ozone levels are high enough. If I do bike on a day with

3

DECL. 009

high levels of air pollution, I feel a shortness of breath that I do not feel when biking on clearer days. These high pollution events make it less enjoyable to be outdoors, whether on my bike or in my garden.

12. Bad air quality means poor visibility too. I have visited parks when visibility is poor, and I do not enjoy them as much as when the air is clean. I also enjoy my time at the parks less when air quality is bad because I am concerned about my health, and I have to limit my exercise. The one place I should be able to see beautiful vistas, breathe clean air, and be free of such concerns, is in our parks.

13. I am aware that the Salt Lake City area is in nonattainment of the 2015 ozone standard and that, according to EPA, in addition to the pollution that originates in Utah, some of the ozone pollution in Salt Lake County originates in other states, including California and Nevada.

14. Reduced ozone pollution where I live and spend time outdoors would benefit me and my family. I would have more good air quality days to bike to work and to garden, and I would worry less about the health effects from breathing the local air during those activities. I would also enjoy the parks in my area more with better visibility, and without having to limit my exercise or worry about my health during my hikes.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed in Salt Lake City, on June 26, 2023

_Brian Moench, MD_
_____
Brian Moench, MD

DECL. 010

## DECLARATION OF MISTI O'QUINN

I, Misti O'Quinn, hereby declare as follows:

1. I am a board member of Downwinders At Risk. I joined the board in 2017. Downwinders At Risk is incorporated under the laws of Texas as a non-profit organization. Downwinders at Risk was organized to reduce air pollution that harms North Texas, particularly the Dallas-Fort Worth area.

2. I am also a Sierra Club member and work for the Club as an organizer. I have been a member since 2017, but I volunteered for Sierra Club even before I joined as a member.

3. I live in Dallas, TX in Collin County. I grew up in the Dallas-Fort Worth area and have lived here all my life. I have three children, ages 9, 16, and 18. They live with me.

4. I am aware that the Dallas-Fort Worth area, including Collin County where I live, fails to meet clean air standards for ozone, a harmful air pollutant that can cause serious respiratory problems, asthma attacks, and even death.

5. My family and I spend lots of time outside for recreation, where we breathe polluted air. My children love playing outside, and swimming when the public pools are open. They usually go swimming two to three times a week during the summer months. We like to visit the Arbor Hills Nature

1

DECL. 011

Preserve and the Cedar Ridge Preserve as a family to spend time at the overlooks and have picnics. We also like to grill outside. But I often check the weather report, and if it's a bad air day, we stay indoors and can't enjoy these activities.

6. I also spend a lot of time outside as part of activities with Downwinders At Risk, and as part of my job with Sierra Club. Since March 2018, I've been frequently going to Joppa, a neighborhood in southern Dallas that was founded as a freedman's town, to try to develop an air monitoring network and to get a better understanding of what the air quality there actually is like. The neighborhood has many sources of air pollution, including a concrete batch plant, an asphalt plant, and other industrial facilities. Based on my experience volunteering with Downwinders at Risk and Sierra Club, I understand that ozone pollution in the Dallas Fort Worth area and my community is also caused by pollution from numerous sources that may be many miles away, including large coal- and gas-burning power plants throughout Texas.

7. We train community members to use portable air monitors to, for example, monitor particulate matter in their neighborhood. We are also getting permanent air monitors up in Joppa and throughout Dallas to build out an air monitoring network. We also help our community members

DECL. 012

track levels of ozone or smog pollution through online sources.

8. As a community organizer, I also sped a lot of time outdoors. Specifically, I participate in outdoor protests, demonstrations, and spending time educating and working with other community members.

9. Two of my children—my 9-year-old son and 16-year-old daughter—have asthma. They've had to go to the doctor so often that my 16-year-old knows the details of the routine at the hospital. When she was about 5, she was in the ER about once a month because of asthma attacks. We've been largely able to control it now, but there are flare-ups. She still has to stay home from school a lot because of her asthma.

10. I've started trying to do more cardio to build up my lungs and combat the effect of ozone pollution—but I only run indoors, at the gym. Running on the treadmill gives me shin splints, and it's boring. I would like to run outside if the air quality were improved.

11. I would also really like to spend more time outdoors gardening if the air quality were improved.

12. My 9-year-old is also seriously affected by asthma and has to stay home from school regularly as a result. He has had two bouts with pneumonia already that sent him to the hospital for 5-6 days each. They started with allergies and asthma attacks, then got worse.

3

DECL. 013

13. The doctor visits and medications my children need because of these asthma problems and flare-ups are expensive. Both my son and daughter take a variety of medication and inhalers to control their asthma. My son likes to hear the hum of his nebulizer—a breathing machine—to get to sleep. We shouldn't have to live like this.

14. Other family members of mine have had asthma. My grandmother would have asthma attacks so bad she would have to be in the hospital for days at a time. One put her in a coma.

15. I also sometimes have to use an inhaler or nebulizer when my chest gets tight and it gets harder to breathe.

16. The doctor visits and medications we need because of these asthma problems are expensive. We also use plug-in air purifiers in our home, which is another expense.

17. I am very concerned about the impact of air pollution on my family's and my health and wellbeing. My children's respiratory illnesses are what drove me to get involved with Downwinders At Risk and Sierra Club. Once I started getting data on air quality and the links between air pollution and respiratory illnesses, it lit a fire under me.

18. Better air quality where we live, work, and engage in recreation will benefit me and my family. With more clean air days, we wouldn't have to

4

DECL. 014

stay inside. I would worry less about my children's and my health. Clean air would also help us financially, because we could avoid the expense of doctor visits and medication for my children's asthma.

19. I am aware that the U.S. EPA has issued a rule that would reduce ozone-forming pollution in Texas by requiring many industrial sources in Texas and other states to reduce emissions. I strongly support Downwinders At Risk's and Sierra Club's legal efforts to support EPA's regulations and to ensure that the Clean Air Act is fully implemented and ozone air pollution levels are reduced. Such regulations would benefit my health, my family's health, and other people who suffer from respiratory disease, and improve my ability to spend time outdoors.

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.


Dated: March *16* , 2023

Misti O'Quinn

5

DECL. 015

**DECLARATION OF RICHARD READING**

I, Richard Reading, hereby declare as follows:

1. I am a member of the Center for Biological Diversity.

2. I live in Denver, Colorado (Denver County) with my family. I have lived in Denver for the past 26 years.

3. I have three master's degrees and a Ph.D. in Wildlife Ecology from Yale University. I currently work as the Vice President of Science and Conservation at the Butterfly Pavilion in Westminster, Colorado (Jefferson County).

4. I enjoy biking or running almost every day near my home in Denver. I also spend time outside gardening two to three days a week, and I go birdwatching about once a week. I enjoy observing birds and other wildlife.

5. During the summer, my work also takes me outside a few days a month to sample and monitor invertebrate populations in the Denver area.

6. My outdoor activities are negatively impacted by poor air quality including high ozone pollution, in some cases causing me serious respiratory distress and even asthma attacks. I can no longer exercise outdoors on bad air quality days or I will suffer an asthma attack and require medication. These impacts seriously affect my quality of life. My family and I have even considered moving to escape the pollution in the Denver area.

7. I have had to spend significant amounts of money to address the problems I face with Denver's air quality and high ozone pollution. I currently have to use four different medications to control my asthma symptoms. In addition to that expense, I have also had to pay for doctor visits, and visits to the hospital or urgent care. On the advice of my doctor, I also invested in central air conditioning to filter the air coming into my home.

1

DECL. 016

This was a significant expense. I also have to use sick and vacation time to heal from asthma attacks.

8. I follow the daily air report on local media, both television and the newspaper. If there is an air quality alert for the Greater Denver Metropolitan area, I will limit my outdoor activities, such as running, biking, gardening, or birdwatching. In some cases, I have stopped running or biking in the middle of a workout or ride because I had difficulty breathing. So, while I would prefer to bike outdoors, the air pollution causes me to spend more time exercising on a bike indoors.

9. I can also see the ground level ozone pollution in the Denver area, like a big brown cloud. I find this unpleasant to see.

10. I worry that the bad air quality and high ozone pollution in the Denver area will negatively impact my health, my family's health, and will harm wildlife in the region, including the birds and other wildlife that I enjoy observing, and the populations of invertebrates that I study.

11. I understand that the Denver area has not attained the ozone standard set in 2015, and that according to EPA, some of the ozone pollution in this area comes from other states, including Utah.

12. Less ozone pollution where I live and work would improve my quality of life. I would worry less about the effects of air pollution on my health, my family, and the wildlife I enjoy and study. I would enjoy running, biking, gardening, and birdwatching without worrying about having trouble breathing due to ozone pollution.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

DECL. 017

Executed in Denver, Colorado on March ___10___, 2023.

_____

Richard Reading

3

DECL. 018

## DECLARATION OF DEEDA SEED

I, Deeda Seed, hereby declare as follows:

1.  I am a member of the Center for Biological Diversity (the Center) and the Southern Utah Wilderness Alliance, and I have been a member for the past five and seventeen years respectively. I am also involved with the Utah Native Plant Society, and I periodically donate to Sierra Club and Utah Physicians for a Healthy Environment.

2.  I live in Salt Lake City with my husband and son. I have lived here on and off for more than 36 years.

3.  In addition to being a member of the Center, I work for the Center as a Senior Campaigner. In that role, I research and prepare written documents that are used for advocacy purposes, and I enable volunteers to take action to promote policies that improve their lives and the environment. One area I work on is preserving endangered plant species endemic to the Uinta Basin. Last year, I worked with a team of people to submit comments on the draft environmental impact statement for the Uinta Basin Railway regarding the impact the railway would have on native plants.

4.  I love spending time in nature. I enjoy hiking, backpacking, camping, and birding. I usually hike two times a month in the foothills near Salt Lake City or on Antelope Island. In the summer I like to hike in the Wasatch and Uinta mountains, and in the fall and summer I will also hike in southern Utah on the Colorado Plateau. In addition to hiking in the Wasatch and Uinta mountains, I go there to backpack about once a year and will camp three or four times a year in the Uintas or in southern Utah on the Colorado Plateau with my son and my friends. Sometimes I will also camp in the western Utah desert. I also go birding around the Great Salt Lake, usually about once a month, but sometimes multiple times in a single week.

DECL. 019

5. My ability to enjoy all of these activities is negatively impacted by ozone pollution. When I was younger, I developed exercise-induced asthma. I liked to run and would come home wheezing because of poor air quality. While I don't run anymore, it is physically more difficult for me to hike on days when the air is bad, and I still have trouble breathing occasionally when the pollution levels are high. It is physically painful for me to be outside when the air quality is bad.

6. As a result, I check the air quality every day on my phone's weather app. The app has a color-coded system which indicates the intensity of ozone pollution for the day. I also look at the Utah Division of Air Quality's website and other air quality monitors regularly.  I love being in nature and doing things outside, but I avoid doing outdoor activities on days when there are especially high levels of ozone pollution, and I enjoy my time outdoors less because I worry it will impair my health. I also worry about the long-term health impact of ozone pollution on my lungs after living in Salt Lake City for so many years and being subjected to ozone pollution for so long.

7. I also pay attention to air quality and ozone pollution for my family's health. My husband has chronic obstructive pulmonary disease (COPD) and so is especially vulnerable to high levels of air pollution. He is unable to join my son and I in many of the outdoor activities we engage in because he faces more acute health risks from breathing in air pollution. I have heard my son remark that he "can feel it in his lungs" when there is a bad air day. I worry about my husband's and my son's health and wellbeing because of air pollution, and I enjoy the time I spend outdoors with my son less because I worry about the impacts on his health.

DECL. 020

8.  I decided to live in Utah and make Salt Lake City my home in part because I value the access to nature I have living here, and I value the natural environments and vegetation of Utah. In addition to affecting me and my family's health, I know that high ozone levels can damage native plants, birds and other wildlife that I enjoy. I care about preserving local plants and wildlife personally and professionally, and I worry that I won't be able to enjoy them as much because of damage from high ozone pollution.

9.  I am aware that the Salt Lake City area is in nonattainment of the 2015 ozone standard, and that, according to EPA, in addition to the pollution that originates in Utah, some of the ozone pollution in Salt Lake City comes from other states, including from Nevada.

10. Reduced ozone pollution where I live and spend time outdoors would benefit me and my family. We would spend more time outdoors together, and I would worry less about our health, and about the health of Utah's environment and plants, while doing so.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed in Salt Lake City, UT on June 12, 2023.

Deeda Seed

DECL. 021

3

## DECLARATION OF SCOTT SILBER

I, Scott Silber, hereby declare as follows:

1. I am a member of the Center for Biological Diversity, and I live in Boulder, Colorado. I have lived in the Boulder area on and off for the past 28 years. My work also takes me to Denver a few times a week. I also visit Utah a few times a year, including around the Salt Lake City area either for work or to meet up with friends for outdoor activities like skiing.

2. I understand that the areas where I spend time—Boulder and Denver, Colorado; and around Salt Lake City, Utah—are not attaining the ozone standard set in 2015. I am also aware that, in addition to the pollution coming from within Colorado and Utah, EPA data shows that some of the pollution in these areas comes from other states, such as, in the case of Colorado, from Utah.

3. I enjoy outdoor activities, but I am often unable to spend time outdoors because of poor air quality, including high ozone levels. When air quality allows, I like to go running three times a week, covering roughly 50 to 60 miles in 2 to 3 weeks, whether around my home or on trails in Boulder County's parks and open space. I also like to go biking two to three times a week, including to commute; hiking two to three times a week; and rock climbing twice a month. I enjoy spending time in and around Rocky Mountain National Park and the Brainard Lake Recreation Area. I am also part of an ultimate Frisbee team that plays in Boulder once a week from March to November.

4. I don't get to enjoy these activities or places as much as I would like to because air pollution and high ozone levels trigger my asthma symptoms. I attribute the vast majority of my asthma symptoms to poor air quality, including high ozone levels. In fact, social distancing and masking through the pandemic has shown me just how much of my

DECL. 022

symptoms are attributable to the air and not to respiratory infections. And I further understand poor air quality compounds the damage of respiratory infections like Covid, respiratory syncytial virus (RSV), and flu. Ozone pollution has made the ongoing Covid pandemic a particularly hard time for me—there are times when it isn't safe to be indoors and it isn't safe to be outdoors either. This continues to negatively affect my quality of life—I shouldn't have to sacrifice my lifespan or my long-term quality of life through cumulative damage to my health from breathing air pollution just to engage in the outdoor activities that sustain my social, psychological, emotional, and spiritual well-being.

5.  In periods where I am active outside and the ozone pollution is especially bad, I have to use my rescue inhaler every day for weeks or months at a time. Having to use my rescue inhaler so frequently means that my asthma is considered uncontrolled. In these conditions, I also have to use a preventative or corticosteroid inhaler once or twice a day. I would prefer not to have to keep an emergency stash of these and other medications, like an EpiPen or prednisone, or to replenish that stash every time the previous prescription expires. I would also like to be able to travel without the stress and worry that I might forget or lose these life-saving medications.

6.  These medications can cause severe unpleasant side effects, including but not limited light headedness, agitation, thrush, increased heart rate, and palpitations. I have had to stop what I was doing to let side effect subside, interrupting my normal activities. Some of these medications also increase the risk of other health conditions, like glaucoma. This worries me—I shouldn't have to choose between breathing and my vision.

DECL. 023

7.  These medications are expensive too. While my asthma medication is currently covered by my health insurance, I have had to pay for them out of pocket before, and the copay varies as well. I would prefer not to have to spend money on medication, and I am concerned that I may have to pay for my medication out of pocket again in the future.

8.  Many people don't realize that each asthma attack has a cumulative effect on your respiratory system. If an attack is severe enough, it can lead to scar tissue which makes the next attack riskier. I also had complications from contracting Covid-19 in March 2022. As a result, a specialist has recommended that I have an endoscopy to inspect my airway tissue.

9.  Nearly every decision I make is affected by air pollution as I try to reduce my risk of breathing difficulties. I check air quality and ozone levels several times a day using an app on my phone. I do not engage in outdoor activities where I would exert myself when the air quality is poor, or I travel farther away to spend time outdoors where the air quality is better. It is not worth it to feel the discomfort and to suffer the fear of a life-threatening asthma attack. I have made a practice of letting people in my life know where my regular running routes are, or where I will be if not on a regular route, because I know there is a chance that the next asthma attack will be the one that my current remedies can't relieve. If my airway were to close because of an asthma attack, I would only have four minutes until I would be brain dead. The prospect of my death due to an asthma attack triggered by poor air quality including high ozone levels distresses me.

10. My outdoor activities are also particularly important to me as exercise, to reduce my risk of high cholesterol and heart disease. To my knowledge, both my grandfathers and every male in my father's family born before him (who died of natural causes) has died of heart

DECL. 024

disease before the age of 50. Among the men in my family, it is customary to compare our annual cholesterol test results. I have remained the only adult member of my family who has not been prescribed statins to regulate cholesterol. I would prefer to run and exercise outdoors in natural light. But, to maintain my exercise regime despite poor air quality, including high ozone levels, I recently bought a pass to a recreation center where I can swim indoors, where the air quality is better.

11. In addition to my physical symptoms, I can often see the effects of ground level ozone pollution in the Denver and Salt Lake City metropolitan areas, in the form of haze, like a big brown cloud. I find this aesthetically displeasing.

12. Lower levels of ozone pollution where I live and spend time outdoors, such as in Colorado and Utah, would improve my health and my quality of life. I could run, hike, bike, and climb as frequently as I would like, and without triggering my asthma symptoms and damaging my long-term health. I would check my air quality apps less frequently. I would also worry less about my health, my medications, and their cost.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed in Boulder, Colorado on March 13, 2022.

_____

Scott Silber

DECL. 025